UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AIR TRANSPORT ASSOCIATION OF AMERICA, INC. d/b/a AIRLINES FOR AMERICA | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:18-cv-10651 ADB |
| MAURA HEALEY, in her official capacity as Attorney General, Commonwealth of Massachusetts, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The Massachusetts Earned Sick Time Law, Mass. Gen. L. ch. 149 § 148C, and its implementing regulations, 940 CMR 33.00 (collectively, the "Earned Sick Time Law" or the "Law"), generally require employers to provide paid sick leave to their employees at a rate of one hour of sick leave for every thirty (30) hours worked, up to a maximum of forty (40) hours per year, and generally immunize employees from any adverse employment consequences for taking such leave.  The Law makes no exception for airline flight or ground crew, or for employees covered by a collective bargaining agreement ("CBA").  Plaintiff Air Transport Association of America, Inc. ("A4A") moves for summary judgment against Maura Healey, in her capacity as Attorney General for the Commonwealth of Massachusetts ("Defendant"), seeking a declaration that the Earned Sick Time Law, as applied to flight crewmembers, (a) violates the Dormant Commerce Clause of the Constitution and (b) the Due Process Clause of the Fourteenth Amendment, and (c) as applied to flight crewmembers and ground employees, is preempted by the federal Airline Deregulation Act ("ADA").  A4A's motion should be granted.

*First*, applying the Law to A4A Member Carriers' flight crew (i.e., pilots and flight attendants) will – in light of the other state and local paid sick leave laws currently on the books

1

as well as the similar laws which could be enacted in the future – impose a significant compliance and administrative burden on A4A Member Carriers that far exceeds the Law's benefits (if any) for Massachusetts-based crewmembers.  The Dormant Commerce Clause prohibits this burden on interstate commerce – namely, the "effect [that] *would arise* if not one, but many or every, State adopted similar legislation."  *See, generally, Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (emphasis added).  Given that pilots and flight attendants cross multiple state lines on a daily basis and do not typically have a "principal" work location in the normal sense, state and municipal regulation of paid sick time for crewmembers would create "a logistical nightmare," *Hirst v. SkyWest, Inc.*, 283 F. Supp. 3d 684, 701 (N.D. Ill. 2017), and "is precisely the type of burden on interstate commerce that the [Dormant] Commerce Clause prohibits."  *Hirst v. SkyWest, Inc.*, 2016 WL 2986978, at *10 (N.D. Ill. May 24, 2016).

*Second*, and alternatively, the Law also violates the Due Process Clause of the Fourteenth Amendment to the extent it purports to apply to conduct occurring in other states (i.e., flight crew work occurring outside Massachusetts).  *Cf. BMW v. Gore*, 517 U.S. 559, 572 (1996) ("[A] State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.").

*Third,* the ADA, which preempts state laws "related to" an air carrier's "price[s], route[s], or service[s]," 49 U.S.C. § 41713(b), precludes application of the Law to A4A Member Carriers' flight crewmembers and ground employees (e.g., mechanics, ramp agents, and customer service agents).  The design and purpose of the Law creates the "potential" or "logical" effect of encouraging A4A Member Carriers' flight crew and ground employees in Massachusetts to take sick leave more often than before the enactment of the Law.  *Cf. Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 21 (1st Cir. 2014).  Indeed, the A4A Member Carriers' actual experience corroborates this effect of the Law and, as detailed in the Expert Report of Dr. Darin Lee, higher employee absences have a statistically-significant relationship with an increase in airline flight delays.  This constitutes a significant and prohibited impact on airline "services" under the ADA.

## SUMMARY OF UNDISPUTED MATERIAL FACTS[1]

A.      **A4A Member Carriers Predominantly Provide Interstate And International Transportation Services.**

A4A is a trade association which advocates on behalf of its nine (9) member airlines (collectively, the "A4A Member Carriers").[2]  A4A Member Carriers provide air transportation on an interstate and international, rather than intrastate, basis.  (SOF ¶ 2.)  This is reflected in the low number of intrastate routes offered by A4A Member Carriers and in the low number of passengers traveling on purely intrastate trips.  In the first half of 2018, for example, only 5.2% of American's routes were intrastate; the corresponding figures for Southwest and United were 5.5% and 6.5%, respectively.  (*Id.*)  JetBlue, the passenger carrier with the most flights to and from Massachusetts, operates only 2 of its 272 routes within the Commonwealth of Massachusetts, and even those two routes are offered only seasonally.  (*Id.*)  The A4A Member Carriers' route structure is shaped by consumer demand, as the vast majority of passengers who travel domestically do so on interstate itineraries.  (*See id.* ¶ 3.)  In the first half of 2018, for example, 97.7% of American's passengers traveled on interstate itineraries, compared to 96.4% for United and 88.9% for Southwest.  (*Id.*)  And all of JetBlue's intrastate non-stop flights transported at least some passengers who began or ended their journey outside Massachusetts. (*Id.* ¶ 4.)  Thus, as detailed in Dr. Lee's report, "because airlines are a network-based industry, intrastate non-stop flights are a vital component of providing ***interstate*** and international transportation to passengers."  (*Id.* ¶ 5 [emphasis in original].)

In light of the interstate and international nature of the air transportation services provided by A4A Member Carriers, their pilots and flight attendants spend the vast majority of their working time in federally (or internationally) regulated airspace – and not in any one state,

---

[1]      A4A's full Statement Of Facts Pursuant To Local Rule 56.1 ("SOF"), from which this summary is derived, is filed concurrently herewith.

