UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AIR TRANSPORT ASSOCIATION OF AMERICA, INC. d/b/a AIRLINES FOR AMERICA | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-10651 ADB |
| | ) | |
| MAURA HEALEY, in her official capacity as Attorney General, Commonwealth of Massachusetts, | ) ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>DEFENDANT'S MEMORANDUM OF LAW<br>IN OPPOSITION TO<br>PLAINTIFF'S MOTION FOR SUMMARY</u>**

**DRAFT #2**

**TABLE OF CONTENTS**

**Page**

ARGUMENT ........................................................................................................... 3

I.    WHEN THE CORRECT LEGAL STANDARD IS APPLIED TO THE
RELEVANT FACTS, IT IS CLEAR THE ATTORNEY GENERAL IS
NOT ENTITLED TO SUMMARY JUDGMENT ON A4A'S DORMANT
COMMERCE CLAUSE CLAIM. ................................................................. 3

    A.    The *Pike* Balancing Test Is The Controlling Legal Standard. ................... 3

    B.    The ESTL's Prohibition On Airline No-Fault Attendance Policies,
And Restrictions On Requiring Verification Of Illness, Fail The
*Pike* Balancing Test. .................................................................................. 6

        1.    Applying The ESTL To Airline Flight Crews Will Impose
Substantial Burdens On Interstate Commerce. .............................. 6

            a.    Compliance Will Cause Flight Delays And
Cancellations. ................................................................... 7

            b.    Compliance With A Patchwork Of Different State
And Local Laws Would Be Extremely Burdensome. ......... 9

        2.    The Burdens Imposed On A4A's Member Carriers Clearly
Exceed The Local Benefits Of The Challenged Provisions
Of The ESTL.................................................................................. 12

II.    WHEN THE CORRECT LEGAL STANDARD IS APPLIED TO THE
RELEVANT FACTS, IT IS CLEAR THE ATTORNEY GENERAL IS
NOT ENTITLED TO SUMMARY JUDGMENT ON A4A'S AIRLINE
DEREGULATION ACT PREEMPTION CLAIM. .......................................... 14

    A.    The Airline Deregulation Act Preemption Clause Applies Equally
To State Employment Laws As Any Other State Laws Which Have
A Significant Impact On Airline Prices, Routes Or Services. ................. 14

    B.    The ESTL Has A Significant Impact On The Prices, Routes And
Services Of A4A's Member Carriers........................................................ 16

CONCLUSION....................................................................................................... 21

Defendant Maura Healey (the "Attorney General") tries leading this Court down a dark path where, without the alleged benefits of the Massachusetts Earned Sick Time Law ("ESTL"), plaintiff Air Transport Association of America, Inc.'s ("A4A's") member airlines deprive employees of paid sick leave and force them to go to work sick.  But that path does not exist. For decades, long before the ESTL was enacted, airlines provided extremely generous paid sick leave benefits pursuant to collective bargaining agreements with the unions representing their employees.  While some airlines provided flight attendants four hours of sick leave each month, and others one hour for every 16 hours worked (SOF ¶ 12), ESTL requires employees to work 30 hours before they accrue just one hour of leave.  Employers can prohibit employees from using more than 40 ESTL leave hours each year, whereas flight attendants at some airlines can accrue and use *more than 30 times that amount* to care for themselves or family members.  (SOF ¶ 13.) Ground crew employees, such as mechanics, are often accruing up to eight hours of sick leave each month with maximum accruals at 1,600 hours – *40 times the ESTL maximum*.  (SOF ¶¶ 14-15.)  And although the Attorney General would have this Court believe that every time an employee uses sick leave, he may be disciplined, that is not true either.  Employees can often take weeks of paid sick leave without any discipline at all.  (*See* SOF ¶¶ 38, 44.)  On top of all that, when hit with COVID, many carriers offered employees two-weeks of paid quarantine leave, with no questions asked and no possibility of discipline, even though they were not required to do so by the Families First Coronavirus Response Act – benefits so generous that unions commended them.  (SOF ¶¶ 28-29.)

On the other side of the coin, and in the words of the Attorney General's own expert, abuse of paid sick leave is "endemic."  (SOF ¶ 76.)  A4A's expert witness, Dr. Darin Lee, has demonstrated beyond any reasonable doubt that some airline employees, flight crewmembers in

particular, do in fact take employer-provided paid sick leave when they are not sick.  There is simply no other explanation which can be posited with a straight face given the chronic spikes in sick leave usage that occur around Christmas and New Year's, Saturdays and Sundays, days that bookend weekends, and Super Bowl Sunday.

In order to control sick leave abuse, calling out sick with no or little notice, and excessive absences, airlines have historically used attendance policies and requested verification of the need for leave.  These protective measures are essential for an airline's ability to provide timely and reliable transportation service because, especially when it comes to flight attendants and pilots, employee absences can easily lead to flight delays and cancellations affecting large numbers of passengers throughout an airline's entire nation-wide system.  This combination of generous paid sick leave benefits with some measure of employee accountability is not the result of management fiat – it is the product of collective bargaining negotiations between carriers and unions.  ESTL will change all of that, in violation of the Dormant Commerce Clause and the Airline Deregulation Act.

