UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| AIR TRANSPORT ASSOCIATION OF AMERICA, INC., d/b/a AIRLINES FOR AMERICA, | * * * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 18-cv-10651-ADB |
| MAURA HEALEY, in her official capacity as Attorney General of the Commonwealth of Massachusetts, | * * * * | |
| Defendant. | * * | |

## MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Plaintiff Air Transport Association of America, Inc. d/b/a Airlines for America ("A4A") brings this action against Defendant Maura Healey in her official capacity as Attorney General of the Commonwealth of Massachusetts (the "AG"), alleging that a Massachusetts statute guaranteeing earned sick leave, and providing other sick leave-related protections, to Massachusetts-based employees is unconstitutional as applied to airline flight and ground crewmembers.  [ECF No. 1 ("Compl.")].  Currently before the Court are the parties' cross-motions for summary judgment.  [ECF Nos. 35 (A4A), 68 (the AG)].  For the reasons set forth below, both motions are DENIED.

# I.      BACKGROUND

## A.      Factual Background

Except as otherwise noted, the following facts are undisputed.[1]

### 1.      The Airlines' Operations

A4A is a trade association that advocates on behalf of its member airlines (the

"Airlines").  [ECF No. 84 ¶ 1].  The Airlines operate at airports around the country, including

Boston Logan International Airport ("Logan") and other Massachusetts airports.  [Id. ¶ 2].  The

vast majority of the Airlines' routes are interstate or international, which means that the Airlines

seldom run flights entirely within a single state.  See [ECF No. 37 ¶ 2; ECF No. 83 at 1].  For

current purposes, the Airlines have two relevant categories of employees: (1) flight

crewmembers (i.e., pilots and flight attendants); and (2) ground crewmembers (i.e., mechanics,

customer service agents, fleet service workers, baggage handlers, and flight dispatchers).  See

[ECF No. 37 ¶¶ 6, 8; ECF No. 83 at 1].  Each flight crewmember has a "base," which is the

airport where that individual begins and ends his or her work assignments.  See [ECF No. 37

¶¶ 6–7; ECF No. 83 at 1].  Some of the Airlines use Logan as a base for flight crewmembers.

[ECF No. 84 ¶ 7].  An individual's base is not necessarily in the state where he or she lives.[2]

[ECF No. 37 ¶ 7; ECF No. 83 at 1].  Regardless of where they are based, flight crewmembers

typically spend the majority of their working time in other states or in federal or international

airspace.  [ECF No. 37 ¶ 6; ECF No. 83 at 1].  Ground crewmembers, on the other hand,

ordinarily spend their working time at a single airport in or near the state where they live.  [ECF

---

[1] The Court draws the facts primarily from the AG's response to A4A's Local Rule 56.1
statement, [ECF No. 83], A4A's response to the AG's Local Rule 56.1 statement, [ECF No. 84],
and the documents cited therein.

[2] An individual could, for example, live in New Hampshire but be "based" at Logan.

No. 37 ¶ 8; ECF No. 83 at 1].  Most of the Airlines employ ground crewmembers at Logan.
[ECF No. 84 ¶ 8].

  With limited exceptions, the Airlines' employees are unionized, and the terms and
conditions of their employment are set forth in collective bargaining agreements ("CBAs").
[ECF No. 83 ¶ 9].  These CBAs typically apply to a particular category of employees working
for a particular airline, regardless of where those employees work or are based.  [Id.].  The CBAs
cover sick leave accrual and carryover, but the specific terms vary from CBA to CBA.  See [id.
¶ 11].  Pursuant to the CBAs, the Airlines have the right to request a doctor's note if they have
reason to believe that sick leave is being taken improperly, but employees are not generally
required to provide medical verification to take sick leave.  [Id. ¶ 13].  Additionally, under the
Airlines' employee attendance policies, disciplinary "points" are assessed for various infractions
(e.g., excessive sick leave usage, missed flights, missed meetings or trainings).  [Id. ¶ 14].
Employees are typically assessed points based on how disruptive the Airlines view the infraction
to be, and the points are part of a progressive discipline policy, which can, in rare cases, lead to
termination.  [Id.].

  Federal law mandates that a certain number of flight crewmembers be aboard before a
plane can take off.  [ECF No. 83 ¶ 15].  A4A maintains that, for this reason, increases in sick
leave among flight crewmembers result in more flight delays and cancelations, although this is
disputed by the AG.  [Id.].  To guard against delays and cancelations, the Airlines employ flight
crewmembers on a reserve basis (i.e., certain employees are "on-call" to report for duty on
certain days).  [Id. ¶ 16].  A4A maintains that this "on-call" system is imperfect because
"on-call" flight crewmembers are not necessarily at the airport where they are needed and must
travel, which takes time and leads to flight delays.  [Id. ¶¶ 17–18].  The AG counters that the

"on-call" system is a successful mitigation tool, and that sick leave use therefore does not cause delays.  [Id.].  The parties also contest the impact that absences among ground crewmembers have on the Airlines' operations.  A4A asserts that such absences, especially with limited or no notice, cause flight delays and other service interruptions.  [Id. ¶¶ 19–20].  A4A further maintains that the Airlines address these issues by offering, and in some cases mandating, overtime for their ground crewmembers, which is costly and causes employee morale issues.  [Id.].  The AG responds that absent ground crewmembers do not cause disruptions to service because the Airlines have multiple protocols in place to reallocate resources to avoid such service disruptions.  [Id.].

