UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AIR TRANSPORT ASSOCIATION OF            :
AMERICA, INC. d/b/a AIRLINES FOR
AMERICA,                                :

                            Plaintiff,            :      Civil Action
                                        No. 18-10651-ADB

          v.                                  :

MAURA HEALEY, in her official           :
capacity as Attorney General,
Commonwealth of Massachusetts,          :

                        Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PARTIES' JOINT PRETRIAL MEMORANDUM

## TABLE OF CONTENTS

I.      Concise Summary of the Evidence .......................................................................1

    A.      Plaintiff's Summary: ..............................................................................1

        1.      MESTL Is Preempted By The Airline Deregulation Act............................2

        2.      MESTL Violates The Dormant Commerce Clause ....................................4

    B.      Defendant's Summary:...........................................................................5

        1.      Preemption Claim ......................................................................5

        2.      Commerce Clause Claim ...........................................................7

II.     Fact Established By Pleadings, Stipulation, Or Admissions Of Counsel ..........................8

    A.      Agreed-To Facts Established By  Pleadings, Stipulation, Or Admissions Of Counsel ........................................................................8

    B.      Plaintiff's Additional Facts Established By  Pleadings, Stipulation, Or Admissions Of Counsel ...................................................11

III.    Contested Issues Of Fact.................................................................................12

    A.      Plaintiff's Contested Issues of Fact .......................................................12

    B.      Defendant's Contested Issues of Fact.....................................................12

IV.     Jurisdictional Questions .................................................................................13

V.      Questions Raised By Pending Motions...............................................................13

    A.      Plaintiff's Pending Motions:..................................................................13

    B.      Defendant's Pending Motions: ..............................................................13

VI.     Issues Of Law, Including Evidentiary Questions ..................................................14

    A.      Plaintiff's Issues of Law and Evidentiary Issues......................................14

    B.      Defendant's Issues of Law and Evidentiary Issues ...................................14

VII.    Requested Amendments To The Pleadings ..........................................................14

VIII.   Additional Matters To Aid In Disposition Of The Action.......................................14

    A.      Witnesses .........................................................................................14

B.    Demonstratives/Chalks ................................................................15

C.    Exhibits ........................................................................................16

    1.    Identification of Exhibits: .......................................................16

    2.    Use of Exhibits:......................................................................16

    3.    Parties' Agreement Regarding Unobjected-To Exhibits:..........16

    4.    Parties' Agreement Regarding Objected-To Exhibits:..............17

IX.    Probable Length Of Trial ...............................................................17

X.    Names And Addresses Of Witnesses..............................................18

A.    Parties' Witness Lists ...................................................................18

B.    Testimony by Deposition...............................................................18

    1.    Plaintiff's Deposition Designations...........................................18

    2.    Defendant's Deposition Designations ......................................18

    3.    Method For Transmitting Deposition Designations to the Court,
      and the Assessment of Time for Deposition Designations:......20

        (a)    Plaintiff's Position:.........................................................20

        (b)    Defendant's Position: .....................................................21

XI.    List Of Proposed Exhibits..............................................................22

Pursuant to Local Rule 16.5(d) of the Local Rules of the United States District Court for the District of Massachusetts, and in accordance with the Court's Scheduling Order (ECF No. 123), the Parties submit this Joint Pretrial Memorandum in advance of the Final Pretrial Conference:

## I.   Concise Summary of the Evidence

### A.   Plaintiff's Summary:

The Massachusetts Earned Sick Time Law, Mass. Gen. L. ch. 149 § 148C ("MESTL") generally requires employers to provide up to forty hours of paid sick leave per year to their employees who work in Massachusetts.  Under MESTL, employers cannot use an employee's use of MESTL hours as a negative factor in any employment action (*i.e.*, not even to assign a "point" for such absences under the employer's attendance policy – even where otherwise permitted by collective bargaining agreements negotiated by unions on the employee's behalf), nor, in most circumstances, can employers request doctor's notes or absence certificates from health care providers to confirm that the employee's use of MESTL was for an appropriate purpose.  MESTL makes no exception for airline in-flight and ground crewmembers, or, as noted, for employees covered by collective bargaining agreements or other employment policies that already provide generous amounts of paid sick leave.

Plaintiff Air Transport Association of America, Inc. ("A4A") is a trade association which advocates on behalf of its ten member airlines, which include, among others, Alaska Airlines, Inc. ("Alaska"), American Airlines, Inc. ("American"), Delta Air Lines ("Delta"), JetBlue Airways Corp. ("JetBlue"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United") (collectively, the "Airlines").  The evidence presented at trial will prove that A4A is entitled to both a declaratory judgment ruling that MESTL is unlawful as applied to the Airlines' in-flight and ground crewmembers, and an injunction preventing the Attorney General from

enforcing MESTL with respect to such employees.  A4A will establish its entitlement to this relief by demonstrating that MESTL is both preempted by the Airline Deregulation Act, and otherwise violates the Dormant Commerce Clause.