[2]      The A4A Member Carriers are:  (1) Alaska Airlines, Inc. ("Alaska"); (2) American Airlines, Inc. ("American"); (3) Atlas Air, Inc.; (4) Federal Express Corp.; (5) Hawaiian Airlines, Inc.; (6) JetBlue Airways Corp. ("JetBlue"); (7) Southwest Airlines Co. ("Southwest"); (8) United Airlines, Inc. ("United"); and (9) United Parcel Service Co.  (*See* SOF ¶ 1.)

including the state where the pilot or flight attendant is "based."[3]  (SOF ¶ 6.)  Indeed, in June of 2018, JetBlue's Boston-based flight attendants spent only 17% of their working time in Massachusetts, compared with 22% in other states and 60% in federal or international airspace. (*Id.*)  Moreover, while A4A Member Carriers' ground crew employees generally spend their working time on the ground in the state where they are based, the vast majority of their time is spent servicing aircraft and passengers on interstate and international trips.  (*Id.* ¶ 8.)  In fact, only 1.4 of the 435 average daily scheduled flights from Massachusetts offered by the large U.S. passenger airlines in 2018 were wholly within Massachusetts, and only 0.05% of the passengers were traveling on a wholly intra-Massachusetts trip.  (*Id.*)

> ### B.      Nationwide Collective Bargaining Agreements Establish The Terms And Conditions Of Employment For A4A Member Carriers' Employees.

The terms and conditions of employment for virtually all A4A Member Carriers' flight crew and ground employees are set forth in CBAs negotiated pursuant to the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, the statute governing labor relations in the airline and railroad industries.  (SOF ¶ 9.)[4]  These CBAs, which typically apply to employee groups on a nationwide basis rather than at a specific site of employment, are designed to ensure uniformity and predictability in the terms and conditions of employment for an A4A Member Carrier's employees, regardless of where the employees are based or perform their work.  (*Id.*)

Flight crew and ground employees are entitled to generous, bargained-for paid sick leave benefits pursuant to these CBAs (and, in the case of JetBlue's flight attendants and ground employees, pursuant to company policy).  These provisions strike a balance between a carrier's

---

[3]      A base, also known as a "domicile," is the airport where pilots or flight attendants begin and end their work assignments (also called "trips" or "pairings").  (SOF ¶ 7.)  A flight crewmember's "base" is not necessarily in the same state as his/her residence; in fact, it is not unusual for flight crew based in one state to live in another state.  (*Id.*)  Flight crewmembers generally fill base openings via a seniority-based bidding system (*id.*), and it is not unusual for pilots and flight attendants to transfer from one base to another.  (*See, e.g., id.* (noting that some American flight attendants have requested transfer to the Boston base for the month of December to take advantage of the provisions of the Earned Sick Time Law).)

[4]      As relevant here, the only flight crew and ground employees not covered by a CBA are JetBlue's flight attendants and ground employees, and Federal Express' ground employees.

need for predictable employee attendance and regulatory compliance, and an employee's need to have time off for legitimate illness or injury.  (SOF ¶ 10.)  These bargained-for sick leave accrual and carryover provisions are generally quite employee-friendly relative to other large employers in the United States.  (*Id.* ¶ 11.)  When employees use sick leave, they are paid at their regular rate of pay.  (*Id.* ¶ 12.)

Employees are not automatically required to provide medical verification of their need for sick leave, but carriers generally have the right to request a doctor's note if they believe sick leave was used for other than a legitimate reason.  (SOF ¶ 13.)  Moreover, to maintain appropriate staffing levels and deter sick leave abuse, carriers also generally have attendance policies in place for flight crews and ground employees, pursuant to which "points" are assessed for various events such as excessive sick leave usage, missed trips, or missing a meeting or training – and relatively more points are assessed for attendance events which are relatively more disruptive to airline operations (e.g., missing work with little or no advance notice).  (*Id.* ¶ 14.) These "points" generally factor into a carrier's progressive discipline policy, usually starting with a series of warnings and progressing up to and including, in rare cases, termination.  (*Id.*)

### C.  Adverse Operational Impact Of Employee Sick Leave Call-Outs.

The safety and efficiency of A4A Member Carriers' operations, as well as their ability to comply with federal regulations, depend on consistent attendance by their employees.  As discussed below, A4A Member Carriers and the traveling public experience significant negative consequences when sick leave use increases among flight crews and ground employees.

#### 1.  Flight Crew.

When sick leave use or other absences increase among pilots and flight attendants, especially on short notice, carriers inevitably experience increased flight delays and cancellations.  (SOF ¶ 15.)  This is primarily because A4A Member Carriers are required by federal law to have a minimum number of flight crewmembers aboard every flight before it can take off.  (*Id.*)  When it comes to pilots and flight attendants, unlike other occupations, the remaining employees cannot "cover" for an absent colleague.