At its core, each of A4A's claims claim is based on the disruption to airline operations and interstate commerce which will inevitably occur if airlines are prohibited by ESTL from using their most basic tools for managing sick leave use/abuse (i.e., verification requirements and points-based attendance policies).  The inevitability of these operational disruptions, and the resulting disruptions to the traveling public, is supported by anecdotal evidence, statistical evidence, expert testimony, and common sense, and, in light of that evidence, A4A has filed its own motion for summary judgment.

The Attorney General, on the other hand, has filed a motion for summary judgment

which asks this Court to adopt legal approaches from other circuits[1] that are inconsistent with applicable Supreme Court and First Circuit precedents.  Under the Attorney General's proffered approach, all of the evidence of disruptions to interstate transportation caused by application of the ESTL to airline flight crews would be immaterial and therefore could be disregarded by the Court.  But the Attorney General's wishes are not the law of this circuit.  The Court should reject the Attorney General's invitation to reshape the law in this circuit and, instead, the Court should follow and apply the existing precedents.  Based on those precedents and the evidence presented by A4A (which the Attorney General contests), it is abundantly clear that the Attorney General's motion for summary judgment should be denied.

**ARGUMENT**

I.   **WHEN THE CORRECT LEGAL STANDARD IS APPLIED TO THE RELEVANT FACTS, IT IS CLEAR THE ATTORNEY GENERAL IS NOT ENTITLED TO SUMMARY JUDGMENT ON A4A'S DORMANT COMMERCE CLAUSE CLAIM.**

   A.   **The *Pike* Balancing Test Is The Controlling Legal Standard.**

Is has been settled law for half a century that "[w]here [a state] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld *unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits*."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (emphasis added).  A state law thus need not "discriminate against interstate commerce … on its face or in practical effect" for the law to be invalid.  *See Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1805 (2015); *see also id.* at 1794 ("[The Dormant Commerce Clause] prohibit[s] States from discriminating against or imposing excessive burdens

---

[1]   Including the decision of the Western District of Washington in a case filed by A4A challenging Washington's paid sick leave law – a decision governed by Ninth Circuit law, which differs from First Circuit law in material ways, and is currently on appeal.

on interstate commerce."); *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008) ("Concluding that a state law does not amount to forbidden discrimination against interstate commerce is not the death knell of all dormant Commerce Clause challenges, for we generally leave the courtroom door open to plaintiffs invoking the rule in *Pike*, that even nondiscriminatory burdens on commerce may be struck down.").

Yet, relying on the Seventh Circuit's idiosyncratic view of the Dormant Commerce Clause, the Attorney General invites this Court to adopt – for the first time in this circuit – a legal standard under which "'*Pike* balancing is triggered **only** when the challenged law **discriminates** against interstate commerce in practical application,'" *Hirst v. SkyWest, Inc.*, 910 F.3d 961, 967 (7th Cir. 2018) (*quoting Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 502 (7th Cir. 2017) (emphasis in original)). (*See* AG MSJ Brief, pp. 3-9.) And, what's more, according to the Attorney General, if the Court adopts *Hirst* (and/or other out-of-circuit case law), then it can disregard all of the record evidence supporting the inference that application of the ESTL to airline flight crews based in Boston does/would impose burdens on interstate transportation, and it need not conduct a comparison of the ESTL's benefits and burdens as mandated by *Pike*. (*See* Doc. No. 69 ("AG MSJ Brief"), p. 9 n.4 (referring to A4A's disputed "factual assertions (1) that the ESTL will meaningfully increase flight-crew sick-time abuse . . . and (2) that any such use will substantially increase flight delays," and asserting that "the Court need not reach these factual disputes in the Commerce Clause context, because the contested facts are not **material** to the matter-of-law arguments set forth" by the Attorney General) (emphasis in original).)

The Court must decline the Attorney General's invitation because her preferred position is contrary to the Supreme Court decisions cited above as well as what the First Circuit has said about the Dormant Commerce Clause: "Under [the *Pike*] test—to be used when the state statute

at issue regulates evenhandedly and has only incidental effects on interstate commerce—courts employ a balancing approach whereby they examine whether the state's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 312 (1st Cir. 2005) (*citing Pike*, 397 U.S. at 142); *see also Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 33 (1st Cir. 2007) (same) (*citing Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 11 (1st Cir. 2007)).

Thus, while it is literally true, as the Attorney General states, that the First Circuit has not yet addressed the so-called "recent approach" of the Seventh and other circuits (AG MSJ Brief, p. 5), it is **not** correct to suggest that application of the *Pike* balancing test to a law like the ESTL is an open question in the First Circuit.[2]  It is a question that has already been answered. Contrary to what the Attorney General claims, the applicable legal standard in this case is not whether the ESTL has "a differential impact on interstate vs. intrastate commerce" (*see id.*), it is whether the ESTL's burdens on interstate commerce clearly exceed its local benefits.  *Pike*, 397 U.S. at 142.  That is not a question which can be answered without careful scrutiny of the evidence, including the evidence supporting the inference that application of the ESTL to flight crews will result in additional flight delays and cancellations and thereby disrupt interstate transportation.  *See, generally, Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 441 (1978) (explaining that, under the *Pike* balancing test, the "inquiry necessarily involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on interstate commerce."); *Pike*, 397 U.S. at 142; *Colon Health Ctrs. of Am.,*

---

[2]      The Attorney General's suggestion that *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178 (1st Cir. 1999), supports adoption of the Seventh Circuit's decision in *Hirst* (*see* AG MSJ Brief, at p. 5) is plainly incorrect.  The First Circuit's decisions in *Pharmaceutical Care Management Association* and *Cherry Hill, LLC,* which state that the *Pike* balancing test applies to laws like the ESTL, were decided after *Houlton Citizens' Coalition*.