2.   The Massachusetts Earned Sick Time Law

The Massachusetts Earned Sick Time Law (the "MESTL"), Mass. Gen. Laws ch. 149, § 148C, and its associated regulations, 940 Mass. Code Regs. 33.00 *et seq.*, impose obligations regarding earned sick time on certain employers with Massachusetts-based employees.  Among other things, the MESTL (1) requires employers to provide employees with a minimum of one hour of sick leave for every thirty hours worked, up to forty hours per year, Mass. Gen. Laws ch. 149, § 148C(d), (2) limits the ability of employers to factor sick-leave absences into employee discipline,[3] id. § 148C(h), and (3) imposes certain recordkeeping and notice requirements on employers, 940 Mass. Code Regs. 33.09.  The MESTL purports to apply to employees with a

---

[3] The statute does, however, provide employers with methods to curb abuse.  For instance, employers may require employees to verify that they have used their sick leave appropriately, 940 Mass. Code Regs. 33.06(1), and are permitted to discipline employees with a "clear pattern of taking leave on days just before or after a weekend, vacation, or holiday" unless the employee provides an adequate verification, id. 33.03(24).

4

"primary place of work" in Massachusetts, see id. 33.03(1),[4] and there is no carve-out for airline employees or for unionized workers working under a CBA.  Under the AG's reading of the MESTL, if an employee spends work hours traveling outside of Massachusetts but returns regularly to a Massachusetts base of operations before resuming a new travel schedule, Massachusetts is that employee's primary place of work.  See Mass. Att'y Gen.'s Office, "Earned Sick Time in Massachusetts Frequently Asked Questions" at 3, available at https://www.mass.gov/doc/earned-sick-time-faqs/download (updated September 21, 2018). Accordingly, under the AG's reading, all flight crewmembers based at a Massachusetts airport and ground crewmembers working at a Massachusetts airport would be entitled to the protections of the MESTL.  Notably, the MESTL does not differentiate between in-state employers and out-of-state employers.  See Mass. Gen. Laws ch. 149, § 148C(a) (defining "employer" without reference to where the employer is headquartered, based, incorporated, etc.).

### B.      Expert Opinions

If this case proceeds to trial, it is expected that each side will advance conflicting expert testimony about the impact of the MESTL on flight operations.

A4A's expert, Darin N. Lee, Ph. D., an economist who specializes in the airline industry, will testify about the likely impact that complying with the MESTL would have on the Airlines, including that:

---

[4] Under the statute, spending a plurality of one's work time in Massachusetts is sufficient.  In other words, even if an individual does not spend the majority of his or her working time in Massachusetts, Massachusetts is the individual's "primary place of work" so long as the individual spends more time working in Massachusetts than in any other state.  940 Mass. Code Regs. 33.03(1).  Additionally, if an employee works in multiple states but Massachusetts is the employee's "primary place of work," the employee will accrue sick time on all hours worked, not just hours worked in Massachusetts.  Id. 33.03(2).

- The vast majority of U.S. airline passengers, including those departing from or ending up in Massachusetts, are traveling on an interstate itinerary;

- Airline flight crewmembers spend the vast majority of their working time in federally- or internationally-regulated airspace;

- Because airlines are federally regulated, the predictable attendance of flight crewmembers is important as ill flight crewmembers cannot always immediately resume working once they recover,[5] and other employees assigned to a particular flight cannot "cover" for them;[6]

- Similarly, airline ground crewmembers are also subject to federal regulation, and high levels of absences amongst them can result in flight delays and cancelations;

- If airlines are subject to the MESTL, airline employees will take more sick time primarily because the airlines will be restricted in their ability to discipline employees for sick leave abuse;[7]

- There is a statistically significant positive relationship between absence among flight crewmembers and flight delays and cancelations;[8]

- If other states were to follow Massachusetts' lead and pass statutes similar to the MESTL, airlines would be subject to a patchwork of regulations that would add significant complexity to their operations.

[ECF No. 86-1 ¶¶ 1, 4, 6].  In sum, according to Lee,

> if airlines were compelled to be universally in compliance with the [MESTL] as it applies to flight crews and ground employees, it would also open a Pandora's box of similar regulations that—while no doubt well-intentioned—have typically

---

[5] As an example, a pilot who calls in sick for a 7:00 a.m. flight from Boston to Los Angeles cannot show up for work mid-flight if she is no longer ill by 10:00 a.m.

[6] For instance, if federal law mandates that a particular flight have three flight attendants and one of the flight attendants scheduled to work the flight is absent, the other two flight attendants cannot simply pull more weight or work harder to account for their missing colleague.  Instead, the airline must arrange for a substitute flight attendant.

[7] To support his assertion, Lee points to Virgin America's experience at John F. Kennedy International Airport ("JFK") following New York City's adoption of a sick leave statute similar to the MESTL.  [ECF No. 86-1 ¶ 6].  He also notes a similar uptick in sick leave among American Airlines employees at Los Angeles International Airport ("LAX") following the passage of a Los Angeles sick leave statute.  [Id. ¶ 77].

[8] Lee conducted a regression analysis that showed that "on days with high flight attendant sick rates, there is a statistically significant increase in both departure and arrival delays for A4A member carriers ranging from approximately 1 to 2 percentage points."  [ECF No. 86-1 ¶ 6].

ignored the practical implications on airlines and their crews. The resulting patchwork of state and local regulations would not only disrupt carriers' operation (i.e., cause greater numbers of delayed and cancelled flights), it would also distort carriers' incentives regarding which routes to serve and/or expand services on. Finally, because attempting to be in simultaneous compliance with a myriad of different (and potentially conflicting) state and local sick leave laws would increase carriers' costs, it would also lead to higher fares for consumers.