1.    **MESTL Is Preempted By The Airline Deregulation Act**

The ADA includes a broad preemption clause — which the First Circuit has repeatedly held to be "sweeping" and "purposefully expansive" — that prohibits states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier . . . ." 49 U.S.C. § 41713(b); *see, e.g.*, *Massachusetts Delivery Ass'n v. Coakley*, 769 F.3d 11, 17-18 (1st Cir. 2014).  Consistent with the "sweeping" nature of the ADA's preemption clause, this Court has held that MESTL will be preempted if it (i) "has had a significant impact on airline prices, routes, or services" or (ii) if its "potential impact on airline prices, routes, or services is significant, as opposed to tenuous, remote, or peripheral."  ECF No. 103 at 21 (citations omitted).

The logical effect of MESTL, indeed its very purpose, is that in-flight and ground crewmembers will take more sick leave (and thus be absent from work more frequently or for longer periods of time), and the Airlines will not be able to regulate such absences by assessing "points" for them under the Airlines' respective attendance policies, or by requiring doctor's notes or absence certificates to confirm the appropriateness of the sick leave.  In fact, witnesses from the Airlines that are already applying MESTL to their Boston-based employees — principally those who serve as managers of the Airlines' in-flight or ground operations in Boston, or oversee flight scheduling system-wide (including in Boston) — will testify that sick leave has increased in Boston post-MESTL, particularly during times of the year when it is most critical that the Airlines' operations be fully-staffed.  Among other things, these witnesses will testify that employees abuse MESTL during holiday periods, in the summertime and other times of peak air

2

travel, during difficult weather events (like snowstorms), and on the weekends.  Moreover, witnesses from the Airlines that are not currently providing MESTL to their Boston-based employees will similarly testify that the potential and logical effect of MESTL is not only that employees will take more sick leave, but that employees will use MESTL sick leave during the "critical coverage" periods where the Airlines currently assess additional points for absences or where doctor's notes or absence certificates are required.

As a result, A4A will prove at trial that the logical result of MESTL — *i.e.*, increased employee absences — will delay, disrupt, and otherwise directly and significantly impact nearly all of the "services" that the Airlines provide to customers, including significant impacts to the Airlines' check-in and other customer services at airport ticket counters, baggage and cargo services, aircraft maintenance, and boarding procedures (among others).  Ultimately, each of MESTL's impacts on these services (which, alone, compel preemption), negatively affects the on-time departures of airplanes, which is the core transportation service of the Airlines.  In addition to the testimony of the Airlines' witnesses, who will explain that delays and cancellations result when employees call out sick (including when specifically using MESTL), A4A's expert witness, Dr. Darin Lee, will explain that flight delays (measured as 15 minutes or more) are on average markedly more common on days where flight attendant sick leave use is high.  That delays result when relatively more flight attendants call out sick (including based on MESTL) is not surprising for a number of reasons, including because federal regulations require a minimum number of flight attendants on board before a flight can take off.

For these and other reasons to be explained at trial, A4A will prove that MESTL squarely fits within the "sweeping" scope of the ADA's preemption clause and that its application to the Airlines' employees should therefore be preempted.

2.      **MESTL Violates The Dormant Commerce Clause**

The "central rationale" of the dormant Commerce Clause is "to foster economic integration and prevent local interference with the flow of the nation's commerce." *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 8 (1st Cir. 1992) (citations omitted).  In determining whether applying MESTL to the Airlines' in-flight crewmembers violates the dormant Commerce Clause, this Court must:  (i) "evaluate the nature of the putative local benefits advanced by [MESTL]"; (ii) "examine the burden [MESTL] places on interstate commerce"; and (iii) "consider whether the burden is 'clearly excessive' as compared to the putative local benefits."  ECF No. 103 at 14 (citations omitted).

At trial, A4A will prove that MESTL will cause (and already has caused) a burden on interstate commerce by disrupting interstate travel, including by causing flight delays and cancellations (including for all of the reasons discussed *supra*).  Importantly, these disruptions do not just affect planes departing Boston.  For example, when a flight is delayed out of Boston because a flight attendant called out sick under MESTL, that delay can and does cascade throughout the Airlines' networks and cause additional downline delays adversely affecting customers throughout the country.  Moreover, when a Boston flight attendant calls out under MESTL mid-trip, that absence can cause disruptions, delays, or cancellations in other locations which, again, cascade throughout the Airlines' networks.  *See* ECF No. 103 at 16 ("[T]he Court finds that a statute that causes disruptions to and/or delays in interstate travel can impose a burden under the dormant Commerce Clause").