To account for the reality that some percentage of pilots and flight attendants will become sick and unable to perform their duties, A4A Member Carriers employ a cadre of pilots and flight attendants on a reserve basis, meaning they are "on-call" to report for duty on certain days each month.  (SOF ¶ 16.)  While these reserve pools somewhat ameliorate the problems caused by sick leave call-outs and other unanticipated employee absences, they do not fully resolve them.  Assuming the reserve pool is not already completely depleted (because the reserves themselves have called out sick, been given flight assignments, or otherwise), reserve crewmembers are not necessarily on "standby" at the airport where a service disruption is occurring, and are usually given a few hours to report for duty.  (SOF ¶ 17.)  In some cases, a reserve crewmember may even need to fly from another city to the relevant location.  (*Id.*)  Thus, even with a robust pool of reserve crewmembers, short-notice sick call-outs and call-outs in high volumes often lead to flight delays and cancellations.  Moreover, because of the inter-connected nature of the A4A Member Carriers' route networks, a single delay or cancellation can ripple throughout an airline's network for several days, and may even spill over to other carriers, such as when a passenger is making a connection with a carrier's regional partner.  (*Id.* ¶ 18.)

Dr. Lee's report addresses the empirical relationship between flight crew sick leave usage and flight delays, and the associated disruption to the traveling public.  Dr. Lee analyzed years of data for Alaska, American, JetBlue, Southwest, United, and Virgin America (now merged with Alaska), and found that, on average, flight delays are markedly more prevalent on days where flight attendant sick leave use is high relative to each airline's normal level of absences (SOF ¶ 18); and, after performing a regression analysis to account for the effect of other possible causes of delay (e.g., weather), Dr. Lee found there was a statistically-significant relationship between flight attendant sick leave use and airline flight delays.  (*Id.*)

###    2.    Ground Employees.

Increased absences among ground employees can also cause flight delays and cancellations.  Mechanics, for example, may need to be available to address both routine and emergent mechanical issues before an airplane can take off on its next scheduled flight.  (SOF

¶ 19.)  If a carrier experiences an unexpectedly-high rate of mechanic absences, it may experience an increase in flight delays – as aircraft might have to hold at the gate until a mechanic can be located to perform necessary maintenance.  (*Id.*)  Likewise, when customer service agents or ramp employees call out sick in high numbers, a carrier's ability to check-in passengers and load and unload baggage can be significantly hindered.  (*Id.*)  These baggage issues can result in flight delays.  For example, if an insufficient number of ramp agents is available to load bags onto an outbound aircraft, the plane will hold at the gate until loading is completed.  (*Id.*)

Carriers tend to make up for gaps in service caused by ground crew sick leave call-outs by offering, and in some cases mandating, overtime.  (SOF ¶ 20.)  However, this comes with adverse consequences.  Using overtime significantly increases an airline's operating costs at a given location, because overtime must be paid at a premium rate (on top of the straight-time pay received by the absent employee).  (*Id.*)  And mandating overtime causes serious morale problems.  (*Id.*)  Moreover, airlines cannot simply hire more employees to avoid these problems, as sick leave use is spread throughout the entire employee population – including newly-hired employees.  (*Id.*)

> **D.   The Massachusetts Earned Sick Time Law.**

The Massachusetts Earned Sick Time Law requires every employer with eleven (11) or more employees in Massachusetts to provide paid sick leave to employees at a rate of one (1) hour of sick leave for every thirty (30) hours worked, up to a maximum of forty (40) hours per year.  Mass. Gen. L. ch. 149, § 148C(d)(1), (4).  The Law does not exempt airline flight crew or ground employees, or employees covered by a CBA.  Under the implementing regulations, the Law applies to an employee "if the employee's primary place of work is in Massachusetts regardless of the location of the employer."  940 CMR 33.03(1).  Defendant's Frequently Asked Questions ("FAQ") state further that if an employee spends time outside Massachusetts "but returns regularly to a Massachusetts base of operations before resuming a new travel schedule, Massachusetts is the primary place of work."  MA Attorney General's Office, *Earned Sick Time*

*in Massachusetts Frequently Asked Questions*, ("FAQ") at 3, *available at* http://www.mass.gov/ago/docs/workplace/earned-sick-time/est-faqs.pdf, at 3 (accessed Nov. 29, 2018). This FAQ encompasses American's, JetBlue's and United's Boston-based flight attendants, as well as JetBlue's Boston-based pilots.

Under the Law, employees begin to accrue sick leave on their date of hire and may begin using accrued sick leave on their 90th day of employment. 940 CMR 33.03(29). Employees may use up to forty (40) hours of paid sick time per year, and can carry over forty (40) hours of unused sick time each year. Mass. Gen. L. ch. 149, § 148C(d)(4), (7). Employers may only require written documentation of an (adult) employee's absence if the sick time: (i) exceeds 24 consecutively-scheduled work hours; (ii) exceeds three (3) consecutive days on which the employee was scheduled to work; (iii) occurs within two (2) weeks prior to an employee's final scheduled day of work before termination of employment; or (iv) occurs after four (4) unforeseeable and undocumented absences in a three (3)-month period. *Id.* 33.06(1)(a)-(e). The Law further provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under or in connection with [the Law], including, but not limited to, by using the taking of earned sick time under [the Law] as a negative factor in an employment action such as evaluation, promotion, disciplinary action or termination, or otherwise subjecting an employee to discipline for the use of earned sick time under [the Law]." Mass. Gen. L. ch. 149, § 148C(h).

## ARGUMENT

### I.  THE DORMANT COMMERCE CLAUSE BARS APPLICATION OF THE MASSACHUSETTS EARNED SICK TIME LAW TO A4A MEMBER CARRIERS' FLIGHT CREW.