*LLC v. Hazel*, 733 F.3d 535, 544, 546 (4th Cir. 2013) (noting that a "host of precedents … have repeatedly emphasized the factual nature of the dormant Commerce Clause inquiry," and that the "*Pike* inquiry" is "fact-bound").

> **B.** **The ESTL's Prohibition On Airline No-Fault Attendance Policies, And Restrictions On Requiring Verification Of Illness, Fail The *Pike* Balancing Test.**
>
> 1. Applying The ESTL To Airline Flight Crews Will Impose Substantial Burdens On Interstate Commerce.

In discussing the burdens imposed by the ESTL vis-à-vis airline flight crews, the Attorney General attempts to negate the regulatory "patchwork" argument from A4A's brief in support of its own motion for summary judgment and only mentions – essentially as an afterthought – the evidence showing the disruptions to interstate transportation caused by application of the ESTL to airline flight crews.  (*See* AG MSJ Brief, pp. 3-4 & 8-9.)  But the Supreme Court has long held that state laws which delay or otherwise impede interstate transportation can violate the Dormant Commerce Clause.  In *Southern Pacific v. Arizona*, 325 U.S. 761 (1945), for example, the Court invalidated an Arizona law restricting the length of trains passing through the State because it would "delay" interstate traffic, impede "efficient operation," and increase "operating costs." *Id.* at 772.  Likewise, in *Raymond* and *Kassel*, the Court struck down state laws regulating truck length which would have "slowed" services, "raised" costs, and "disrupted" operations.  *See Raymond Motor,* 434 U.S. at 438; *Kassel v. Consol. Freightways Corp. of Delaware,* 450 U.S. 662, 674 (1981).  And, in *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 527-28 (1959), the Court invalidated an Illinois law requiring trucks to use a certain type of mudguard, in conflict with an Arkansas law, because it would delay interstate transit and interfere with interline operations.  If operational delays and increased costs were sufficient to create Dormant Commerce Clause problems in the interstate trucking

industry, where "deference to state regulation" is at its zenith, *Raymond*, 434 U.S. at 434-44, then those same burdens are surely unacceptable in the context of air transportation, which is "in [its] nature national." *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 625 (1973).

These Supreme Court precedents cannot be distinguished, as the Attorney General would have it, on the basis that this case merely involves a question of how much cost airlines must incur to avoid ESTL-related disruptions to interstate transportation. The railroad and trucking companies involved in the Supreme Court cases could just as "easily" have utilized a larger number of shorter trains or trucks, or moved railroad tracks, to comply with the state laws at issue, albeit presumably at extraordinary expense, yet that possibility did not defeat their Dormant Commerce Clause claims. What is more, A4A's evidence of actual flight delays and cancellations, which constitute disruption to air transportation, caused by the application of the ESTL to airline flight crews is undeniably material to its Dormant Commerce Clause claim and, for the reasons set forth in A4A's motion for summary judgment, these disruptions are substantial and require that the ESTL be deemed unconstitutional as applied to A4A's Member Carriers. (Doc. No. 36, pp. 8-15). At a minimum, the Attorney General's disagreement with the facts presented by A4A require denial of her motion. (*Cf.* AG MSJ Brief, p. 9 n.4.)

      a.    ***Compliance Will Cause Flight Delays And Cancellations.*** To recap, the record evidence supports the existence of the following facts and reasonable inferences therefrom:

- When flight crew call out sick with little or no notice, "delays and cancellations inevitably increase because [the airlines] must take the time to rearrange flight crew to adequately staff flights, or, if insufficient crew members are available, [they] must cancel flights." An increase in these kinds of delays or cancellations imposes a substantial burden on interstate commerce. *See Kassel*, 450 U.S. at 674; *Raymond Motors*, 434 U.S. at 438, 445-46; *Bibb*, 359 U.S. at 527-28; *S. Pac.*, 325 U.S. at 772. (SOF ¶ 88.)

- A principal tool for airlines to ensure their employees' accountability for no- or

short-notice sick leave is no-fault attendance/reliability policies. The ESTL prohibits these kinds of policies, and it thereby follows that short-notice and no-notice absences will increase. (SOF ¶ 98 (flight crew "adapt their behavior in response to policy changes that impact their ability to influence their work schedule").)

• Sick-leave abuse is a serious problem in the airline industry, and it tends to spike on weekends, holidays, and the days before and after weekends and holidays. (SOF ¶ 72.) To mitigate the risks of flight delays and cancellations caused by sick-leave abuse, airlines have maintained the ability to request medical verification. (SOF ¶ 21.) The ESTL's prohibition on requiring medical verification for absences of three days or less renders medical verification essentially useless for airlines vis-à-vis pilots and flight attendants because many trips are three days or less. (SOF ¶ 6.) The probable effect of applying the ESTL's medical verification restrictions to flight crew is, therefore, increased sick-leave abuse when the airlines can least afford it, and this, in turn, will cause increased flight delays and cancellations. (SOF ¶¶ 78, 85, 87.)