[Id. ¶ 6].

To respond to Lee's opinions, the AG has engaged experts of her own, including Christian Tregillis and Daniel Akins.  Tregillis is a partner at Hemming Morse LLP who performs accounting, financial, economic, and statistical investigations, [ECF No. 70-3 at 9], and Akins is an air transport economist, [ECF No. 70-5 at 7].  Among other things, Tregillis opines that (1) Lee's "quantitative analyses (and particularly his regressions) are flawed in their design and his interpretation of their meaning," (2) the conclusions Lee draws based on the Airlines' experiences at JFK and LAX are faulty, and (3) Lee has ignored "elements necessary to [opine] about the actual effects . . . of . . . the MESTL."  See [ECF No. 70-3 at 11 (Tregillis' summary of opinions)].  Like Tregillis, Akins rejects Lee's findings, maintaining that Lee's analysis is biased and unsupported.  See [ECF No. 70-5 at 9].  Akins asserts, *inter alia*, that Lee's conclusions regarding the likely impact of MESTL-compliance are exaggerated and at odds with the actual experience of the Airlines in Massachusetts since the MESTL was enacted.  See [id. at 9–16 (Akins' summary of opinions)].

### C.    Procedural Background

On April 4, 2018, A4A filed its three-count complaint, in which it seeks a declaratory judgment that the MESTL is unconstitutional as applied to the Airlines' flight and ground crewmembers and an injunction preventing the AG from forcing the Airlines to comply with the MESTL in connection with such employees.  [Compl. ¶ 75].  A4A claims that the MESTL (1) violates the dormant Commerce Clause by placing an undue burden on interstate commerce;

(2) is preempted by the Airline Deregulation Act (the "ADA") because it substantially impacts airline prices, routes, and/or services; and (3) violates the Fourteenth Amendment's prohibition on the extraterritorial application of state legislation.  [Id. ¶¶ 56–74].  A4A asserts that because the MESTL severely limits the Airlines' ability to monitor and prevent abuse of employee sick leave, flight and ground crewmembers will take more sick time, which will result in increased flight delays and cancelations.  It further claims that compliance with a  "patchwork" of regulation (i.e., the MESTL and other potentially applicable state labor laws) will significantly hinder the Airlines' operations.

A4A subsequently abandoned its Fourteenth Amendment claim, see [ECF No. 94 at 11 n.4], leaving only the dormant Commerce Clause claim and the ADA preemption claim.  Each party has moved for summary judgment on both remaining claims.[9]  [ECF Nos. 35 (A4A), 68 (the AG)].  The parties filed oppositions and replies, [ECF Nos. 82, 87, 91, 94], and the Court held a motion hearing on April 8, 2021, see [ECF No. 98].  After the hearing, the AG filed two notices of supplemental authority.  [ECF Nos. 99, 102].

## II.      LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (alteration in original) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v.

---

[9] As clarified during the motion hearing, A4A's position is that the dormant Commerce Clause renders the MESTL unconstitutional as applied to flight crewmembers and that the ADA preempts the MESTL as applied to both flight and ground crewmembers.

Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003).  Thus, "[a] genuine issue exists as to such a

fact if there is evidence from which a reasonable trier could decide the fact either way."  Id.  By

invoking summary judgment, "the moving party in effect declares that the evidence is

insufficient to support the nonmoving party's case."  United States v. Plat 20, Lot 17, Great

Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp.

v. Catrett, 477 U.S. 317, 325 (1986)).

> To succeed in showing that there is no genuine dispute of material fact, the moving
> party must . . . "affirmatively produce evidence that negates an essential element of
> the non-moving party's claim," or, using "evidentiary materials already on file . . .
> demonstrate that the non-moving party will be unable to carry its burden of
> persuasion at trial."

Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v.

Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported

motion for summary judgment, the nonmoving party must establish a trial-worthy issue by

presenting enough competent evidence to enable a finding favorable to the nonmoving

party."  ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (quoting

LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993)).  That is, the nonmoving party

must set forth specific, material evidence showing that there is "a genuine disagreement as to

some material fact."  Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to

the party opposing summary judgment, indulging all reasonable inferences in that party's

favor."  Cochran, 328 F.3d at 6.  The First Circuit has noted that this review "is favorable to the

nonmoving party, but it does not give him a free pass to trial."  Hannon v. Beard, 645 F.3d 45, 48

(1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and

material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the

Court may discount "conclusory allegations, improbable inferences, and unsupported speculation." <u>Cochran</u>, 328 F.3d at 6 (quoting <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)).

## III.   DISCUSSION

Each party maintains that it is entitled to summary judgment on the two remaining claims. <u>See</u> [ECF Nos. 36, 69].  For the reasons stated below, the Court finds that there are genuine disputes of material fact concerning both claims that preclude summary judgment in either party's favor.[10]  Accordingly, the motions, [ECF Nos. 35, 68], are <u>DENIED</u>.

### A.   Dormant Commerce Clause

The Commerce Clause provides that [t]he Congress shall have Power ... [t]o regulate Commerce . . . among the several States.  Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a negative aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.  The Framers granted Congress plenary authority over interstate commerce in the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.  This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, . . . has as its corollary that the states are not separable economic units.