At trial, A4A will additionally prove that it will be excessively burdensome for the Airlines to comply with MESTL and all other similar state and local paid sick leave laws (not just those that currently exist, but those that could exist in the future).  Indeed, it is reasonable to expect that in-flight crewmembers may be subject to multiple and conflicting paid sick leave

laws, particularly because (i) it is not unusual for in-flight crewmembers "based" at an airport in one state to live in a different state, and (ii) the assignments for in-flight crewmembers change day-to-day, but almost always require them to perform work on the ground and in the sky above multiple states and localities (even those that the in-flight crewmembers are not "based" in or live in). At trial, A4A will prove that requiring the Airlines to comply with such a regulatory patchwork could create a logistical nightmare and, at a minimum, would be uniquely burdensome to airlines relative to other employers subject to MESTL.

Ultimately, A4A will prove at trial that the burden on interstate commerce is and will be "clearly excessive" as compared to the putative local benefits of MESTL. This is particularly the case because the Airlines already provide far more generous paid sick leave benefits, and other mechanisms to take time off from work to attend to health-related and other personal matters, for their Massachusetts-based in-flight crewmembers than are provided by MESTL.

For these and other reasons to be explained at trial, A4A will prove that MESTL violates the dormant Commerce Clause as applied to the Airlines' in-flight crewmembers.

**B.** **Defendant's Summary**:

The plaintiff, a trade association of airlines, challenges the Massachusetts Earned Sick Time Law ("MESTL") on theories that it is preempted by the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1), and violates the Dormant Commerce Clause.

1.  **Preemption Claim**

The issue for trial on the preemption claim is whether two provisions of the MESTL— specifically, its limitations on an employer's ability to require verification from employees taking sick leave and its restrictions on factoring sick leave absence into employee discipline— have had or logically will have a significant impact on the airlines' services, as opposed to a potential impact that is tenuous, remote, or peripheral. The plaintiff has sought to show that they

5

do through a two-part syllogism: (1) MESTL increases employee abuse of sick leave; and (2) the increase in abuse of sick leave causes flights to be delayed and cancelled.  The evidence will contradict both parts of that syllogism.

First, the evidence will show that the appropriate lens to assess MESTL is "abuse," not "use," of sick time.  The airlines uniformly do not want their workers to work sick.  And of the airlines that have implemented MESTL for Massachusetts-based flight attendants (American Airlines) and ground crew (American and most others participating in the case), the evidence will show there has been no discernable increase in sick leave abuse by Boston-based workers after implementation of MESTL.  Indeed, the evidence will show the contrary—that sick leave use in Boston is lower than that of other airline bases.  One way the evidence will show this is through summary charts that compile system and base-specific sick leave data for American Airlines, the only participating airline that has implemented MESTL for both Massachusetts-based flight attendants and Massachusetts-based ground crew.

The evidence will also show that the airlines misunderstand MESTL, permitting it to be used for purposes that it does not cover, and fail to use tools available to them to curb purported sick time abuse.  The evidence will further establish that many airline workers have incentives not to abuse sick leave.

As to the second part of the syllogism, the evidence will show that any excess absenteeism that the airlines attribute to MESTL does not significantly impact airline services.

As to flight crew, the evidence will refute the plaintiff's contention that sick-related absenteeism is a significant cause of flight delays.  One way the evidence will show this is through summary charts that compile system and base-specific delay performance data for American Airlines, showing that American has not suffered adverse impacts to its services and,

in fact, is doing as well or better in Boston than at its other bases.  The evidence will also show that the airlines enjoy a host of mitigation measures to address absenteeism among flight attendants, and that the airlines regularly utilize those measures to address the various types of delays inherent in the industry.  The evidence will show that the opinion of the plaintiff's expert, Dr. Darin Lee, on this point is flawed and unreliable.

As to ground crew, the evidence will show that sick-related absenteeism is even less directly impactful to on-time performance.  In addition to having similar mitigation measures for ground crew, there are no minimum staffing requirements for ground crew, the ground crew workers' roles are less specialized, and managers have greater flexibility to use employees to cover for one another.  The evidence will also show that Dr. Lee did not conduct any reliable analysis tying ground crew sick leave use to delays and that his opinion as to flight crew is simply inapplicable to ground crew.

Finally, as to both flight and ground crew, the evidence will establish two other points.  First, the evidence will show that airlines want to be operating at Boston's Logan International Airport regardless of MESTL.  Second, the evidence will show that other factors are far more impactful on airlines' services than employee absenteeism—including the airlines' own failure to adequately manage and staff their operations.

2.   <u>**Commerce Clause Claim**</u>

As to the Commerce Clause claim, the issues for trial are: (1) whether compliance with the MESTL will cause (or already has caused) flight delays and cancelations and (2) if so, whether those flight delays and cancelations impose a burden on interstate commerce that is 'clearly excessive' as compared to the MESTL's benefits.

The same evidence described above with respect to the preemption claim will show that compliance with the MESTL has not caused (and will not cause) flight delays and cancellations.

7

Additionally, testimony by academic researchers and individual workers will demonstrate MESTL's ample benefits to employees and the public, significantly outweighing any burden on interstate commerce.