The Dormant Commerce Clause is the "negative implication" of the United States Constitution's affirmative grant of legislative power to Congress to "regulate Commerce with foreign Nations, and among the several States." *See* U.S. Const. Art. I, § 8, cl. 3; *see also Dennis v. Higgins*, 498 U.S. 439, 447 (1991). "The central rationale of this dormant Commerce Clause doctrine, as the Supreme Court has explained, is . . . to foster economic integration and prevent

local interference with the flow of the nation's commerce." *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 8 (1st Cir. 1992).  In industries where national uniformity is critical, state regulations are especially vulnerable to a Dormant Commerce Clause challenge – because relatively slight obstacles can become significant burdens when nationwide transportation is in jeopardy.  *See Kassel v. Consol. Freightways Corp.*, 450 U.S. 662 (1981) (regulating length of trucks); *Morgan v. Virginia*, 328 U.S. 373, 386 (1946) (regulating bus seating).  Not surprisingly, this is particularly true in the airline industry.  *See Hirst v. SkyWest, Inc.*, 2016 WL 2986978, at *10 (N.D. Ill. May 24, 2016) (*Hirst I*); *see also Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 302 (1944) (Jackson, J., concurring) ("Any authorization of local burdens on our national air commerce will lead to their multiplication in this country.").

Where, as here, the state law at issue is not facially discriminatory and has only indirect effects vis-à-vis interstate commerce, the law is invalid if it places an undue burden on interstate commerce.  *See Pike v. Bruch Church, Inc.*, 397 U.S. 137, 142 (1970).  The test for determining whether a state law creates such an "undue burden" is whether the law's burden on interstate commerce clearly exceeds its local benefits.  *Id.*; *see also Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 529 (1959) (invalidating an Illinois statute that required trucks within the state to use a certain type of mudguard, because the law would require trucks to stop at the state border to change their mudguards); *Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 45 (D. Mass. 2002) ("courts use a 'burden versus benefit' balancing test to determine the constitutionality of state laws that incidentally affect interstate commerce").

A.      **The Massachusetts Earned Sick Time Law, Combined With Other Similar Laws, Imposes A Significant Burden On A4A Member Carriers Vis-à-Vis Their Flight Crew.**

Under the Dormant Commerce Clause, the relevant inquiry is "what effect ***would arise*** if not one, but many or every, State adopted similar legislation."  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (emphasis added); *see also Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 82 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003) (court must determine "the consequence of other states passing

similar statutes"). "[T]he threat of inconsistent regulation, not inconsistent regulation in fact, is enough" to implicate the Dormant Commerce Clause. *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 834 (7th Cir. 2017). This means that, even if a carrier has not yet attempted to comply with a particular state or municipality's paid sick leave law, the carrier can still mount a successful Dormant Commerce Clause challenge by showing the burden of compliance with current and future similar laws.

In *Hirst v. SkyWest, Inc.*, an airline's Chicago-based flight attendants claimed their employer's practice of compensating them for "block time hours" worked after the airplane's cabin door was closed, rather than paying them based on the total number of hours worked in a given day, violated the Illinois Minimum Wage Law ("IMWL"). *See Hirst I*, 2016 WL 2986978, at *1. Despite the fact the flight attendants were all based in Illinois and the IMWL would only apply to their hours worked in Illinois, the court held that the Dormant Commerce Clause barred their state-law claims. *Id.* at *11. The court explained that,

> [I]f the IMWL were applicable to [the airline's flight attendants], then every state's comparable laws would also apply, subjecting [the airline] to 50 or more regulations depending where each FA [i.e., flight attendant] was physically located at a particular moment in time. Requiring compliance with the IMWL would not be a simple matter of setting an FA's minimum wage at the statutory amount in the state in which she is based; it would impose a labyrinth of potentially conflicting wage laws upon FAs based out of different states and cities, working on the same flights, literally moving through interstate commerce on a daily basis. ***This is precisely the type of burden on interstate commerce that the [Dormant] Commerce Clause prohibits.***

*Id.* at *10 (footnote omitted) (emphasis added).

The *Hirst* court reaffirmed its holding a year later in *Hirst II*, when it dismissed amended complaints seeking to invoke the minimum wage law of each state where the airline maintained a flight attendant base. The court rejected the flight attendants' argument that compliance with the state minimum wage laws would not be burdensome because only one state's law would be involved for each flight attendant (namely, the law of the state where a given flight attendant was based), noting that "[s]ome wage ordinances, for example, may apply to all hours worked by an employee who is employed within a state, even if some hours are worked out of state; others

10

apply only to employees who work predominantly in one state for hours they work in that state, while still others apply to all hours worked by an employee in a state, even if the employee predominantly works or is employed elsewhere."  283 F. Supp. 3d 684, 698 (N.D. Ill. 2017) ("*Hirst II*").[5]  Thus, as the court explained, the burden on an airline "is more substantial than merely complying with the wage laws of the state where each FA [i.e., flight attendant] is ***based***," as an airline "would be forced to contend with the wage laws of each state in which an FA ***works*."  *Id.* at 699 (emphasis in original) (footnotes omitted).  And, "because FAs routinely work in multiple states (and cities) on any given day, and in different combinations of states and cities for any given assignment, the compliance burdens that would be imposed on [the airline] to pay its FAs in accordance with the applicable laws of all of the states and cities in which they performed work would be ***monumental*."  (*Id.*) (emphasis added).