• A departure delay in one city (Boston, for example) caused by the absence or late arrival of a flight attendant can, itself or in combination with other circumstances, result in a late arrival of that flight in another city, and these delays are sometimes significant. (SOF ¶ 81.) These delays propagate, impacting passengers throughout an airline's system – impacting those who have no connection to Massachusetts. (SOF ¶ 92.) Where Boston departures were delayed one hour or more, subsequent flights that day were delayed 90.6% of the time, with one quarter of such flights experiencing delays of more than two hours and 25 minutes.[3] (SOF ¶ 92.)

• Flight delays are markedly more prevalent on days where flight attendant sick leave use is high relative to each airline's normal level of absence. The relationship between flight attendant sick leave use and airline flight delays is statistically significant. (SOF ¶ 86.) "Given that the A4A passenger carriers collectively operate 10,731 mainline flights per day with an average of 130 passengers per flight, even a relatively small (i.e., one percentage point) increase in delays will delay thousands of passengers each day." (SOF ¶ 87).

Because this case involves a pre-enforcement challenge, the evidence summarized above showing the ESTL's "probable effects" on interstate transportation is more than sufficient to sustain A4A's Dormant Commerce Clause claim and defeat the Attorney General's motion for

---

[3]    The Attorney General's expert witness, Mr. Akins, does not consider that delays cascade throughout airlines' networks and can affect numerous passengers who have little or no ties to Massachusetts, including those only making a flight connection there. (SOF ¶ 91.)

summary judgment.  *See Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980); *cf. Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 21 (1st Cir. 2014); Section II.B, *infra*.

> **b.**      ***Compliance With A Patchwork Of Different State And Local Laws Would Be Extremely Burdensome.*** Under the Dormant Commerce Clause, the relevant inquiry is "what effect ***would arise*** if not one, but many or every, State adopted similar legislation." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (emphasis added); *see also Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 82 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003) (court must determine "the consequence of other states passing similar statutes").  This means that, even if an airline has not yet attempted to comply with a particular state/local paid sick leave law, the carrier can still mount a Dormant Commerce Clause challenge by showing the burden of compliance with current and future similar laws.

In its own motion for summary judgment, A4A relied on the decision in *Hirst v. SkyWest, Inc.*, 283 F. Supp. 3d 684 (N.D. Ill. 2017), for its analysis of the "logistical nightmare" that would be created by application of state and local wage laws to an airline with nation-wide operations (like all of A4A's member carriers).  *Id.* at 701.  Although the district court's decision in *Hirst* was reversed by the Seventh Circuit based on its misguided view of the parameters of claims under the Dormant Commerce Clause, *Hirst v. Skywest, Inc.*, 910 F.3d 961 (7th Cir. 2018), the Seventh Circuit's decision does not undermine A4A's reliance on the district court's decision because the appellate court did not disagree with the district court's conclusions regarding the compliance difficulties created by the state/local laws.  Instead, the Seventh Circuit

ruled that the compliance costs did not matter because they allegedly fell equally on both in-state and out-of-state employers. *See id*. at 967-98. But, as shown above, that is not the standard in the First Circuit. To the contrary, the burdens imposed by a state law are relevant even where, in "practical effect," those burdens do not discriminate against out-of-state businesses.[4] *Id*. at 967.

As in *Hirst*, it would be highly burdensome for the A4A Member Carriers to comply with the ESTL, and all other state and local paid sick leave laws, with respect to their pilots and flight attendants.[5] Even though the ESTL purports to apply only to flight crews based in Massachusetts, all hours worked by such employees – no matter the location – would be included in the calculation of sick leave accrual. *See* 940 CMR 33.03(2). That multiple states may well seek to apply their local laws to the same flight crew, and the same work activity, is a very real possibility for A4A Member Carriers, given that: (i) it is not unusual for flight crew based in one state to live in a different state (SOF ¶ 6); and (ii) flight crew work assignments routinely entail performing work on the ground and in the sky above multiple states and localities. (SOF ¶ 5.)

Carriers would thus be required to determine the amount of time each of their thousands of flight crewmembers work in each state. That calculation must be made to account for the potentially overlapping coverage of state and local paid sick leave laws, and that is not an easy

---

[4] To a similar effect, the Ninth Circuit's decision in *Ward v. United Airlines, Inc.*, 2021 WL 345578 (9th Cir. Feb. 2, 2021), which reversed the district court decision cited in A4A's motion for summary judgment, was based on a conception of the Dormant Commerce Clause under which the patchwork problem is only relevant if the subject matter is one requiring "national uniformity." That requirement is not found in the First Circuit's decisions. Moreover, *Ward* involved employee wage statements and not substantive employment benefits, and the court was not presented with the same industry-wide evidence of disruptions to interstate commerce as is presented in this case.

[5] The Attorney General also argues that A4A is advocating for a "company-focused approach" that is insufficient under *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978). (*See* AG MSJ Brief, p. 3.) But, while *Exxon* holds that burdens on companies' internal operations alone are insufficient, it does not hold that a burden on internal operations whose necessary effect is to burden interstate commerce is non-cognizable. Unlike in *Exxon*, the Dormant Commerce Clause problem here is not just that the ESTL makes it harder for airlines to operate, although that is certainly true; the problem is that these operational difficulties will in turn make it harder for passengers (and goods) to travel.

calculation to make:  carriers may have to calculate these hours based on the location of an employee's residence or "base," where an employee's work is performed, and/or where the carrier is headquartered.  This would be a massive undertaking for carriers because flight crew do not stay in one place.  Instead: (i) the overwhelming majority of flight assignments routinely involve work on the ground and in the air over multiple jurisdictions; (ii) flight crew assignments change from day-to-day within the course of the month; and (iii) the flight path between the same two points (e.g., Boston-Seattle) can vary significantly from day-to-day.  (SOF ¶ 148.)