<u>Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.</u>, 511 U.S. 93, 98–99 (1994) (alterations in original) (citations and internal quotation marks omitted).

### 1.   Pike Remains the Applicable Legal Standard

The parties disagree about the legal standard that governs A4A's dormant Commerce Clause claim.  A4A asserts that because the MESTL is not facially discriminatory (i.e., treats in-state employers and out-of-state employers equally) and has only indirect effects on interstate

---

[10] Neither party has sought, or argued that it is entitled to, a jury trial.  For that reason, the Court will serve as factfinder.

commerce, the statute violates the dormant Commerce Clause if it places an undue burden on interstate commerce.  [ECF No. 36 at 9; ECF No. 87 at 5–8].  A4A believes that, to assess whether a burden is "undue," the Court must weigh the MESTL's burdens against its putative benefits.  [ECF No. 36 at 9].  The AG, on the other hand, takes the position that the Court need not conduct a balancing of burdens and benefits because the statute does not discriminate against interstate commerce and therefore cannot be "undue" as a matter of law.  [ECF No. 69 at 4–7].  For the reasons stated below, the Court agrees with A4A that it must compare the statute's burdens and benefits.

In Pike v. Bruce Church, Inc., the Supreme Court established a framework for evaluating dormant Commerce Clause challenges to facially-neutral state laws.  397 U.S. 137 (1970).  "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  Id. at 142.  Since 1970, the Supreme Court has, on multiple occasions, reiterated that the test articulated in Pike is still applicable to dormant Commerce Clause attacks on non-discriminatory state statutes.  See South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2090–91 (2018) ("Modern precedents rest upon two primary principles that mark the boundaries of a State's authority to regulate interstate commerce.  First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce. . . . State laws that 'regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" (alteration in original) (quoting Pike, 397 U.S. at 142)); Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 353 (2008) ("[T]hat a state law does not amount to forbidden

discrimination against interstate commerce is not the death knell of all dormant Commerce

Clause challenges, for we generally leave the courtroom door open to plaintiffs invoking the rule

in Pike, that even nondiscriminatory burdens on commerce may be struck down on a showing

that those burdens clearly outweigh the benefits of a state or local practice.").  Additionally, the

First Circuit has repeatedly (and relatively recently) confirmed that Pike is still good law.  See

Industria y Distribution de Alimentos v. Trailer Bridge, 797 F.3d 141, 146 (1st Cir. 2015)

("Where we have a facially neutral regulation, . . . the law 'will be upheld unless the burden

imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'"

(quoting Pike, 397 U.S. at 142)); Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28, 33 (1st

Cir. 2007) ("Laws that regulate evenhandedly and only incidentally burden commerce are

subjected to less searching scrutiny under a balancing test, which operates to validate a

challenged regulation unless it burdens commerce in a way that is 'clearly excessive in relation

to the putative local benefits' to be derived therefrom." (quoting Wine & Spirits Retailers, Inc. v.

Rhode Island, 481 F.3d 1, 11 (1st Cir. 2007))); Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d

294, 312 (1st Cir. 2005) (per curiam) ("Under [the Pike] test—to be used when the state statute

at issue regulates evenhandedly and has only incidental effects on interstate commerce—courts

employ a balancing approach whereby they examine whether the state's interest is legitimate and

whether the burden on interstate commerce clearly exceeds the local benefits." (citing Pike, 397

U.S. at 142)).

     Against this backdrop, the Court must determine whether to forgo the Pike balancing test

altogether as the AG argues it should.  To support its position that Pike is inapplicable where a

statute does not impact interstate commerce more than intrastate commerce, the AG relies

primarily on the Seventh Circuit's decision in Hirst v. SkyWest, Inc..  In that case, a group of

flight attendants brought Fair Labor Standards Act ("FLSA") claims, and claims based on state and local wage laws, against the airline that employed them. 910 F.3d 961, 963 (7th Cir. 2018)).[11]  The district court dismissed the complaint, finding that the plaintiffs had failed to adequately allege FLSA violations and that the dormant Commerce Clause barred the state and local wage claims.  Id.  The Seventh Circuit affirmed as to the FLSA claims but reversed as to the others, id., holding that the "Pike balancing [test] is triggered *only* when the challenged law *discriminates* against interstate commerce in practical application," id. at 967 (quoting Park Pet Shop, Inc. v. City of Chicago, 872 F.3d 495, 502 (7th Cir. 2017)).  The AG urges the Court to adopt the Seventh Circuit's reasoning and "not entertain [A4A's] undue burden claim unless a differential impact on interstate v. intrastate commerce is shown."[12]  [ECF No. 69 at 7].

Notwithstanding the AG's argument, the Court finds that the Pike balancing test is applicable here.  The Court is bound by Supreme Court and First Circuit precedent and based on that precedent, it is clear that Pike is still good law in this circuit and that a discriminatory impact on interstate commerce is not required for a successful dormant Commerce Clause challenge. See Wayfair, 138 S. Ct. at 2091 ("State laws that 'regulat[e] even-handedly to effectuate a

---

[11] The AG also cites decisions from the Second, Fifth, and Ninth Circuits, which it contends stand for the proposition that discrimination against interstate commerce is a prerequisite for a dormant Commerce Clause violation.  See [ECF No. 69 at 6 (citing N.Y. Pet Welfare Ass'n v. City of New York, 850 F.3d 79 (2d Cir. 2017), Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n, 945 F.3d 206 (5th Cir. 2019), and Rosenblatt v. City of Santa Monica, 940 F.3d 439 (9th Cir. 2019))].