## II.    Fact Established By Pleadings, Stipulation, Or Admissions Of Counsel

### A.    Agreed-To Facts Established By Pleadings, Stipulation, Or Admissions Of Counsel

The Parties agree that the following facts have been established by pleadings, stipulation, or admissions of counsel:

1.    Plaintiff Air Transport Association of America ("A4A") is a trade association comprised of ten air carriers, including but not limited to, Alaska Airlines, Inc. ("Alaska"), American Airlines, Inc. ("American"), Delta Air Lines ("Delta"), JetBlue Airways Corp. ("JetBlue"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United'). (ECF No. 70 (Defendant's Statement of Material Facts in Support of Her Motion For Summary Judgment ("AG's SMF")) ¶ 1; ECF No. 84 (Plaintiff's Opposition To Defendant's Statement Of Acts, And Statement Of Facts In Support Of Opposition To Defendant's Motion For Summary Judgment ("A4A's Resp. to AG's SMF")) at 1-2.)

2.    A4A's member carriers provide air transportation on an interstate and international, rather than intrastate, basis.  In the first half of 2018, only 5.2% of American's routes were intrastate; the corresponding figures for Southwest and United were 5.5% and 6.5%, respectively.  As of November 2018, JetBlue, the passenger carrier with the most flights to and from Massachusetts, operated only 2 of its 272 routes within the state of Massachusetts, and those two routes were offered only seasonally. (ECF No. 37 (Plaintiff's Statement of Facts pursuant to Local Rule 56.1 ("A4A SMF")) ¶ 2; ECF No. 83 (Defendant's Responses and Objections to Plaintiff's Statement of Material Facts, and Statement of Disputed Materials Facts

("AG's Resp. to A4A's SMF")) at 1.)

3.      The vast majority of passengers who travel domestically with A4A's member carriers do so on interstate itineraries.  In the first half of 2018, 97.7% of American's passengers traveled on interstate itineraries, compared to 96.4% for United and 88.9% for Southwest. (A4A SMF ¶ 3; AG's Resp. to A4A's SMF at 1.)

4.      In the full-year ending at the second quarter of 2018, all of JetBlue's intrastate non-stop flights transported at least some passengers who began or ended their journey outside the Commonwealth of Massachusetts. (A4A SMF ¶ 4; AG's Resp. to A4A's SMF at 1.)

5.      Even the intrastate non-stop flights operated by A4A's member carriers are a vital component of providing interstate and international transportation to passengers. (A4A SMF ¶ 5; AG's Resp. to A4A's SMF at 1.)

6.      A4A's member carriers' pilots and flight attendants (collectively referred to as "flight crew" or "flight crewmembers") spend the vast majority of their working time in federally (or internationally) regulated airspace — and not in any one state, including the state where the employee is "based."  (A4A SMF ¶ 6; AG's Resp. to A4A's SMF at 1.)

7.      In June of 2018, JetBlue's Boston-based flight attendants spent only 17% of their working time in Massachusetts, compared with 22% in other states and 60% in federal or international airspace.  And even when dealing with the same route (e.g., Boston-Seattle), the flight path between those two points can vary significantly from day-to-day. (A4A SMF ¶ 6; AG's Resp. to A4A's SMF at 1.)

8.      A base, also known as a "domicile," is the airport where pilots or flight attendants begin and end their work assignments (also called "trips" or "pairings").  (A4A SMF ¶ 7; AG's Resp. to A4A's SMF at 1.)

9

9.      A flight crewmember's "base" is not necessarily in the same state as his/her residence, and it is not unusual for flight crew based in one state to live in another state. (A4A SMF ¶ 7; AG's Resp. to A4A's SMF at 1.)

10.      Flight crewmembers generally fill base openings via a seniority-based bidding system.  (A4A SMF ¶ 7; AG's Resp. to A4A's SMF at 1.)

11.      A4A's member carriers' ground crew employees (e.g., mechanics, customer service agents, fleet service workers, baggage handlers, and flight dispatchers) generally spend their working time in the state where they are based, but the vast majority of their time is spent servicing aircraft and passengers on interstate and international trips.  (A4A SMF ¶ 8; AG's Resp. to A4A's SMF at 1.)

12.      Only 1.4 of the 435 average daily scheduled flights from Massachusetts offered by the large U.S. passenger airlines in 2018 were wholly within the Commonwealth of Massachusetts, and only 0.05% of the passengers were traveling on a wholly infra-Massachusetts trip. (A4A SMF ¶ 8; AG's Resp. to A4A's SMF at 1.)

13.      In April 2014, New York City implemented the NYC EST.  At that time and up until November 1, 2017, Virgin America operated a flight attendant base at New York City's John F. Kennedy International Airport ("JFK").  Virgin America employed between 34 and 50 flight attendants at its JFK base.  Virgin America had bases in Los Angeles International Airport ("LAX") and San Francisco International Airport ("SFO") at the same time it had its JFK base, with LAX and SFO having no fewer than 400 flight attendants.  (AG's SMF ¶ 62; A4A's Resp. to AG's SMF at 37.)