Similarly, in *Ward v. United Airlines, Inc.*, 2016 WL 3906077, at \*5 (N.D. Cal. July 19, 2016), the court held that California's wage-statement statute violated the Dormant Commerce Clause because the compliance burden on the airline-employer, with respect to pilots who principally worked in California, outweighed any local benefits from the statute.  In so ruling, the court emphasized "the administrative burden of complying with the patchwork of state wage-statement statutes and regulations," and reasoned that if the California wage-statement statute were applicable, the airline "could be required to give an individual pilot a different form of wage statement in each bid period, depending on whether that pilot worked principally in California or some other state."  *Id.*

As in *Hirst* and *Ward*, it would be exceptionally burdensome for the A4A Member Carriers to comply with the Massachusetts Earned Sick Time Law, and all other state and local paid sick leave laws, with respect to their pilots and flight attendants.  Even though the Law purports to apply only to flight crews based in Massachusetts, all hours worked by such

---

[5]     The court in *Hirst* was referring to Washington, Illinois and California law.  The Massachusetts Earned Sick Time Law falls in the same category as Washington's minimum wage law, which is the first category.  *See* 940 CMR 33.03(2).

employees – no matter the location – would be included in the calculation of sick leave accrual under the Law.  *See* 940 CMR 33.03(2).  As the *Hirst* court explained, there is no reason "why any state would not, at a minimum, take the position that its labor laws apply to its residents performing work within its borders," and that "[an airline] cannot assume that the wage laws of 42 other states do not apply merely because it complies with the laws of the state in which its [flight attendants] are based."  *Hirst II*, 283 F. Supp. 3d at 700.  That multiple states may well seek to apply their local laws to the same flight crew, and the same work activity, is a very real possibility for A4A Member Carriers, given that:  (i) it is not unusual for flight crew based in one state to live in a different state (SOF ¶ 7); and (ii) flight crew work assignments routinely entail performing work on the ground and in the sky above multiple states and localities.  (SOF ¶ 6.)

To calculate a flight crewmember's sick leave accrual, an airline would first have to determine the amount of time each of its thousands of pilots and flight attendants spent working in each of the fifty (50) states.  Because of the potentially-overlapping coverage of state and local paid sick leave laws (some of which may be triggered by the location of an employee's residence or "base," some of which may be triggered by where an employee's work is performed, and some of which may be triggered by the location of the employer's headquarters), the airline would then have to predict which states' sick leave laws might be applicable to each of its pilots and flight attendants.  This would require the airline to analyze myriad factors, as noted, and then the airline would have to credit each pilot and flight attendant with different sick leave accruals according to the accrual rates and maximum accrual "banks" under each of the potentially-applicable state and local laws.  *Cf. Hirst II*, 283 F. Supp. 3d at 698 (noting the complications caused by the fact that different states use different approaches for calculating the minimum wage).  This would be an enormous undertaking for A4A Member Carriers, given that:  (i) the overwhelming majority of flight assignments routinely involve work on the ground and in the air over multiple jurisdictions; (ii) flight crew assignments change from day-to-day within the course of the month; and (iii) the flight path between the same two points (e.g., Boston-Seattle) can vary significantly from day-to-day.  *Hirst II* addressed this, too, acknowledging that

"[b]ecause [a flight attendant's] pairings often shift from week to week, and involve multiple jurisdictions each day, [the airline] would have to comply with a different patchwork of wage laws for the same employee virtually every day."  283 F. Supp. 3d at 699; *see also Ward*, 2016 WL 3906077, at *5 (same); SOF ¶ 6 (discussing variations in flight paths between same city-pair).

Matters only get more complicated when a flight crewmember asks to take leave.  The laws in the various jurisdictions entitle employees to take leave for different reasons; some are limited to medical concerns – but other laws create leave entitlements for additional causes, such as to make arrangements necessitated by the death of a family member (*see* Or. Rev. Stat. § 653.616(3)), or to travel with a family member to an appointment related to their long-term care (*see* Vt. Stat. Ann. tit. 21, § 483(a)(3)).  And, not surprisingly, the laws also vary in terms of requirements for advance notification of the need for sick leave as well as when and under what circumstances an employer can request verification of the employee's illness or other reason for leave.  *Compare* 940 CMR 33.06 (Massachusetts; employer may request documentation where employee has been absent for three consecutive work days), *with* Md. Code. Ann., Lab. & Empl. § 3-1305(g)(i) (Maryland; employer may request documentation where employee has been absent for two consecutive scheduled shifts); *compare* Wash. Rev. Code § 296-128-650 (if need for paid sick leave is foreseeable, employer may require at least ten days advance notice from the employee); 940 CMR 33.065 ("For foreseeable or pre-scheduled use of earned sick time, the employer may have a written policy requiring up to seven days' notice . . . .").

The multifarious, idiosyncratic, and often-inconsistent provisions of the state and local sick time laws currently in effect throughout the United States confirm what the *Hirst* court said about the application of state and local wage laws to an airline's flight attendants:  "This isn't a logistical conundrum; it's a ***logistical nightmare***."  *Hirst II*, 283 F. Supp. 3d at 701 (emphasis added).

**B.** **The Benefits Of The Massachusetts Earned Sick Time Law Do Not Exceed The Burdens Of Compliance On A4A Member Carriers.**

In *Hirst*, the court concluded that the benefits provided by the state minimum wage laws there at issue – acknowledged to be "weighty state interests in protecting workers and providing a living wage" – were insufficient to justify the administrative and compliance burden imposed on the airline. *Hirst II*, 283 F. Supp. 3d at 699; *see also Ward*, 2016 WL 3906077, at *5 (same conclusion as to state wage-payment statutes). The "burden versus benefit" calculus (*see Stone*, 256 F. Supp. 2d at 45) is even more lopsided in the present case, because the A4A Member Carriers already provide, in their CBAs and employment policies, far more generous paid sick leave benefits for their Massachusetts-based pilots and flight attendants than is required by the Massachusetts Earned Sick Time Law.