Matters only get more complicated when a flight crewmember asks to take leave.  The laws in the various jurisdictions entitle employees to take leave for different reasons; some are limited to medical concerns, but other laws create leave entitlements for additional causes, such as to make arrangements necessitated by the death of a family member (*see* Or. Rev. Stat. § 653.616(3)), to travel with a family member to an appointment related to the latter's long-term care (*see* Vt. Stat. Ann. tit. 21, § 483(a)(3)), and due to a closure of an employee's place of business by order of a public official (*see* N.Y.C. Admin. Code § 20-914(a)(1)(c)).  And, not surprisingly, the laws also vary in terms of requirements for advance notification of the need for leave as well as when and under what circumstances an employer can request verification of the employee's illness or other reason for leave.  *Compare* 940 CMR § 33.06 (Massachusetts; employer may request documentation where employee has been absent for three consecutive work days), *with* Md. Code. Ann., Lab. & Empl. § 3-1305(g)(i) (Maryland; employer may request documentation where employee has been absent for two consecutive scheduled shifts); *compare* Wash. Rev. Code § 296-128-650 (if need for paid sick leave is foreseeable, employer may require at least ten days advance notice from the employee); 940 CMR § 33.05 ("For foreseeable or pre-scheduled use of earned sick time, the employer may have a written policy

-11-

requiring up to seven days' notice . . . .").

\* \* \*

The above-described record evidence (and reasonable inferences therefrom) demonstrates that the burdens on interstate transportation imposed by the application of the ESTL to airline flight crew are significant.

> 2.    The Burdens Imposed On A4A's Member Carriers Clearly Exceed The Local Benefits Of The Challenged Provisions Of The ESTL.

In discussing the alleged benefits of the ESTL to airline flight crew, the Attorney General does not offer a single piece of evidence to suggest that a prohibition on medical verification requirements for absences of three days or less serves any local interest at all, so "there is nothing to be weighed in the balance to sustain the law." *Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982) (plurality op.).  Manifestly, the burdens on interstate commerce caused by such restrictions, which a fact-finder could adduce based on the evidence summarized above, clearly exceed the zero benefits achieved by the restrictions on medical verification.

As for the ESTL's prohibition on airline attendance policies, the Attorney General claims that these sick leave policies "discourage workers from actually taking [] sick leave, by assessing them disciplinary points that lead to warnings, discipline, and, in some cases, termination," that "[t]o avoid accumulating such disciplinary points, flight and ground crew work sick," and that "Massachusetts-based airline employees thus benefit substantially from having access to discipline-free paid sick leave under the ESTL, especially right now, when preventing the spread of illness is of paramount importance."[6]  (AG MSJ Brief, p. 10.)  These "benefits" are illusory.

---

[6]    The Attorney General's invocation of the current pandemic is curious because the 40 hours of paid sick leave provided through the ESTL is plainly insufficient for a COVID-related absence.  The generous sick leave accruals offered by the airlines are, however, sufficient for this purpose and, moreover, some airlines are now offering an extra two-week quarantine leave for employees during the pandemic with absolutely no possibility of any disciplinary action attached to the leave.  (SOF ¶¶ 23-28.)

They are illusory because most airline employees can already use more sick leave under their employers' policies/collective bargaining agreements than is protected by ESTL without discipline and certainly without termination. The Attorney General's experts readily admit that. For example, Mr. Tregillis agrees that a flight attendant under the typical airline policy could be absent on account of sick leave for 10 or 15 days – two to three times more days than a flight attendant would receive under ESTL – and yet not be subject to discipline. (SOF ¶ 38.) Mr. Akins acknowledges both that it is a "relatively unusual circumstance" when an airline employee would be disciplined for an absence and that airlines do not frequently discipline employees for absences. (SOF ¶ 56.) Most employees can potentially be absent for far more than 40 hours each year and never be disciplined, let alone terminated – as they could under ESTL.[7] (SOF ¶¶ 52, 53.) In the real world, airline employees use their company-provided paid sick leave without hesitation. In 2019 alone, Southwest and United spent $309 and $375 million on employee sick leave, respectively. (SOF ¶ 32.)

Given the paltry and speculative nature of the evidence of local benefits, including that pilots and flight attendants actually work when sick, the Attorney General is not entitled to summary judgment on the burden/benefit calculus with respect to the ESTL's restrictions on medical verification requirements and prohibition of points-based attendance policies.[8]

---

[7]     One former United Airlines employee with cancer was out of work for hundreds of hours in 2017 and 2018 and was placed on only the first step of United's progressive discipline policy; she testified that she did not even rely on ESTL for time off. (SOF ¶¶ 47-50.)

[8]     A4A is no longer pursuing the 14th Amendment's Due Process Clause as an independent basis for invalidating application of the ESTL to flight crew.