[12] The AG claims that this would be consistent with the First Circuit's ruling in Houlton Citizens' Coal. v. Town of Houlton, [ECF No. 69 at 7], seemingly relying on the following general statement from that case: "The core purpose of the dormant Commerce Clause is to prevent states and their political subdivisions from promulgating protectionist policies."  175 F.3d 178, 188 (1st Cir. 1999).  The AG's argument regarding Houlton is unavailing because Trailer Bridge, Cherry Hill, and Rowe all post-date Houlton.  Therefore, the First Circuit has continued to apply Pike to dormant Commerce Clause challenges to neutral statutes even after Houlton.

legitimate local public interest . . . will be upheld unless the burden imposed on such commerce

is clearly excessive in relation to the putative local benefits.'" (quoting <u>Pike</u>, 397 U.S. at 142));

<u>Cherry Hill</u>, 505 F.3d at 33 ("Laws that regulate evenhandedly and only incidentally burden

commerce are subjected to less searching scrutiny under a balancing test, which operates to

validate a challenged regulation unless it burdens commerce in a way that is clearly excessive in

relation to the putative local benefits to be derived therefrom." (internal quotation marks

omitted)); <u>Rowe</u>, 429 F.3d at 312 (identifying a <u>Pike</u> theory as an "[a]lternative[]" to a theory

based on discrimination against interstate commerce).

2.   <u>The Court Cannot Conduct the Pike Balancing Test Without a Trial</u>

The First Circuit has described <u>Pike</u> balancing as a three-part test:

> First, [the Court is] to evaluate the nature of the putative local benefits advanced by
> the statute.  Second, [the Court] must examine the burden the statute places on
> interstate commerce.  Finally, [the Court is] to consider whether the burden is
> "clearly excessive" as compared to the putative local benefits.

<u>Rowe</u>, 429 F.3d at 312.[13]

The MESTL is designed to improve health outcomes for the general population, relieve

the burden on Massachusetts' healthcare system, and improve workplace productivity and safety.

The statute (1) guarantees Massachusetts-based employees a certain amount of annual earned

sick leave, (2) allows them to take sick leave more easily, and (3) protects them from reprisal for

---

[13] With respect to putative local benefits, the Court need not and will not assess the wisdom of
the MESTL.  <u>See</u> <u>United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.</u>, 550
U.S. 330, 347 (2007) (declining invitation to "rigorously scrutinize economic legislation passed
under the auspices of the police power"); <u>Rowe</u>, 429 F.3d at 312–13 ("It is not the place of this
court, however, to pass judgment on the wisdom of the policies adopted by the Maine
legislature.").  Similarly, it is immaterial to the analysis whether any of the intended benefits
have been realized.  <u>Id.</u> at 313 ("Furthermore, as the district court points out, under <u>Pike</u>, it is the
*putative* local benefits that matter.  It matters not whether these benefits actually come into being
at the end of the day.").

taking sick leave.  For purposes of assessing the putative benefits, the statute seemingly assumes that: (1) employees will, if able, address their own (and their families') healthcare needs earlier on, thereby hopefully obviating the need for more costly emergency and critical treatment down the line, improving health outcomes and saving time and resources; (2) allowing sick employees to stay home will limit the transmission of infectious diseases; and (3) healthy workers are safer and more productive than workers who are sick but still work because they do not have paid sick leave.  See [ECF No. 69 at 11–12].

Concerning the burden portion of the analysis, A4A makes two primary arguments.  First, that complying with a regulatory patchwork (i.e., the MESTL and other potentially applicable state labor laws) will be a logistical nightmare for the Airlines.  See [ECF No. 36 at 9–13]. Second, that if the Airlines comply with the MESTL, flight crewmembers will take more sick leave and there will be more flight delays and cancelations.  See [ECF No. 87 at 8–9].  Because the Court finds that increased flight delays and cancelations can constitute a burden on interstate commerce and that there is a genuine factual dispute regarding whether the burden here is "clearly excessive" as compared to the MESTL's putative benefits, it does not reach the first argument.[14]  Rowe, 429 F.3d at 312.

---

[14] As to A4A's first burden argument, the parties dispute whether compliance will actually be burdensome and assuming so, whether having to comply with a more complicated regulatory scheme is a legally cognizable burden for purposes of the dormant Commerce Clause.  Compare [ECF No. 36 at 9–13 (citing cases discussing compliance burden in dormant Commerce Clause cases and asserting that "it would be exceptionally burdensome for the [Airlines] to comply with the [MESTL]")], with [ECF No. 69 at 5 (distinguishing A4A's cases)] and [ECF No. 82 at 19–22 (downplaying regulatory complexity of MESTL-compliance)].  Because it does not address this first argument, the Court reserves judgment on both questions but does note that there is some conflicting authority as to whether having to comply with a complex regulatory scheme is a burden on interstate commerce that can support a dormant Commerce Clause claim.  On one hand, the Supreme Court and First Circuit have repeatedly stated that the dormant Commerce Clause does not protect individual firms, like the Airlines, from burdensome and/or costly