14.      In April 2015, Virgin America complied with the NYC EST by front loading employees' sick leave with the 40 hours maximum that would be available to employees

under the NYC EST.  This meant that employees could use up to 40 hours of sick leave without being assessed points that could result in discipline under Virgin America's employee sick leave policy. (AG's SMF ¶ 63; AG's Resp. to A4A's SMF at 37.)

15.     On November 4, 2014, the voters of Massachusetts approved the Massachusetts Earned Sick Time Law, G.L. c. 149, § 148C ("MESTL").  (Compl. (ECF #1) ¶ 34; Answer (ECF #17) ¶ 34).

16.     The Attorney General has promulgated implementing rules and regulations.  *See* 940 CMR 33.00 *et. seq.*  (Compl. (ECF #1) ¶ 36; Answer (ECF #17) ¶ 36).

17.     Since implementation, the Massachusetts Attorney General's Office has published Frequently Asked Questions ("FAQs") regarding the Law.  (Compl. (ECF #1) ¶ 47; Answer (ECF #17) ¶ 47).

### B.     Plaintiff's Additional Facts Established By Pleadings, Stipulation, Or Admissions Of Counsel

Plaintiff asserts that the following additional facts have been established by pleadings, stipulation, or admissions of counsel:

1.     It is not unusual for pilots and flight attendants to transfer from one base to another. (A4A SMF ¶ 7; AG's Resp. to A4A's SMF at 1.)

2.     When A4A's member carriers' employees use sick leave, they are paid at their regular rate of pay. (A4A SMF ¶ 12; AG's Resp. to A4A's SMF at 5.)

3.     A4A's member carriers are required by federal law to have a minimum number of flight crewmembers aboard every flight before it can take off. (A4A SMF ¶ 15; AG's Resp. to A4A's SMF at 7-8.)

### III.   Contested Issues Of Fact

#### A.   Plaintiff's Contested Issues of Fact

The list of contested issues of fact, which is not intended to be exhaustive, but rather identifies the key factual questions, is as follows:

1.     Whether MESTL has had a significant impact on airline prices, routes, or services, or whether MESTL's potential impact on airline prices, routes, or services is significant, as opposed to tenuous, remote, or peripheral.

2.     Whether MESTL places a burden on interstate commerce, whether there are putative local benefits advanced by MESTL, and whether the burden MESTL places on interstate commerce is clearly excessive as compared to the nature of the putative local benefits advanced by MESTL.

#### B.   Defendant's Contested Issues of Fact

The defendant prefers to frame the issues for trial in the same manner that this Court did in denying the parties' cross-motions for summary judgment.  Accordingly, the defendant identifies the key factual questions, which are not intended to be exhaustive, as follow:

1.     Whether "two provisions of the MESTL [i.e., (1) the limitations on an employer's ability to require verification from employees taking sick leave; and (2) the restrictions on factoring sick leave absence into employee discipline] have had or logically will have a significant impact on the Airlines' services," as opposed to a potential impact that is tenuous, remote, or peripheral.  ECF #103 at 24 & n.17.

2.     "(1) Whether compliance with the MESTL will cause (or already has caused) flight delays and cancelations and (2) if so, whether those flight delays and cancelations impose a burden on interstate commerce that is 'clearly excessive' as compared to the MESTL's benefits."  ECF #103 at 17.

**IV.**     **Jurisdictional Questions**

The Parties agree that this case presents federal questions and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and that venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  As a result, the Parties are not aware of any jurisdictional issues at this time.

**V.**     **Questions Raised By Pending Motions**

**A.**     **Plaintiff's Pending Motions:**

A4A has no pending motions at this time.  Plaintiff notes that it intends to depose Mr. Sacha Zadmehran on August 31, 2022.  Pursuant to the amended scheduling order, Plaintiff's deadline to file any motion in limine concerning Mr. Zadmehran or the purported Fed. R. Evid. 1006 summaries he prepared is September 6, 2022.  (ECF Nos. 141, 147.)

**B.**     **Defendant's Pending Motions:**

The Attorney General has two pending motions: (1) a Motion in Limine to Exclude Media Articles and Press Statements (ECF #155); and (2) a Motion to Sequester Witnesses (ECF #157).  Plaintiff filed its opposition to the Motion in Limine to Exclude Media Articles and Press Statements on August 29, 2022 (ECF No. 158).  Plaintiff's counsel has informed Defendant's counsel that Plaintiff opposes the relief requested by Defendant's anticipated Motion to Sequester Witnesses, and that Plaintiff will file an opposition in advance of the upcoming Final Pretrial Conference.

In addition, the plaintiff has indicated its intention to depose the defendant's witness Sacha Zadmehran on August 31, 2022.  Pursuant to the amended scheduling order (ECF #141 & 147), the Attorney General's deadline to file any motion in limine concerning the testimony and/or exhibits addressed in that deposition is September 6, 2022.