The Law provides for accrual of sick leave at the rate of one (1) hour of sick leave for every thirty (30) hours worked with a maximum "bank" of forty (40) hours. *See* Mass. Gen. L. ch. 149, § 148C(d)(1), (4). The A4A Member Carriers, in contrast, provide the following approximate sick leave accruals for their Massachusetts-based flight crewmembers: for American's flight attendants, one (1) hour of sick leave for every sixteen (16) hours worked; for United's flight attendants, one (1) hour of sick leave for every eighteen (18) hours worked; for JetBlue's flight attendants, eight (8) hours of paid time off ("PTO"), which can be used for illness, for each month of work; and for JetBlue's pilots, one (1) hour of PTO for every four (4) - six (6) hours worked. (*See* SOF ¶ 11.)[6] The comparison between the maximum sick leave "bank" under the Law and the A4A Members Carriers is even more telling: 40 hours vs. 1,500 hours (American's flight attendants); 1,250 hours (United's flight attendants); 216-288 hours (JetBlue's flight attendants); and 510 hours (JetBlue's pilots). (*Id.*)

Furthermore, because of the unique nature of the airline industry, carriers and the unions

---

[6]    Pilots and flight attendants generally accrue sick leave on the basis of X hours of sick leave per month, whereas the Law provides for accrual based on one (1) hour of sick leave per thirty (30) hours of work. In order to make an "apples-to-apples" comparison, the figures in the text represent the airlines' per-month accruals divided by the work hours in a month (as measured by each airline's minimum monthly guarantee). (See SOF ¶ 11 & n. 1.)

representing their flight crewmembers have – through negotiated CBA provisions – established a framework which ensures uniform paid sick leave provisions among the relevant employee group, while also balancing the carriers' needs to comply with federal regulations mandating minimum flight crew staffing and to minimize operational disruption to the traveling public. (SOF ¶ 10.)  Given that the carriers and unions have already struck a balance, the marginal benefit provided by the Massachusetts Earned Sick Time Law (i.e., providing a greater level of protection for taking sick leave, but providing far less overall paid sick leave) does not outweigh the "monumental" burden imposed on carriers from complying with the Law and other state and local sick leave laws.  *Cf. Hirst II*, 283 F. Supp. 3d at 699.

**II.     THE MASSACHUSETTS EARNED SICK TIME LAW VIOLATES THE DUE PROCESS CLAUSE TO THE EXTENT IT PURPORTS TO APPLY EXTRATERRITORIALLY TO WORK PERFORMED BY A4A MEMBER CARRIERS' FLIGHT CREW.**

Under the Due Process Clause of the Fourteenth Amendment, a state (or municipality) cannot regulate and control activities beyond its boundaries when the state has only insignificant contacts with the parties, occurrences or transactions at issue.  *See, e.g., Watson v. Emp'rs Liab. Assurance Corp.*, 348 U.S. 66, 70-71 (1954).

The Massachusetts Earned Sick Time Law applies to employees whose "primary place of work is in Massachusetts *regardless of the location of the employer*."  940 CMR 33.03(1) (emphasis added).  However, "[a]n employee need not spend 50% or more time working in Massachusetts" for Massachusetts to be the employee's primary place of work.  *Id.* Massachusetts applies a plurality test instead.  *See* FAQ at 3.  If, for example, a flight crewmember works 20% in Massachusetts, 20% in some other state, and 10% in six other states, Massachusetts is the primary place of work under the Law.  The Law, moreover, provides that "all hours the employee works must be applied toward accrual of earned sick time *regardless of the location of the work* and regardless of the location of the employer." 940 CMR 33.30 (emphasis added).

But Massachusetts cannot, consistent with the Fourteenth Amendment, regulate conduct occurring outside its borders in this way. *BMW v. Gore*, 517 U.S. 559 (1996), is instructive on this point. There, BMW had a nationwide policy regarding vehicles damaged in the course of manufacturing or transportation. If the cost of repair did not exceed 3% of the car's retail price, BMW performed the repairs and sold the car as new without telling the dealer repairs had been made. BMW's policy violated Alabama's disclosure laws. An Alabama jury awarded $4 million in punitive damages, based on BMW's vehicle sales nationwide, including in 25 states where BMW's policy was lawful. The Supreme Court held the punitive damages award violated the Fourteenth Amendment, reasoning that:

> [W]hile we do not doubt that Congress has ample authority to enact such a policy for the entire Nation, it is clear that no single State could do so, or even impose its own policy choice on neighboring States. *See Bonaparte v. Tax Court*, 104 U.S. 592, 594, 26 L.Ed. 845 (1881) ("No State can legislate except with reference to its own jurisdiction . . . . Each State is independent of all the others in this particular."). Similarly, one State's power to impose burdens on the interstate market for automobiles is . . . is also constrained by the need to respect the interests of other States, *see, e.g., Healy v. Beer Institute*, 491 U.S. 324, 335-336, 109 S.Ct. 2491, 2498-2499, 105 L.Ed.2d 275 (1989) (the Constitution has a "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres") (footnote omitted).
>
> We think it follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.