-13-

II.     **WHEN THE CORRECT LEGAL STANDARD IS APPLIED TO THE RELEVANT FACTS, IT IS CLEAR THE ATTORNEY GENERAL IS NOT ENTITLED TO SUMMARY JUDGMENT ON A4A'S AIRLINE DEREGULATION ACT PREEMPTION CLAIM.**

A.     **The Airline Deregulation Act Preemption Clause Applies Equally To State Employment Laws As Any Other State Laws Which Have A Significant Impact On Airline Prices, Routes Or Services.**

The Airline Deregulation Act ("ADA") includes a broad preemption clause prohibiting states or their political subdivisions from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of an air carrier* . . . ." 49 U.S.C. § 41713(b)(1) (emphasis added).  "[T]he *effect* of a state law, regulation, or provision" is what matters, "not its form." *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 283 (2014) (emphasis added).  Thus, the ADA may preempt laws which do not specifically regulate the airline industry and only indirectly affect airline prices, routes or services.  *See, e.g., id.* at 283-84*; Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 385-86 (1992); *Coakley*, 769 F.3d at 20 (same analysis under identical federal preemption provision governing trucking industry).  Under First Circuit law, a statute's "potential" or "logical" effect on a carrier's prices, routes or services can trigger ADA preemption:

> [A] statute's "potential" impact on carriers' prices, routes, and services can be sufficient if it is significant, rather than tenuous, remote, or peripheral.  We have previously rejected the contention that empirical evidence is necessary to warrant [] preemption, and allowed courts to "look[] to the logical effect that a particular scheme has on the delivery of services or the setting of rates.

*Coakley*, 769 F.3d at 21 (quoting *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 82 n.14 (1st Cir. 2006), *aff'd on other grounds sub nom. Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008)).

Similar to her arguments with respect to the Dormant Commerce Clause, the Attorney General invites this Court to adopt a view of ADA preemption which is based on decisions from other circuits but which is inconsistent with applicable Supreme Court and First Circuit case

-14-

law.[9]  (*See* AG MSJ Brief, pp. 12-15.)  Indeed, it is only after a few pages of discussion of the law from other circuits that the Attorney General mentions that the First Circuit's decisions in *Schwann v. FedEx Ground Package System, Inc.*, 813 F.3d 429 (1st Cir. 2016), and *Massachusetts Delivery Ass'n v. Healey*, 821 F.3d 187 (1st Cir. 2016), which she dismisses as "wrongly decided," are in tension with her current argument that state employment-related laws should be categorically immune from ADA preemption.  (*See* AG MSJ Brief, p. 14 n.9.)  But both *Schwann* and *Massachusetts Delivery Association* involved the definition of "employee" under Massachusetts law for purposes of various Massachusetts employment-related laws and the First Court held that application of the Massachusetts law was preempted.  The bottom line is that ADA preemption is triggered when a state law, in its "probable" or "logical" effect or as implemented in practice, has an impermissible effect on an airline's prices, routes or services.[10] It may well be the case that most state employment laws ordinarily do not have such an effect but, if and when they do, they are preempted just like any other law with a similar effect.[11]

---

[9]     For starters, the Attorney General's motion goes through contortions to explain why, notwithstanding the numerous First Circuit decisions describing ADA preemption as "broad," the "presumption against preemption" applies in this case.  (*See* AG MSJ Brief, pp. 19-20.)  But that discussion ignores *Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938 (2016), which held that the presumption against preemption does not apply to express preemption provisions, including the ADA's, *see Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017).

[10]    The Department of Justice has acknowledged the applicability of ADA preemption in cases against airlines involving employment claims.  Am. Br. of United States, *Bernstein v. Virgin America, Inc.*, No. 19-15382 (9th Cir.) ("Congress enacted the ADA's expansive express preemption provision for the very purpose of avoiding 'regulatory patchwork[s]' that impact airlines' prices, routes, and service. And that applies a fortiori to 'a patchwork of requirements that interfere with flight scheduling.'").  *Id.* at 24-25 (citation omitted).

[11]    Thus, the Attorney General's invocation of the putative "dividing line" for ADA preemption "between state laws that regulate how a 'service' is performed (preempted) and those that regulate how the carrier behaves as an employer or proprietor (not preempted)" is off the mark.  (*Cf.* AG MSJ Brief, p. 12.)  A state law can effectively regulate in both spheres, as was the case in the Attorney General's cited decision of *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 86 (1st Cir. 2011).  *See id.* at 87 ("Importantly, the tips law does more than simply regulate the employment relationship between the skycaps and the airline.").  That is the case here with the ESTL, with its adverse effect on the ability of airlines to provide timely and reliable transportation service for its passengers.

**B.      The ESTL Has A Significant Impact On The Prices, Routes And Services Of A4A's Member Carriers.**

Although the Attorney General disagrees (*see* AG MSJ Brief, p. 9 nn.4 & 5), by guaranteeing that employees can use, with impunity, at least some paid sick leave without providing adequate notice and/or without having to present documentation of their need for leave, the ESTL has the "potential" or "logical" effect of allowing the A4A Member Carriers' Massachusetts employees to be absent from work in circumstances which undermine the carriers' ability to operate their interstate transportation systems effectively and efficiently.  The logical relationship between the ESTL (and similar paid sick leave laws) and an increase in employee absences (both arguably legitimate and obviously illegitimate) is corroborated by not only the A4A Member Carriers' actual experiences in Boston and elsewhere as well as the behaviors of individual employees, but also by the statistical analysis performed by A4A's expert witness, Dr. Lee, and the testimony of the Attorney General's own expert witnesses.