As an initial matter, the Court finds that a statute that causes disruptions to and/or delays in interstate travel can impose a burden under the dormant Commerce Clause.  See Kassel v. Consol. Freightways Corp. of Del., 450 U.S. 662, 678–79 (1981) (finding that an Iowa statute restricting the length of vehicles on Iowa highways, which would slow down interstate transportation of goods, violated the dormant Commerce Clause); Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 430 (1978) (concluding that a Wisconsin statute governing the length and configuration of trucks driving in Wisconsin impermissibly burdened interstate commerce because it would interfere with the movement of goods across state lines); Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 529–30 (1959) (invalidating an Illinois statute regulating mudguards on trucks and trailers passing through Illinois because it would significantly disrupt the motor carriers' operations); S. Pac. Co. v. Ariz. ex rel. Sullivan, 325 U.S. 761, 783–84 (1945) (holding that an Arizona statute limiting the length of trains in Arizona contravened the dormant Commerce Clause where it impeded efficient operation of freight and passenger trains).  The AG argues that the purported increase in delays here, unlike the delays and disruptions in these Supreme Court cases, should not be considered a cognizable burden on interstate commerce

---

regulation.  See Exxon Corp. v. Governor of Md., 437 U.S. 117, 127–28 (1978) ("[T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."); Pharm. Rsch. & Mfrs. of Am. v. Concannon, 249 F.3d 66, 84 (1st Cir. 2001) ("[T]he fact that a law may have devastating economic consequences on a particular interstate firm is not sufficient to rise to a Commerce Clause burden."), aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v. Walsh, 538 U.S. 644 (2003).  On the other hand, other courts assessing challenges by airlines to state regulation have found that regulatory compliance is a cognizable burden.  See Hirst v. SkyWest, Inc., No. 15-cv-02036, 2016 WL 2986978, at *10 (N.D. Ill. May 24, 2016) (finding that compliance with "a labyrinth of potentially conflicting wage laws" is "precisely the type of burden on interstate commerce that the Commerce Clause prohibits").  Although the Seventh Circuit subsequently reversed the district court's decision in Hirst, it did not seem to disturb the district court's finding regarding the burden of regulatory compliance, instead holding that as long as both in-state and out-of-state entities were equally burdened, the dormant Commerce Clause was not implicated.  See 910 F.3d at 967.

because the Airlines could avoid any such delays by spending additional money or by adjusting their operations.  See [ECF No. 69 at 10].  This argument fails.  Whether and how easily the Airlines could mitigate any increase in delays speaks to *how* burdensome the statute is rather than to whether a burden exists for dormant Commerce Clause purposes in the first instance.

Accordingly, the critical questions are (1) whether compliance with the MESTL will cause (or already has caused) flight delays and cancelations and (2) if so, whether those flight delays and cancelations impose a burden on interstate commerce that is "clearly excessive" as compared to the MESTL's benefits.  Rowe, 429 F.3d at 312.  Because the Court cannot answer those questions without a trial, summary judgment is inappropriate.

As outlined above, A4A's expert is prepared to testify that (1) if the MESTL applies to the Airlines' Boston-based flight crewmembers, those employees will take more sick leave with little or no notice because the Airlines will have fewer tools at their disposal to police the misuse of sick leave; (2) when flight crewmembers call out sick with little or no notice, flights get delayed and/or canceled; (3) the vast majority of the Airlines' flights have an interstate (or international component); (4) flight delays have a compounding effect (i.e., a delayed departure of one leg of a flight is likely to lead to delays on later legs); and (5) given the volume of air travel, even a slight uptick in delays will adversely impact many interstate travelers.  See [ECF No. 86-1 ¶ 6 (Lee's summary of opinions)].  The AG's experts dispute these opinions, asserting instead that compliance with the MESTL will not lead to increased flight delays and cancelations, and that, even if it does, the resulting delays and cancelations will be minor.  See [ECF No. 70-3 at 10–11 (Tregillis' summary of opinions); ECF No. 70-5 at 9–16 (Akins' summary of opinions)].  Without the benefit of hearing and evaluating the expert testimony (and the testimony of the parties' other witnesses) regarding the impact of the MESTL on airline

operations, the Court cannot credit the opinions of one side's expert(s) over those of the other's and therefore cannot determine whether any burdens (assuming they exist) are "clearly excessive" relative to the MESTL's benefits.[15]  Rowe, 429 F.3d at 312.

Although dormant Commerce Clause cases are often resolved before trial, see Cherry Hill, 505 F.3d 28 (stipulated record); Rowe, 429 F.3d 294 (summary judgment), Air Transp. Ass'n of Am. v. Wash. Dep't of Lab. & Indust., 410 F. Supp. 3d 1162 (W.D. Wash. 2019) (summary judgment), aff'd, No. 19-35937, 2021 WL 2029186 (9th Cir. May 21, 2021), there are some that require a trial, see Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 203 (2d Cir. 2003) (noting that district court held a bench trial to determine whether burdens imposed by New York law concerning the shipping and transporting of cigarettes in New York ran afoul of the dormant Commerce Clause.  Here, because there are factual issues that must be resolved by the Court, the parties' motions for summary judgment as to A4A's dormant Commerce Clause claim, [ECF Nos. 35, 68], are DENIED.

## B.      ADA Preemption

In 1978 . . . Congress enacted the ADA, which sought to promote "efficiency, innovation, and low prices" in the airline industry through "maximum reliance on competitive market forces and on actual and potential competition."  While the ADA did not repeal the predecessor law's saving provision, it included a pre-emption provision in order to "ensure that the States would not undo federal deregulation with regulation of their own."  In its current form, this provision states that "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."