13

**VI.**     **Issues Of Law, Including Evidentiary Questions**

    **A.**     **Plaintiff's Issues of Law and Evidentiary Issues**

Plaintiff has identified numerous issues of law, including evidentiary issues, in its summary judgment papers, and its objections to Defendant's proposed exhibits and deposition designations (*see infra* Sections X(B)(1) and XI).

    **B.**     **Defendant's Issues of Law and Evidentiary Issues**

The Attorney General has identified numerous issues of law, including evidentiary issues, in her summary judgment motion papers (e.g., ECF #69, 82, 91), her objections to the defendant's proposed exhibits, her pending Motion in Limine to Exclude Media Articles and Press Statements, and her pending Motion to Sequester Witnesses.

**VII.**     **Requested Amendments To The Pleadings**

Neither party seeks to amend the pleadings at this time.

**VIII.**     **Additional Matters To Aid In Disposition Of The Action**

    **A.**     **Witnesses**

Pursuant to Local Rule 43.1(b)(2), the Parties will identify the witnesses they expect to testify live or by deposition, and the anticipated order in which they will testify, no later than seven days before the trial day on which the testimony is expected.  For example, Plaintiff will identify on September 5, 2022 the witnesses it expects to call on September 12, 2022, and Plaintiff will identify on September 6, 2022 the witnesses it expects to call on September 13, 2022, *etc.*

To facilitate Defendant's identification of its witnesses for the first day of Defendant's case, Plaintiff will endeavor to identify the date on which it anticipates resting seven days before the trial day on which Plaintiff anticipates resting.  The day after Plaintiff provides such notice of the date it anticipates resting, Defendant will begin providing notice regarding its anticipated

14

witnesses in accordance with the above procedures.  Similarly, if either party determines that it will not make an opening statement, that party will identify that to the other party by September 5, 2022.

Should unforeseen circumstances arise that change the witnesses anticipated to be called, the anticipated witness order, or the anticipated date of resting identified above, the Parties agree to promptly inform the other party.

### B.   <u>Demonstratives/Chalks</u>

Plaintiff's demonstratives/chalks will be identified with PD numbers, starting with PD001.  Defendant's demonstratives/chalks will be identified with DD numbers, starting with DD001.

The Parties agree to provide a copy of its intended demonstratives/chalks to the other party no later than the day before the party intends to use the demonstrative/chalk, so that the other party may have sufficient time to raise any objections with the Court prior to the use of the at-issue demonstrative/chalk.  The party seeking to use a demonstrative/chalk will provide a color representation of the demonstrative/chalk to the other party in both electronic and paper forms.  Court time spent resolving any objections to demonstratives/chalks shall not count against any party's usable trial time as set forth in Section IX below, but rather shall be deemed part of the 2 hours anticipated for housekeeping and related matters.

Blow-ups or highlights of exhibits or parts of exhibits or testimony are not required to be provided to the other party in advance of their use, as long as the exhibit itself has been properly disclosed pursuant to the requirements set by the Court.  These provisions likewise do not apply to demonstratives/chalks created during testimony or demonstratives/chalks to be used for impeachment only, neither of which need to be provided to the other party in advance of their use.

C.    **Exhibits**

1.    **Identification of Exhibits:**

Plaintiff's trial exhibits will be identified with PX numbers, starting with PX001.

Defendant's trial exhibits will be identified with DX numbers, starting with DX001.  After the

initial exchange of Exhibit Lists on August 5, 2022, any additions or withdrawals to the Parties'

lists will be handled without changing the assigned PX/DX numbers.  Additions will be added to

the end of the list; withdrawals will result in a row that reads "Exhibit Withdrawn".  The Parties

agree to exchange pre-marked exhibits bearing the PX and DX numbers by September 2, 2022.

The Parties agree that any date listed on the exhibit list is neither evidence of nor an

admission of the date of the document, and that failing to list a date is neither evidence of nor an

admission of whether the document is dated.  The Parties agree that any description of a

document on an exhibit list is provided for convenience only and shall not be used as an

admission or otherwise as evidence regarding that document.

2.    **Use of Exhibits:**

Any exhibit, once admitted, may be used equally by each party. The listing of an exhibit

by a party on its exhibit list does not waive any evidentiary or other objections to that exhibit by

the listing party should the opposing party attempt to offer it into evidence.

Each party reserves the right to use documents not set forth in its exhibit list for purposes

of impeachment.

3.    **Parties' Agreement Regarding Unobjected-To Exhibits:**

As reflected in the Parities' limited respective objections to one another's exhibit lists (*see*

Section XI, *infra*), the Parties agreed to mutually release objections to many of the other party's

exhibits in an effort to streamline the trial.  In so doing, the Parties agreed to waive objections to

an agreed-upon set of exhibits, and to make good faith efforts to present each unobjected-to

16

exhibit to a relevant witness if possible.  The Parties also retain the right to move into evidence (without objection) any unobjected-to exhibits.