517 U.S. at 571-72.[7]

Similarly here, an A4A Member Carrier's flight crewmember may be "based" in Massachusetts in the sense that the employee's work assignments (i.e., "pairings") start and end there, but the employee may perform more than 80% of his/her work outside the state. (*See* SOF

---

[7]     *See also see also Bigelow v. Virginia*, 421 U.S. 809, 824 (1975) ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State."); *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends. This is so obviously the necessary result of the Constitution that it has rarely been called in question and hence authorities directly dealing with it do not abound.").

¶ 6 [noting that JetBlue's Boston-based flight attendants spent only 17% of their working time in Massachusetts].)  Yet the Massachusetts Earned Sick Time Law would apply to all hours worked, even if the employee did not reside in Massachusetts and the airline was not headquartered there.  In effect, Massachusetts is attempting to create a nationally-applicable paid sick leave law through the guise of a local one.  That, the Fourteenth Amendment prohibits. *BMW*, 517 U.S. at 572.

### III.    The Massachusetts Earned Sick Time Law, As Applied To A4A Member Carriers' Flight Crew And Ground Employees, Is Related To Airline "Prices, Routes, Or Services," And Is Therefore Preempted By The Airline Deregulation Act.

Congress enacted the ADA in 1978 to eliminate federal regulation of airline rates, routes, and services in order to allow those aspects of air transportation to be set by market forces.  *See* 49 U.S.C. § 40101(a)(6), (a)(12)(A); *Northwest, Inc. v. Ginsberg*, 134 S.Ct. 1422, 1430 (2014). To ensure states would not undo this deregulation with regulation of their own, the ADA includes a broad preemption clause prohibiting states or their political subdivisions from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of an air carrier* . . . ."  49 U.S.C. § 41713(b)(1) (emphasis added).

When determining whether the ADA preempts a state law, "the *effect* of a state law, regulation, or provision" is what matters, "not its form."  *Northwest, Inc.*, 134 S. Ct. at 1430 (emphasis added).  Thus, the ADA may preempt laws which do not specifically regulate the airline industry and only indirectly affect airline prices, routes or services.  *See, e.g., id.* at 1430-1431*; Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 385-386 (1992); *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 20 (1st Cir. 2014) (same analysis under identical federal preemption provision governing trucking industry).[8]  Under First Circuit law, a statute's "potential" or "logical" effect on a carrier's prices, routes, or services can trigger ADA

---

[8]      *Coakley* involved the Federal Aviation Administration Authorization Act ("FAAAA"), 49 U.S.C. § 14501(c)(1), which preempts state laws "related to a price, route, or service of any motor carrier . . . ." The courts interpret the ADA and FAAAA preemption provisions coextensively.  *See Coakley*, 769 F.3d at 17-18.

preemption:

> [A] statute's "potential" impact on carriers' prices, routes, and services can be sufficient if it is significant, rather than tenuous, remote, or peripheral.  We have previously rejected the contention that empirical evidence is necessary to warrant [] preemption, and allowed courts to "look[] to the logical effect that a particular scheme has on the delivery of services or the setting of rates.

*Coakley*, 769 F.3d at 21 (quoting *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 82 n.14

(1st Cir. 2006), *aff'd on other grounds sub nom. Rowe v. N.H. Motor Transp. Ass'n*,

552 U.S. 364 (2008)).

Here, by guaranteeing that at least some amount of sick time will be paid at the

employee's regular rate, and that an employee generally will not suffer adverse employment

consequences for taking sick leave (notwithstanding bargained-for and long-standing attendance

"points" systems), the Massachusetts Earned Sick Time Law has the "potential" or "logical"

effect of allowing flight and ground crew in Massachusetts to take sick leave more often than

was previously the case.  That is the manifest design of the Law.

The logical relationship between the Law (and similar paid sick leave laws) and an

increase in employee absences is corroborated by A4A Member Carriers' actual experience in

Boston – where both Southwest and United have seen an increase in ground employee absences

since implementing the provisions of the Law (SOF ¶ 22 [Southwest]; *id.* [United; noting

employees in Boston refer to sick leave as "Mass Cash"]); and American has experienced an

increase in sick leave by Boston-based flight attendants (*id.* ¶¶ 7 & 24 [also noting some flight

attendants have requested transfers to Boston for the month of December, to take advantage of

the Law]).  A4A Member Carriers' experience with similar paid sick leave laws is also in accord:

after implementing the Los Angeles Sick Leave Law, sick leave usage by American's ground

employees at LAX increased over the next two years, from 2.5% to 3.1% for fleet service agents

and from 3.3% to 4.6% for passenger service agents (*id.* ¶ 23); after Virgin America

implemented the New York City Earned Sick Time Act, JFK-based flight attendants began using

sick leave at increasingly greater rates than flight attendants based at other airports and, by 2017,

the flight attendant sick rate at JFK was twice the average rate at SFO and LAX (*id.* ¶ 25).