The experience of the A4A Member Carriers demonstrates that sick leave abuse is chronic.  In Boston, both Southwest and United experienced an increase in ground employee absences after implementing ESTL (SOF ¶ 124 [Southwest]; *id.* [United; noting employees in Boston refer to sick leave as "Mass Cash"]); and American experienced an increase in sick leave by Boston-based flight attendants (*id.* ¶¶ 6 & 85 [also noting some flight attendants requested transfers to Boston for the month of December, to take advantage of protected leave under the ESTL]).  A4A Member Carriers' experience with similar paid sick leave laws is in accord:  after implementing the Los Angeles Sick Leave Law, sick leave usage by American's ground employees at LAX increased over the next two years, from 2.5% to 3.1% for fleet service agents and from 3.3% to 4.6% for passenger service agents (SOF ¶ 125); after Virgin America implemented the New York City Earned Sick Time Act, JFK-based flight attendants began using

-16-

sick leave at increasingly greater rates than flight attendants based at other airports and, by 2017, the flight attendant sick rate at JFK was twice the average rate at SFO and LAX (SOF ¶ 129.) American has dealt with exorbitant sick leave usage for flight attendants at Christmas and New Year's, while multiple carriers deal with consistently the highest sick leave on Saturday and Sunday for flight crews and higher absence rates on days that bookend weekends.  (SOF ¶ 72.) Super Bowl Sunday is another day when sick leave usage consistently spikes.  (SOF ¶ 73.) Make no mistake – employees are not suddenly getting sick at higher rates on and around holidays, weekends, and vacations.  They are simply using paid sick time as their personal time off for these and other occasions.

And the Attorney General's experts do not disagree.  In fact, both expert witnesses have acknowledged abuse.  (SOF ¶ 74.)  Mr. Akins testified that because employees are now "hungry for work," there has been a decrease in the amount of sick leave taken – conceding that sick leave usage is driven by factors other than illness – and Mr. Tregillis acknowledges that at least some portion of sick leave is illegitimate.  (SOF ¶¶ 74-76.)

In other industries, an increase in employee absences might not create a significant problem.  Not so in the airline industry.  An increase in employee absences has a significant impact.   Dr. Lee analyzed years of data for Alaska, American, JetBlue, Southwest, United, and Virgin America, and concluded that flight delays (measured as 15 or more minutes late) are on average markedly more common on days where flight attendant sick leave use is high.  (SOF ¶ 86; *see also id.* ¶ 85 [similar anecdotal evidence for American flight attendants]; *id.* ¶ 78 [same for United flight attendants].)  And, even accounting for the effect of other possible causes for delay, there is a statistically-significant relationship between flight attendant sick leave use and airline flight delays.  (SOF ¶ 86.)  "Given that the A4A passenger carriers collectively operate

-17-

10,731 mainline flights per day with an average of 130 passengers per flight, even a relatively small (i.e., one percentage point) increase in delays will delay thousands of passengers each day." (SOF ¶ 87.)  A single flight delay or cancellation also can ripple throughout an airline's network for several days and may even spill over to other carriers, such as when a passenger is making a connection with a carrier's regional partner.  (SOF ¶ 87.)  In fact, a one percentage point increase in controllable delays represents an 11.6% increase in the number of such delays (SOF ¶ 88), and, as Mr. Tregillis admits, even a short delay could be significant to some passengers in some circumstances.  (SOF ¶ 89.)  He also acknowledged that in some instances, sick leave usage can result in significant operational disruptions to an airline (SOF ¶ 119), and Mr. Akins acknowledged that significant arrival delays can damage an airline's goodwill with customers.  (SOF ¶ 117.)  There can be no doubt that flight delays (and cancellations) implicate "services" within the meaning of the ADA's preemption provision – transportation of passengers and cargo by air is indisputably a core airline function.[12]

There are also real-world examples of increased employee absences impacting airline routes and services.  After implementing the New York City Earned Sick Time Act ("ESTA"), which at the time, like ESTL, permitted employees to accrue up to 40 hours of protected paid leave each year and restricted the employer's ability to ask for documentation certifying the leave, Virgin America's JFK-based flight attendants used 17.3 days of leave each year – an increase over the previous 8.7 days per year.  (SOF ¶ 129.)  By 2017, its flight attendant sick rate

---

[12]     And the problems extend beyond flight crew.  A shortage of ground employees may adversely impact carriers' ability to provide baggage services.  For example, sick call-outs at Southwest leave it unable to provide efficient and timely service during some of its busiest times.  (SOF ¶¶ 70-71.)  When sick calls rise among passenger service and fleet service agents, the ability to timely check-in passengers and (as Mr. Akins acknowledges) load bags onto aircraft is hindered – requiring passengers to wait longer for the baggage or, worse, planes to hold until loading is complete.  (SOF ¶¶ 115, 116.)

at JFK was twice the average rate at San Francisco and Los Angeles.[13]  (SOF ¶ 129.)  The increased sick leave usage resulted in a statistically significant spike in flight cancellations and delays attributable to cabin crew shortages and corresponding increases in operational costs. When Virgin America transferred 19 of its flight attendants from California to JFK to deal with the high sick leave usage among JFK-based flight attendants, each one of them used more sick leave after they arrived in New York and had the benefit of ESTA.  (SOF ¶¶ 136-137.)  The situation became so bad that Virgin America closed its JFK flight attendant base.  (SOF ¶ 129.)