Nw., Inc. v. Ginsberg, 572 U.S. 273, 280 (2014) (citations omitted).

---

[15] The Court declines the AG's invitation to find, based on the summary judgment record, that the increase in delays predicted by A4A's expert is not "clearly excessive" as compared to the MESTL's benefits as a matter of law.  See [ECF No. 91 at 7–9].

1.     <u>Schwann and the MDA Cases Provide the Applicable Legal Standard</u>

The parties disagree about what legal standard applies to A4A's ADA preemption claim. A4A asserts that any state statute that significantly impacts (or has the logical effect of significantly impacting) an airline's prices, routes, or services is preempted by the ADA.  <u>See</u> [ECF No. 87 at 15–16; ECF No. 94 at 6].  The AG counters that unless a state statute directly regulates how an airline provides services, sets prices, or chooses routes (as opposed to merely regulating how airlines behave as employers), there is no ADA preemption.  <u>See</u> [ECF No. 69 at 14; ECF No. 91 at 10–11].

A4A relies primarily on three relatively recent analogous First Circuit decisions that discuss preemption under the Federal Aviation Administration Authorization Act (the "FAAAA").  This statute has a preemption provision with the language "related to a price, route, or service" that is "interpreted identically" to the same language in the ADA's preemption provision.  <u>Mass. Delivery Ass'n v. Coakley</u>, 769 F.3d 11, 17 (1st Cir. 2014) ("<u>MDA I</u>").

In <u>MDA I</u>, the issue before the First Circuit was whether the FAAAA preempted provisions of the Massachusetts independent contractor statute as applied to certain motor carriers.  769 F.3d at 14.  The court began its analysis by noting that the standard is broad:

> To trigger preemption under the FAAAA, a state law must relate[ ] to a price, route, or service of a motor carrier.  The phrase related to . . . embraces state laws having a connection with or reference to carrier rates, routes, or services, whether directly or indirectly.  Under this rubric, a state statute is preempted if it expressly references, or has a significant impact on, carriers' prices, routes, or services.
>
> The related to test is purposefully expansive.

<u>Id.</u> at 17–18 (alteration in original) (citations and internal quotation marks omitted).  Although broad, preemption is not total, and "[s]tate laws whose effect is only tenuous, remote, or peripheral are not preempted."  <u>Id.</u> at 18 (internal quotation marks omitted).  With regard to evaluating preemption-based challenges, the court instructed as follows:

> First, a statute's potential impact on carriers' prices, routes, and services can be sufficient if it is significant, rather than tenuous, remote, or peripheral.  We have previously rejected the contention that empirical evidence is necessary to warrant FAAAA preemption, and allowed courts to look[ ] to the logical effect that a particular scheme has on the delivery of services or the setting of rates.  Second, this logical effect can be sufficient even if indirect, as described above.

Id. at 21 (alterations in original) (citations and internal quotation marks omitted).  Finally, the court specifically rejected the attorney general's argument that generally-applicable labor laws, which do not target a particular area of federal authority, should be excluded from preemption because such statutes have an impact that is *per se* tenuous or remote.  Id. at 18–20.  Instead, the court held that courts must treat those statutes like all others, by "carefully evaluat[ing] [them] for an impermissible effect on carriers' prices, routes, and services."  Id. at 20.  With respect to that case, the First Circuit reversed and remanded because the district court failed to "sufficiently credit the broad language and legislative history of the FAAAA's express preemption provision."  Id. at 14.

Two years later, in Schwann v. FedEx Ground Package Sys., Inc., the First Circuit again found that the FAAAA preempted a portion of the Massachusetts independent contractor statute as applied to a carrier.  813 F.3d 429, 432 (1st Cir. 2016).  In that case, the court largely reiterated the principles set forth in MDA I, but also made a number of additional points, including about the kinds of statutes that are not preempted:

> As examples of such unpreempted laws, the Supreme Court has pointed to laws against gambling and prostitution, and state regulation that broadly prohibits certain forms of conduct and affects, say, truckdrivers, only in their capacity as members of the public (e.g., a prohibition on smoking in certain public places).  These examples demonstrate both that there is a limit to the preemptive scope of [the FAAAA's preemption provision] and that one must move quite far afield to confidently reach that limit.  Exactly where the boundary lies between permissible and impermissible state regulation is not entirely clear.

Id. at 436–37 (citations and internal quotation marks omitted).

A few months after deciding Schwann, the First Circuit issued its second opinion in the Massachusetts Delivery Association ("MDA") case, which affirmed the district court's finding that a certain aspect of the Massachusetts independent contractor statute was preempted by the FAAAA.  Mass. Delivery Ass'n v. Healey, 821 F.3d 187, 189 (1st Cir. 2016) ("MDA II").  In so holding, the First Circuit rejected the attorney general's invitation to reconsider Schwann, expressly noting that the out-of-circuit cases relied upon by the attorney general had been considered and rejected.  See id. at 192.

Taken together, MDA I, MDA II, and Schwann make clear that (1) the Court must carefully evaluate the MESTL, even though it is a generally-applicable labor law, to determine its impact on airline prices, routes, or services; (2) if the MESTL has had a significant impact on airline prices, routes, or services, it is preempted by the ADA; (3) if the MESTL's potential impact on airline prices, routes, or services is significant, as opposed to tenuous, remote, or peripheral, it is preempted by the ADA; (4) it is immaterial whether the impact is direct or indirect; and (5) empirical evidence is not required because the Court may properly focus on the logical effect of the MESTL.