           4.      **Parties' Agreement Regarding Objected-To Exhibits**:

The Parties agree to provide notice of its intent to use any objected-to exhibit to the other party reasonably in advanced of using the objected-to exhibit so that the other party may have sufficient time to raise objections with the Court prior to the use of the at-issue exhibit.  Court time spent resolving objections to, or discussing the procedures for admission of, exhibits shall not count against any party's usable trial time as set forth in Section IX below, but rather shall be deemed part of the 2 hours anticipated for housekeeping and related matters.

## IX.    Probable Length Of Trial

The Parties anticipate that trial will last two weeks.

The Parties respectfully request that the trial days run from 9:00 a.m. to 4:00 p.m., with a fifteen-minute morning break, a one-hour lunch break, and a fifteen-minute afternoon break each day (*i.e.*, thus leaving 5 hours and 30 minutes of trial time per day).  With that requested schedule in mind, the Parties estimate that there will be 55 hours of trial time over the two-week trial.  The Parties also estimate that there may be 2 hours of trial time dedicated to matters such as housekeeping, resolution of objections, *etc.*, which will reduce the expected trial time usable for the presentation of evidence to 53 hours over the two-week trial.  The parties have agreed to divide that time equally, with 26.5 hours of trial time per side.

Each party's usable trial time may include opening statements of up to 30 minutes per party, and will include the time that each party uses with any witness (whether on direct examinations, cross-examinations, re-direct examinations, and re-cross-examinations).  For example, if Plaintiff calls Witness A in its case-in-chief, it will be charged with any time it uses on Witness A's direct and re-direct examination, while Defendant will be charged with any time

17

it uses on Witness A's cross-examination and re-cross-examination.  The Parties agree to confer in good faith throughout trial regarding the time assessed to each party for its ongoing examinations.

The Parties agree to forego any closing arguments during the September 2022 trial. Instead, the Parties propose that the Court enter a post-trial schedule for the submission of proposed findings of fact and conclusions of law, and responses thereto, and thereafter that the Parties be permitted to discuss those submissions at oral argument before the Court (if such oral argument will be of assistance to the Court).

## X.     Names And Addresses Of Witnesses

### A.     Parties' Witness Lists

Plaintiff's witness list is attached hereto as **Exhibit 1** (ECF No. 135).  Defendant's witness list is attached hereto as **Exhibit 2** (ECF No. 134).

### B.     Testimony by Deposition

#### 1.     Plaintiff's Deposition Designations

Plaintiff did not designate any deposition designations for use in its case-in-chief.

#### 2.     Defendant's Deposition Designations

Defendant's current deposition designations, including Plaintiff's objections and counter-designations and Defendant's objections to those counter-designations, are attached hereto as **Exhibit 3**.

The defendant designated deposition testimony of eight deponents—Mark Blaska, Jeffrey Butler, Brady Byrnes, Thomas Cochran, Lindy Johnston, Denia Pisia, Michael Sasse, and Cindi Simone—that the plaintiff ultimately included on its trial witness list.  The defendant has since withdrawn its designations relating to two of those witnesses (i.e., Mr. Butler and Ms. Pisia) and has provisionally withdrawn its designations relating to the other six witnesses.  (Those

designations thus are not reflected in Exhibit 3.)  In the event that the plaintiff does not call one or more of those six witnesses to testify live at trial, the defendant will promptly notify the plaintiff of any deposition testimony related to that witness(es) that the defendant wishes to offer into evidence, and the parties will meet and confer regarding the admission of such deposition testimony into evidence.

The defendant also designated deposition testimony of ten deponents— Mark Kilayko (in his individual capacity), Mark Kilayko (in a corporate representative capacity), Robert Krabbe (in a corporate representative capacity), James Moses, Elizabeth Ryan (in a corporate representative capacity; two volumes), Charles Schubert (in his individual capacity), Charles Schubert (in a corporate representative capacity), Wayne Shaw, Claire Taitte, and Anthony Wafer—that do not appear on any party's trial witness list.  The defendant has since withdrawn its designations relating to four of those deponents (i.e., Ms. Taitte and Messrs. Moses, Shaw, and Wafer), and those designations thus are not reflected in Exhibit 3.  As to those deponents, the Defendant shall identify to Plaintiff whether she is withdrawing any of the disclosed deposition designations that she expects to use at trial, and/or any trial exhibits to be offered through that witness' deposition testimony, by September 9, 2022.  By September 14, 2022, Plaintiff will confirm whether it withdraws any of its prior counter-designations.  Then, the Parties will thereafter confer on all objections to the remaining designated and counter-designated testimony, and trial exhibits to be offered through such testimony.  If good faith efforts to resolve the objections fail, will raise the objections with the Court.  Court time spent resolving objections to, or discussing the procedures for admission of, deposition testimony shall not count against any party's usable trial time, but rather shall be deemed part of the 2 hours anticipated for housekeeping and related matters.