In other industries, an increase in employee absences might not create a significant problem but, in the airline industry, an increase in employee absences has a significant impact. Dr. Lee analyzed years of data for Alaska, American, JetBlue, Southwest, United, and Virgin America, and concluded flight delays (measured as 15 or more minutes late) are on average markedly more common on days where flight attendant sick leave use is high.  (SOF ¶ 18; *see also id.* ¶ 24 [similar anecdotal evidence for American flight attendants]; *id.* ¶ 15 [same for United flight attendants].)  And, even accounting for the effect of other possible causes for delay, there is a statistically-significant relationship between flight attendant sick leave use and airline flight delays.[9]  (SOF ¶ 18.)  "Given that the A4A passenger carriers collectively operate 10,731 mainline flights per day with an average of 130 passengers per flight, even a relatively small (i.e., one percentage point) increase in delays will delay thousands of passengers each day."  (*Id.*)  There can be no doubt that flight delays (and cancellations) implicate "services" within the meaning of the ADA's preemption provision – transportation of passengers and cargo by air is indisputably a core airline function.

Additionally, a shortage of ground employees can adversely impact carriers' ability to provide baggage services.  For example, the "drop time" (time to unload bags from an aircraft and to load them on the belt to baggage claim) may increase, causing longer waits for passengers at baggage claim.  (SOF ¶ 19.)  It is well-established that baggage-handling is one of an airline's "services" under the ADA's preemption provision.  In *DiFiore v. American Airlines, Inc.*, 646 F.3d 81 (1st Cir. 2011), the First Circuit held the ADA preempted a claim by skycaps under the Massachusetts tip law and, in so holding, ruled that an airline's "conduct in arranging for transportation of bags at curbside into the airline terminal en route to the loading facilities is itself a part of the 'service' referred to in the federal statute."  *Id.* at 87; *see also Mitchell v. US Airways, Inc.*, 858 F. Supp. 2d 137, 158 (D. Mass. 2012), *aff'd sub nom. Brown v. United*

---

[9]     A4A Member Carriers' experience with ground employees in Boston is to the same effect.  (*See* (SOF ¶ 19 [explaining how high sick leave call-outs among ramp agents in Boston can cause flight delays].)

*Airlines, Inc.*, 720 F.3d 60 (1st Cir. 2013) (following *DiFiore* and holding that ADA preempted tip law claim); *Angeles v. US Airways, Inc.*, 2013 WL 622032, at *9 (N.D. Cal. Feb. 19, 2013) (ADA preempted California meal and rest break claim by ramp agents; "[i]t is easy to imagine a situation in which a [ramp agent] must, by law, be relieved of duty, but doing so would prevent an aircraft from being fueled or serviced, or cargo from being unloaded such that it would impact the schedule of the point-to-point transportation of passengers or cargo.").

An increase in employee absences could also impact airline prices and routes. Because airlines must respond to increases in employee absences by either hiring more employees (e.g., reserve pilots and flight attendants) or by paying overtime at a premium rate (such as for ground employees), the A4A Member Carriers' operating costs in Boston will increase, which might result in higher fares. (SOF ¶ 21.) And, whether or not A4A Member Carriers can pass through 100% of the increased costs attributable to the Law, this idiosyncratic element of operating costs in Boston may distort airline decisions about where to fly and how often. (*Id.*) Virgin America's experience provides a telling real-world example. After implementing the New York City Earned Sick Time Act, Virgin America experienced an increase in average sick leave use for flight attendants from 8.7 days/year to 17.3 days/year. (SOF ¶ 25.) That resulted in a statistically-significant spike in flight cancellations and delays attributable to cabin crew shortages. (*Id.*) These absences, and corresponding flight delays and cancellations, significantly increased Virgin America's operating costs at JFK, and were a major factor in the airline's decision to close its JFK flight attendant base. Closing that base negatively impacted Virgin America's ability to offer direct flights to and from JFK. (*Id.*)

Because the Massachusetts Earned Sick Time Law tends to increase flight and ground crew absences, and because those absences will directly and indirectly affect airline prices, routes, and services, the ADA preempts the application of the Law to these employees.

## CONCLUSION

For the foregoing reasons, A4A respectfully requests that the Court grant its Motion for Summary Judgment.

Dated:  November 30, 2018

AIR TRANSPORT ASSOCIATION OF
AMERICA, INC. d/b/a AIRLINES FOR
AMERICA,
By its attorneys,

*/s/ Chris A. Hollinger*
O'Melveny & Myers LLP
Chris A. Hollinger, (*pro hac vice*, CA Bar No.
147637)
   E-Mail:  chollinger@omm.com
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Tel:  (415) 984-8700

Robert A. Siegel, (*pro hac vice*, CA Bar No.
65605)
   E-Mail:  rsiegel@omm.com
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Tel:  (213) 430-6005

*/s/ John-Hodges-Howell*
Davis Wright Tremaine LLP
Harry J. F. Korrell, (*pro hac vice*, WA Bar No.
23173)
   E-Mail:  harrykorrell@dwt.com
Rebecca Francis (pro hac vice, WA Bar No.
41196)
   E-Mail:  RebeccaFrancis@dwt.com
John Hodges-Howell, (*pro hac vice,* WA Bar No.
42151)
   E-Mail:  jhodgeshowell@dwt.com
920 Fifth Avenue, Suite 3300
Seattle, WA 98104
Telephone: (206) 622-3150

*/s/  David P. Mason*
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
David P. Mason, BBO No. 663028
   E-Mail:  david.mason@ogletree.com
One Boston Place, Suite 3500
Boston, MA 02108
Tel:  (617) 994-5700

## CERTIFICATE OF SERVICE

I certify that on November 30, 2018, a true copy of the above document was served through the Court's CM/ECF electronic filing system upon counsel for Defendant.

*/s/ David P. Mason*
   David P. Mason