When it comes to mitigating the impact of the increased sick leave use (and abuse) facilitated by ESTL, airlines (unlike most other employers) do not enjoy the luxury of having employees – and certainly not pilots and flight attendants – "cover for" one another.  Instead, they must have "reserve" flight crew members on standby to replace absent crewmembers.  That is a big problem for airlines because there is simply no way to know precisely how many reserves will be needed in a given place at a given time or, for that matter, how many reserves will mirror the behavior of other crew members and more frequently use sick time when they are apparently not sick.  (SOF ¶ 98.)  Nor can airlines have a sufficient number of reserves on standby, because that would require putting reserves in every single airport location where a pilot or flight attendant might call out sick.  (SOF ¶ 100.)  Even the Attorney General's expert recognizes the conundrum, admitting that it would take "a thousand people sitting in the crew room" to avoid delays resulting from short-notice sick leave.  (SOF ¶ 101.)  And even if this were a remotely realistic possibility, which it is not, the cost would be astronomical and

---

[13]     Regressions of Virgin America JFK-based flight attendant sick rates from October 1, 2011 to April 30, 2017 confirm that for the entire period following ESTA compliance during the time from April 2015 through April 2017, sick rates for JFK-based Virgin America flight attendants were 2.4 percentage points higher than would otherwise be expected, after controlling for other factors, and statistically significant at the 99% level of confidence.  (SOF ¶ 133.)

ultimately passed on to consumers in the form of higher fares.[14] (SOF ¶ 101.) Mr. Akins purported to calculate the cost of hiring additional reserve flight attendants to cover for the increased sick calls related to ESTL implementation. His analysis had several flaws,[15] and when those flaws were corrected, the cost of hiring additional flight attendants in Boston *alone* would be approximately $27.2 million -- and that does not include employees in other workgroups who also would call out sick with little or no notice. It is certainly reasonable to infer that airline fares might increase to account for increased labor costs of these magnitudes and that routes involving Boston might become less profitable and prone to service reductions. (SOF ¶ 109.)

Full compliance with ESTL will prevent airlines from taking reasonable measures to ensure that employees use paid sick leave responsibly and legitimately, and will thus adversely affect the ability of airlines to provide reliable and timely interstate transportation services. (SOF ¶ 77.) The only way for carriers to avoid this outcome, i.e., increasing year-round employee staffing levels and adding new flight crew reserve staffing at airports where they do not currently staff reserves, would be extremely costly and those increased costs would necessarily impact carriers' routes and services. (SOF ¶ 111.) Either way, the ESTL will directly or indirectly affect airline prices, routes and services, and its application to the A4A Member Carriers' employees is preempted by the ADA.

---

[14]    The Attorney General should not question this conclusion since her expert admits he did not analyze whether fares would have been different but for compliance with ESTL, (SOF ¶ 66), or the amount of fare increase that could impact passenger demand. (SOF ¶ 141.)

[15]    Mr. Akins opined that the flight delays could be mitigated by adding 36 flight attendants at bases in Boston but, for many reasons, he is wrong. For example, Mr. Akins' analysis assumes that the airlines could share a pool of 36 flight attendants (airlines do not share employees); his analysis provides coverage for at most six delays each day; the reserve would have to be working at the precise time of day as the delays; it does not consider Boston-based flight attendants who call out sick while working in another city, or the costs associated with pilots and other workgroups. (SOF ¶¶ 104-109.)

## CONCLUSION

For the foregoing reasons, A4A respectfully requests that the Court deny the Attorney General's Motion for Summary Judgment.

**[Signatures on following page]**

Dated:  February 16, 2021.

AIR TRANSPORT ASSOCIATION OF
AMERICA, INC.

By its attorneys,

/s/ Chris A. Hollinger
Chris A. Hollinger (*pro hac vice*)
(CA Bar # 147637)
O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone:  (415) 984-8700
E-Mail:  chollinger@omm.com

Robert A. Siegel (*pro hac vice*)
(CA Bar # 64604)
O'Melveny & Myers LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6005
E-Mail:  rsiegel@omm.com

/s/ John Hodges-Howell
John Hodges-Howell (*pro hac vice*)
Harry J. F. Korrell
(WA Bar # 23173)
John Hodges-Howell
(WA Bar No. # 42151)
Davis Wright Tremaine
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Telephone: (206) 622-3150
E-mail:  harrykorrell@dwt.com
E-Mail:  jhodgeshowell@dwt.com

/s/ Rachel Reingold Mandel
Rachel Reingold Mandel
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Boston Place, Suite 3220
Boston, MA 02108
Telephone:  (617) 994.5700
E-Mail:  Rachel.mandel@ogletree.com

-22-

-23-

## **CERTIFICATE OF SERVICE**

I, Chris A. Hollinger, of O'Melveny & Myers LLP, hereby certify that the foregoing Opposition to Defendant's Motion for Summary Judgment Pursuant to Local Rule 56.1 was filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 16, 2021.

/s/ Chris A. Hollinger
Chris A Hollinger (Cal. Bar No. 147637)
O'Melveny & Myers LLP