Notwithstanding these cases, the AG persists in arguing in favor of her preferred standard.  First, she describes Schwann and MDA II as "wrongly decided," and argues that because they dealt with an "anomalous state employment law," they are not applicable to the instant dispute.  [ECF No. 69 at 16 n.9].  Second, she points to out-of-circuit cases which she contends stand for the proposition that state laws regulating carriers "in their capacity as employers" are not preempted by the ADA or FAAAA.  [Id. at 15–16 (citing cases from Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits)].  Third, she cites to Tobin v.

Fed. Express Corp., a First Circuit ADA preemption case, which she believes supports her position. [Id. at 14].

Most importantly, with respect to Schwann and MDA II, regardless of whether the First Circuit's decisions were "wrong[]," [ECF No. 69 at 16 n.9], the Court is bound by them. Further, the Court does not read those cases as narrowly as the AG seems to. To the contrary, in MDA I, the First Circuit stated bluntly that courts must meaningfully engage with any state statute subject to a preemption challenge. 769 F.3d at 20. Moreover, the statute at issue in those cases—which regulates when employers can characterize workers as independent contractors as opposed to employees—is not dissimilar to the MESTL, which regulates how the Airlines must treat their employees. In fact, the Schwann court labeled the statute at issue in that case "a generally applicable law regulating the relationships between businesses and persons who perform services for those business," 813 F.3d at 437, which is similar to how the AG characterizes the MESTL, see [ECF No. 69 at 20 ("[T]he [M]ESTL . . . does [no] more than regulate the employment relationship.")].

With respect to the out-of-circuit cases, the AG is essentially rehashing the arguments that her office has made to the First Circuit in previous cases and that the First Circuit has repeatedly rejected. See MDA I, 769 F.3d at 18–20 (noting the attorney general's request for "a categorical rule against preemption of 'background' labor laws," discussing the Ninth and Seventh Circuit cases cited by the attorney general, and "refus[ing] the . . . invitation to adopt such a categorical rule"); see also MDA II, 821 F.3d at 192 (declining the attorney general's request to reconsider Schwann and noting that cases from other circuits, allegedly inconsistent with Schwann, had already been considered). Because the Court is bound by existing First

Circuit precedent, unless and until the First Circuit adopts a different approach, the views of other United States Courts of Appeals regarding ADA preemption are immaterial.

As to Tobin, the AG asserts that the following sentence supports her argument that the MESTL is not preempted as a matter of law: "we drew the preemption 'dividing line' between state laws that regulate 'how [a] service is performed' (preempted) and those that regulate how an airline behaves as an employer or proprietor (not preempted)."  775 F.3d 448, 456 (1st Cir. 2014) (alteration in original) (quoting DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 88 (1st Cir. 2011)).  The Court disagrees.  Schwann and MDA II were both decided after Tobin, and in both cases, the statute at issue, Massachusetts General Laws Chapter 149, § 148B, regulated how the carriers behaved as employers (i.e., whether they could treat deliverers and couriers as independent contractors as opposed to employees), but was still found to be preempted because the statute would also have had a significant impact on the carriers' provision of services.  Here, too, A4A's contention is that services will be impacted if the Airlines are required to comply with the MESTL.

Thus, the Court will, as it must, apply the standard set forth in Schwann and the MDA cases in assessing A4A's ADA preemption claim.

> 2. The Court Cannot Determine Whether the ADA Preempts the MESTL
>    Without a Trial

During the motion hearing, A4A clarified that its ADA preemption claim is limited to two provisions of the MESTL: (1) the limitations on an employer's ability to require verification from employees taking sick leave and (2) the restrictions on factoring sick leave absence into employee discipline.  Additionally, A4A stated that its challenge to the MESTL is based on the

statute's impact on the Airlines' services, rather than their prices or routes.[16]  Accordingly, the question before the Court is whether those two provisions of the MESTL have had or logically will have a significant impact on the Airlines' services.  See MDA I, 769 F.3d at 21.

For essentially the same reasons discussed in connection with A4A's dormant Commerce Clause claim, see supra Section III.A.2, the Court cannot answer that question without a trial. "Exactly where the boundary lies between permissible and impermissible state regulation is not entirely clear."  Schwann, 813 F.3d at 437.  As detailed above, the parties dispute whether compliance with the MESTL has had or will have any impact on flight delays and cancelations and, assuming there is an impact, whether that impact is significant.[17]  The Court cannot resolve those disputes based on the record before it and without the benefit of being able to assess witness credibility at trial.  Accordingly, the parties' motions for summary judgment on the ADA preemption claim, [ECF Nos. 35, 68], are DENIED.

## IV.      CONCLUSION

For the reasons stated above, both motions, [ECF Nos. 35, 68], are DENIED.

**SO ORDERED.**

June 3, 2021                                                    /s/ Allison D. Burroughs
                                                               ALLISON D. BURROUGHS
                                                               U.S. DISTRICT JUDGE

---

[16] A4A does, however, take the position that to mitigate the MESTL's effect on their services, the Airlines might need to take action that would impact prices and/or routes.

[17] The Court acknowledges that empirical evidence is unnecessary and that a potential impact is sufficient so long as it is "significant, rather than tenuous, remote, or peripheral."  MDA I, 769 F.3d at 21.  The Court cannot, however, determine whether the potential impact of the MESTL is significant as opposed to tenuous, remote, or peripheral based on the record before it.