3.      **Method For Transmitting Deposition Designations to the Court,**
        **and the Assessment of Time for Deposition Designations:**

As to all deposition testimony to be offered into evidence following the resolution of any

outstanding objections, the Parties have not been able to agree on how such testimony shall be

presented.  The parties' respective positions are set forth below:

(a)     **Plaintiff's Position:**

The Attorney General has designated hundreds of pages of deposition testimony from six

depositions, which were <u>not</u> taken in this action but were instead taken years ago in connection

with a different action, occurring in a different jurisdiction, concerning a different law.  Even if

the designated deposition testimony were not irrelevant (and it is), it is cumulative:  indeed,

much of the designated deposition testimony concerns generalized information about how flight

schedules are made, how employees can bid and trade schedules, and the time off options that

employees have under the collective bargaining agreements, among other generalized topics.

Each of these are topics that the live witnesses at trial are able to testify about (indeed the

Attorney General explored precisely these same topics at their depositions).  In any event,

Plaintiff timely served its objections to Defendant's voluminous depositions designations, and

made comparatively minor counter-designations.  *See supra*.

Given the large volume of testimony designated by the Attorney General, Plaintiff

initially proposed that any deposition testimony that a party believes should be made part of the

trial record and considered by the Court in rendering its decision should be read into evidence or

played by video (*i.e.*, the same practice that would result if this were a jury trial).  Such a

requirement would ensure that both Parties are judicious with their designations, and would

reduce the number of objections that will need to be ruled on by the Court.  The fact that this is a

bench trial should not permit the parties to inflate the trial record with voluminous deposition

testimony.  Plaintiff proposed this approach (*i.e.*, that all designations be read or played at trial) during a recent meet and confer, and the Attorney General rejected it.

Thereafter, Plaintiff suggested—as a compromise—that if the Parties were permitted to submit their deposition designations to the Court without reading or playing the testimony at trial (as Defendant requests), that the Parties should adjust the estimated trial time per party to give Plaintiff two more hours of trial time than Defendant (*i.e.*, so that Plaintiff would have 27.5 hours of estimated trial time, Defendant would have 25.5 hours of estimated trial time).  This approach is sensible: Defendant has designated three-to-four times more pages of deposition testimony.  If the Parties' designated testimony were actually taken at the trial, it is reasonable to assume that Defendant's designations would take well more than two more hours than the time needed for Plaintiff's counter-designations.  Thus, a two-hour adjustment is more than reasonable.

As a result, Plaintiff requests that either (i) all deposition designations and counter-designations be played or read in Court; or (ii) the estimated trial time per party be adjusted to give Plaintiff 27.5 hours of estimated trial time, and Defendant 25.5 hours of estimated trial time.

### (b)  Defendant's Position:

In the defendant's view, after any objections to proffered deposition testimony have been resolved, transcripts of that testimony should be moved into evidence by the defendant and also filed on the Court's public docket.[1]  Because this is a bench trial, the defendant sees no need to spend valuable trial time orally reading such testimony into the record in open court.

---

[1] The defendant can also provide courtesy copies of those transcripts to the Court as needed.

Because the process of moving deposition transcripts into evidence would consume no meaningful trial time, the defendant believes that it should not be assessed any amount of its 26.5 hours of trial time for doing so.

If, however, the Court disagrees and prefers that deposition testimony be orally read into the record, the assessment of the trial time required to do so would need to be allocated between those portions of the depositions designated by the defendant and those portions of the depositions counter-designated by the plaintiff.

## XI.   <u>List Of Proposed Exhibits</u>

Plaintiff's exhibit list, including Defendant's remaining objections to those exhibits, is attached hereto as **Exhibit 4**.  Defendant's exhibit list, including Plaintiff's remaining objections to those exhibits, is attached hereto as **Exhibit 5**.

Dated:  August 29, 2022

*/s/ Eric A. Haskell*
Matthew Q. Berge (BBO #560319)
Douglas S. Martland (BBO #662248)
Eric A. Haskell (BBO #662248)
Phoebe Fischer-Groban (BBO #687068)
Trini Gao (BBO #707204)
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963 2062
matthew.berge@mass.gov
douglas.martland@mass.gov
eric.haskell@mass.gov
phoebe.fischer-groban@mass.gov
trini.gao@mass.gov

*Counsel for Defendant*
*Maura Healey, in her official capacity as*
*Attorney General, Commonwealth of*
*Massachusetts*

Respectfully submitted,

*/s/ Emily M. Jennings*
James R. Carroll (BBO #554426)
Alisha Q. Nanda (BBO #657266)
Emily M. Jennings (BBO #691652)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
(617) 573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com
emily.jennings@skadden.com

Chris A. Hollinger (*pro hac vice*)
Kristin MacDonnell (*pro hac vice*)
O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111
(415) 984-8700
chollinger@omm.com

Robert A. Siegel (*pro hac vice*)
Karen Gillen (*pro hac vice*)
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000
rsiegel@omm.com
kgillen@omm.com

*Counsel for Plaintiff*
*Air Transport Association of America, Inc.*
*d/b/a Airlines for America*