UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | * | |
| AIR TRANSPORT ASSOCIATION OF | * | |
| AMERICA, INC. d/b/a AIRLINES FOR | * | |
| AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 18-cv-10651-ADB |
| | * | |
| ANDREA JOY CAMPBELL, in her official | * | |
| capacity as Attorney General of the | * | |
| Commonwealth of Massachusetts, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

i

## Table of Contents

I.    INTRODUCTION ................................................................................................ 1

II.   PROCEDURAL HISTORY ................................................................................ 1

III.  FINDINGS OF FACT ......................................................................................... 2

    A.    The Parties ................................................................................................ 2

    B.    The Airlines' Employees and Services ................................................... 2

    C.    The Collective Bargaining Agreements and Attendance Policies ...................... 5

    D.    The Massachusetts Earned Sick Time Law (MESTL) ......................... 8

    E.    Airline Employees Abuse Sick Leave and MESTL ........................... 10

    F.    The Airlines' Mitigation Measures ..................................................... 12

    G.    MESTL's Impact on Employee Sick Rates ........................................ 16

    H.    Employee Absences Negatively Impact Airline Services ................. 18

IV.   CONCLUSIONS OF LAW ............................................................................... 20

    A.    MESTL Will and Has Caused an Increase in Employee Sick Calls ................. 22

    B.    Increased Sick Calls Logically Will Have and Have Had a Significant Impact on the Airlines' Service ................................................................................................. 23

    C.    MESTL Is Preempted in Its Entirety as to Airlines' In-Flight and Ground Crew Employees ............................................................................................................. 25

V.    CONCLUSION ................................................................................................. 26

BURROUGHS, D.J.

## I.        INTRODUCTION

Air Transport Association of America, Inc. d/b/a Airlines for America ("A4A" or "Plaintiff") brought this action against the Attorney General ("Defendant"), alleging that the Massachusetts Earned Sick Time Law ("MESTL"), Mass. Gen. Laws ch. 149, § 148C, is preempted by the federal Airline Deregulation Act (the "ADA"), see 49 U.S.C. § 41713(b).  For the reasons set forth below, A4A has demonstrated that MESTL is preempted as applied to its in-flight and ground employees, and the Court will therefore enter judgment in A4A's favor.

## II.       PROCEDURAL HISTORY

A4A filed this action against the Attorney General, in her official capacity, on April 4, 2018.  [ECF No. 1 ("Compl.")].  The complaint asserts three counts: (i) that MESTL violates the dormant Commerce Clause of the U.S. Constitution ("Count I"), [Compl. ¶¶ 56–63]; (ii) that MESTL is preempted by the ADA ("Count II"), [id. ¶¶ 64–70]; and (iii) that MESTL violates the prohibition against extraterritoriality implicit in the Fourteenth Amendment to the U.S. Constitution ("Count III"), [id. ¶¶ 71–74].  A4A later abandoned its Fourteenth Amendment claim, see [ECF No. 94 at 11 n.4], leaving only the dormant Commerce Clause claim and the ADA preemption claim.

Following discovery, the parties filed cross-motions for summary judgment on both remaining claims, which, after the motions were fully briefed, the Court denied.  See [ECF Nos. 35, 68, and 103].

The case proceeded to trial on the dormant Commerce Clause and ADA counts, and a nine-day bench trial took place between September 12 and September 22, 2022.  [ECF Nos. 173–79, 182–84, 189].  During the trial, A4A called thirteen fact witnesses and one expert witness, and the Attorney General called two fact witnesses, one summary witness, and three expert

witnesses.  At the close of A4A's case-in-chief, the Attorney General moved for judgment as a matter of law, which the Court denied.  [ECF Nos. 180–81].   Both parties filed proposed findings of fact and conclusions of law on November 3, 2022, and the Court thereafter heard closing arguments on November 22, 2022.[1]  [ECF Nos. 204–05, 209].

Having considered the evidence presented at trial, and the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## III.   FINDINGS OF FACT

### A.   The Parties

A4A is a trade association that represents ten member airlines, including, among others, American Airlines, Inc. ("American"), JetBlue Airways Corp. ("JetBlue"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United").  Defendant Andrea Joy Campbell, the Attorney General for the Commonwealth of Massachusetts, is named as Defendant in her official capacity.[2]  As Attorney General, she is charged with enforcing MESTL, and has promulgated rules and regulations thereunder.  See 940 Code Mass. Regs. 33.00 et seq.

### B.   The Airlines' Employees and Services

A4A's member airlines (the "Airlines") operate at airports nationwide, and internationally, including at Boston Logan International Airport ("Logan").  For purposes of this order, the Airlines' employees can be roughly divided into two groups: (i) in-flight employees

---

[1] A4A also filed a response to the Attorney General's post-trial submission.  [ECF No. 207].

[2] At the time this lawsuit was filed, now-Governor Maura Healey was serving as Attorney General of Massachusetts.  In the interim period, Andrea Campbell succeeded to the office of Attorney General, and was automatically substituted as a party.  [ECF No. 211].

(*e.g.*, flight attendants and pilots) and (ii) ground crew (*e.g.*, mechanics, customer service agents, and baggage handlers).

><br>i. <u>In-Flight Employees: Flight Attendants</u>

The Airlines employ thousands of flight attendants who staff both domestic and international flights. Each flight attendant is assigned to a "base" airport, at which they begin and end their work assignments, variously referred to as "trips," "sequences," or "pairings." It is common for a single sequence to include multiple flights either in a single day or over a multi-day period. Several of the Airlines, including American, JetBlue, and United have a flight attendant base at Logan. Others, including Southwest, do not.

Flight attendants assist in providing numerous services to airline passengers including, among others, helping to ensure the reliable and on-time operation of flights. To help ensure on-time flights, flight attendants are generally expected to report to the airport at least one hour prior to departure. Because federal regulations require that a certain number of flight attendants be on-board an aircraft before passengers may board,[3] and because flight attendants must complete several tasks prior to boarding—such as meeting with gate agents to learn whether any customers need special assistance—their on-time arrival to the gate is essential to a flight's on-time departure. Once on-board, but before takeoff, flight attendants provide additional services to passengers that are individually and collectively key to an on-time departure including, for example, conducting an inventory of emergency and catering equipment, assisting customers with seating, stowing luggage, and securing the cabin. After takeoff, flight attendants are tasked

---

[3] For example, there must be at least one flight attendant for every 50 seats, 14 C.F.R. § 121.391, and there must be at least two pilots if the plane is "type certificated for more than one required pilot," is a large plane, or is a "commuter category airplane," <u>id.</u> § 91.531.

with providing food and beverage service and ensuring customers' safety during the flight and upon arrival.

  ii.  <u>Ground Employees</u>

  The Airlines also employ thousands of ground employees (or "ground crew") nationwide. Ground employees typically fall into one of two categories: above-the-wing or below-the-wing.

  Above-the-wing ground employees often work in a customer facing role, whether at the ticket counter, as a gate agent, or in the baggage claim office.  The services they provide include, among others, checking in passengers, checking passengers' bags, scanning boarding passes at the gate, assisting with boarding, and helping to find lost bags.

  Below-the-wing ground employees typically work in more "behind-the-scenes" roles, in baggage rooms, air hangars, and on the ramp.[4]  They assist in sorting, transporting, and loading and unloading baggage, performing maintenance and service repairs on aircraft and various ground equipment, work on "move teams" to tow planes, for example, to and from the gates and to hangars for maintenance,[5] provide de-icing services in winter, provide water and lavatory service to aircraft, and assist aircrafts with taxiing to and from the runway.  Each of these services is also individually and collectively key to the on-time departure of the Airline's scheduled flights.

  Most ground employees are not subject to federal minimum staffing regulations or duty time regulations, and while some ground crew assignments require specialized training, most do

---

[4] Employees working on the ramp, sometimes referred to as "rampers," help to load and unload baggage, and operate machinery that, for example, tow airplanes to and from the gate.

[5] The move teams, in particular, typically consist of three to five employees, depending on the aircraft.

not.[6]  Airlines therefore have, relative to their in-flight crews, greater flexibility in re-assigning ground employees to cover for colleagues who are absent on any given day.

### C.      The Collective Bargaining Agreements and Attendance Policies

The employment terms that govern the majority of the Airlines' in-flight and ground employees are contained in detailed collective bargaining agreements ("CBAs").  The CBAs are typically negotiated by union representatives, who advocate for employee interests.  The CBAs and the policies incorporated into those agreements provide for uniform employment terms across the airline, regardless of where employees are geographically located, with respect to things such as how work schedules are set, trip and shift trading, and vacation, sick time, and other time off.

### i.      Scheduling

The CBAs set forth the various processes for creating employee schedules, which are typically based on seniority.  Flight attendants, for example, submit bids for their desired schedules based on numerous criteria, including how many days or hours they would like to work in a particular month, the days they want to work, trip length, cities where they want to lay over, and the other flight attendants they want to work with.  Ground employees also bid for schedules based on their preferred days off, shift times, and type of work.  For example, a ground crew employee might bid to work at the ticket counter rather than as a gate agent.

After schedules are set, flight attendants and ground crew generally can, and do, trade shifts, and, in the case of flight attendants, trips, with other employees.  These trades happen after employees have been assigned a certain schedule.  Flight attendants and ground employees

---

[6] Some ground employees, for example, mechanics who work on airplanes, are subject to federal regulations.

may also "pick up" "open" trips or shifts, which were not fully staffed initially or have since become open because a colleague called out absent.

    ii.       <u>Sick Leave</u>

The CBAs also typically provide for sick leave in addition to other types of absences, such as vacation, personal or medical leave, bereavement, and unpaid time off.  Most employees accrue between 48 and 96 hours of paid sick leave per year, and unused hours can roll over from year-to-year (maximum accruals across the airlines range from 1,200 to 2,400 hours).  Paid sick hours can generally be used for an employee's personal illness, and certain airlines, such as United, allow some portion of the paid sick hours to be used for a child or spouse's injury or illness.[7]  In contrast, the CBAs generally do not permit employees to use sick leave to attend routine doctor or dental appointments for themselves or for their child, spouse, parent, or in-law.[8] Flight attendants and ground employees are therefore typically expected to schedule such appointments outside of their assigned working hours.  The CBAs discussed at trial also do not explicitly permit employees to use sick leave in response to instances of domestic violence.

    iii.       <u>Attendance Policies</u>

The Airlines also have attendance policies that set forth the Airlines' expectations regarding employee attendance as well as the progressively severe disciplinary measures that the companies may take if employees repeatedly fail to meet those expectations.  These policies are

---

[7] United's CBA limits the amount of sick leave that can be used for a child or spouse's injury or illness to the greater of either three days or the number of days of the affected scheduled flight sequence.

[8] For example, American's in-flight and ground employees and Southwest and United's ground employees cannot use sick leave to attend a doctor's appointment.  United's flight attendants can only use sick leave to attend a dental or doctor appointment if they can show that the doctor does not maintain office hours outside of the flight attendant's time off.

typically included either in the Airlines' CBAs or documents incorporated by reference into those agreements.

The attendance policies usually involve a points-based system, wherein if an employee accrues a certain number of points for arriving late or being absent from work, an airline can implement progressively severe disciplinary measures.  For example, and subject to certain exceptions, if an American flight attendant is absent for between one to six days, they will receive one point.[9]  Pursuant to American's policy, a flight attendant can receive up to three points without any repercussions.  Once a flight attendant receives four points, however, they receive a first warning, and at seven points they receive a second warning.  At nine points the flight attendant is eligible for a final warning, and, if they proceed to accrue a total of 11 points, American may terminate their employment.  Terminations for attendance-based issues, however, are relatively rare across the Airlines.

The attendance policies also generally allow, in certain circumstances, airlines to request that an employee provide a doctor's note when they return from sick leave.  For example, pursuant to JetBlue's "dependability" policy, if a ground employee is absent for more than one day but less than eight days and the employee submits a doctor's note regarding their illness when they return to work, they will receive only one point.  If the employee does not provide a doctor's note upon their return to work, however, they will receive two points.  Other airlines

---

[9] An American flight attendant can be assessed more than one point for an absence of less than six days if, for example, (i) they call out sick with less than two hours before departure or (ii) they call out sick during what are called "critical coverage" periods, such as holidays and school vacations.  In either of those instances, an employee would receive two points rather than one.

require some employees to provide a doctor's note if they call out sick on short notice or during critical coverage periods.[10]

### D.    The Massachusetts Earned Sick Time Law (MESTL)

MESTL, codified at Mass. Gen. Laws ch. 149, § 148C, and its associated regulations, 940 Mass. Code Regs. 33.00 *et seq.*, imposes on certain employers with Massachusetts-based employees obligations regarding earned sick time.  MESTL both (i) requires that employers provide employees with at least one of hour of sick leave for every 30 hours worked, up to 40 hours per year,[11] and (ii) prohibits employers from using an employee's absence, taken pursuant to MESTL, as a "negative factor" in employment decisions, including evaluation, promotion, discipline, or termination.  Mass. Gen. Laws ch. 149, § 148C(d), (h).  MESTL also permits employees to use sick leave in a variety of circumstances, including (i) when the employee or their spouse, child, parent, or spouse's parent is suffering from a medical condition requiring home care or professional care; (ii) to attend routine medical appointments for themselves or certain relatives; and (iii) in response to instances of domestic violence.  Mass. Gen. Laws ch. 149, § 148C(c)(1)–(4).

Pursuant to the applicable regulations, an employee is eligible for MESTL if their "primary place of work" is in Massachusetts, regardless of their employer's location, and there is no carve-out for airline employees or for unionized workers working under a CBA.  940 Mass. Code Regs. 33.03(1).  The Attorney General contends that MESTL applies to the Airlines'

---

[10] For example, American's CBA for ground employees permits the airline to require a doctor's note if employees are absent during certain critical operation periods.  United and JetBlue's attendance policies have similar provisions for their flight attendants.

[11] This allows employers to either establish a system wherein employees accrue MESTL leave incrementally, *e.g.*, accrue one hour for every 30 hours worked, or to credit employees all 40 hours of MESTL leave at the beginning of the year, as is American's practice.

ground crew members who work in Massachusetts and in-flight employees, including flight

attendants, based in Massachusetts.  [ECF No. 205 ¶ 145]; see Mass. Att'y Gen.'s Off., "Earned

Sick Time in Massachusetts Frequently Asked Questions" at 3, available at

https://www.mass.gov/doc/earned-sick-time-faqs/download (updated Sept. 21, 2018).

Notwithstanding the Attorney General's guidance, American is the only carrier that provides to

both its Boston-based in-flight and ground crew employees 40 hours of sick time under MESTL.

It is undisputed that other of A4A's members, for example, United and Southwest, provide 40

hours of earned sick time under MESTL to their Boston-based ground crew, but not to in-flight

personnel.  JetBlue, in contrast, does not comply with MESTL with respect to either its in-flight

or ground crew employees.

MESTL allows employers to discipline employees who abuse or fraudulently use earned

sick time.  940 Mass. Code Regs. 33.03(23).  For example, an employer may discipline an

employee who, without an authorized purpose, uses time accrued under MESTL to be late for

work.[12]  940 Mass. Code Regs. 33.03(16).  An employer may also discipline an employee who

exhibits a clear pattern of using earned sick time on days immediately preceding or immediately

following a weekend, vacation, or holiday, unless the employee provides verification of an

authorized use of earned sick time.  940 Mass. Code Regs. 33.03(24).  Additionally, an employer

can require that an employee provide a doctor's note where the absence exceeds twenty-four

consecutively scheduled work hours or three consecutively scheduled workdays or occurs after

---

[12] MESTL also allows employers to require employees to verify, in writing, that they used
earned sick time for a permissible purpose, so long as the employee is not required to disclose
information regarding the nature of the illness or details of domestic violence. 940 Mass. Code
Regs. 33.06(10).

four unforeseeable and undocumented absences within a three-month period.  940 Mass. Code Regs. 33.06(1).

An employer can also require an employee to provide up to seven days' notice for the foreseeable or pre-scheduled use of earned sick time under MESTL, except where the employee learns of the need within a shorter period.  940 Mass. Code Regs. 33.05(1)(b).  This, however, does nothing to address the common scenario wherein an employee experiences a sudden illness and cannot provide sufficient notice to allow the airline to find a replacement in time to avoid a flight delay or cancellation.

### E.    Airline Employees Abuse Sick Leave and MESTL

Notwithstanding the Airlines' attendance policies, witnesses at trial, including managers from American, JetBlue, Southwest, and United, provided extensive, credible testimony regarding the prevalence of sick leave abuse in the airline industry, including abuse of earned sick time under MESTL.  Witnesses recounted numerous experiences observing and investigating suspected and confirmed sick leave abuse during holidays such as Halloween, Thanksgiving, Christmas, New Years, and the Super Bowl, as well as otherwise unexplained spikes in sick calls on weekends.  One notable example was American's experience over the Halloween weekend in 2021, where high flight attendant sick rates, systemwide, caused the airline to cancel 254 flights on Saturday and 1,000 flights on Sunday due to staffing issues.[13] American's Flight Service Base Manager at Logan, Elena Salinas, also testified to another example of sick leave and MESTL abuse wherein two Boston-based flight attendants travelled to New Zealand and then called in sick for three days under MESTL.  A subsequent investigation

---

[13] American's flights departing from Boston were also affected that weekend due to flight attendants arriving late, calling in sick, or simply not showing up.

revealed that the flight attendants had gone sightseeing on one of the days they called in sick using MESTL leave.

Testimony regarding sick leave abuse by in-flight employees was corroborated by A4A's expert witness, Dr. Darin Lee, who analyzed American's flight attendant daily sick leave rates from January 1, 2016 through March 31, 2018, and found that there was an otherwise unexplained "dramatic spike in sick leave use by American Airlines flight attendants" during the period between December 22 and January 3 in 2017 and 2018 (*i.e.*, during the Christmas and New Years holidays). Dr. Lee also reviewed data reflecting the sick rates for United and Southwest flight attendants and JetBlue and American pilots during August 2017, and found that sick rates peaked on Saturdays and Sundays and were at their lowest during the middle of the week (*i.e.*, Tuesdays, Wednesdays, and Thursdays) and that other than sick leave abuse there is "really no reason why proportionally more airline employees should get sick on [ ] Saturday and Sunday versus the middle of the week . . . ."

In addition, fact witnesses provided specific, credible testimony regarding numerous likely instances of sick leave abuse by ground employees. Examples include a Logan-based American ground employee who repeatedly used sick leave to be absent during the Christmas holiday in 2016, 2017, and 2019, and a United ground employee, also based at Logan, who consistently used MESTL to ensure time off over holidays including Thanksgiving and the Super Bowl. Dr. Lee similarly corroborated these examples, and testified that the data reflecting the sick rate of JetBlue's Boston ground crew had an otherwise unaccounted for spike on Super Bowl Sunday in 2015, 2016, 2017, and 2018 relative to other Sundays in January and February, which further substantiated his opinion that the spikes were caused by sick leave abuse.

F.        **The Airlines' Mitigation Measures**

As employee absences have the potential to cause service disruptions, the Airlines have

developed mitigation measures, in addition to their attendance policies, to encourage regular

attendance.

i.        Flight Attendants

To lessen the number of in-flight employee absences, the Airlines have implemented

several strategies including (i) staffing reserve and standby flight attendants; (ii) reassigning,

drafting, or tagging flight attendants; (iii) assigning managers to fill in for flight attendants; and

(iv) offering premium pay.

Reserve and Standby Flight Attendants:  In addition to assigning flight attendants to work

specific flights, each day the Airlines also staff flight attendants as "at-home reserves," meaning

that the flight attendants are "on call" and may need to step in for flight attendants who call out

sick or are otherwise absent.  At-home reserves are generally required to be able to get to their

base airport within two or three hours if they are needed to fill in.  At-home reserves, however,

are not a fail-safe mitigation measure for airlines experiencing high flight attendant sick rates

because at-home reserve flight attendants also can, and do, call out sick.  United's Managing

Director for Crew Planning, Scheduling, and Administration for Inflight, Michael Sasse, testified

that reserve flight attendants call out sick at a higher rate than flight attendants who are

scheduled to fly.  The pool of at-home reserve flight attendants may therefore be depleted when

flight attendants who are scheduled to fly call out in high numbers in addition to the at-home

reserves calling out sick.  While, in theory, airlines could staff a large enough number of at-home

reserves to ensure that the pool would never be depleted, doing so would likely be both

extremely costly and, as witnesses testified at trial, unpopular amongst flight attendants,

especially those who, because of seniority, are currently staffed on reserve less frequently.

At-home reserves also have limited utility when a flight attendant calls out at the last-minute and there is not enough time for an at-home reserve flight attendant to travel to the airport in time to avoid a delay or cancellation.  To address this issue, airlines also schedule a smaller number of "standby reserves" or "standby flight attendant[s]" who, while not scheduled to fly, are required to come to the airport in uniform and be prepared to replace a late or absent flight attendant when it is too late for an at-home reserve to travel to the airport in time to avoid a service interruption.  Standby reserve flight attendants can also help to avoid delays by, for example, assisting with boarding that otherwise could not begin due to a late or no-show flight attendant.  The CBAs generally also limit the length of time a standby reserve can be staffed to wait at the airport—typically restricted to a total of either four or five hours.

Reassignments and Assigning Managers to Fly:  Airlines may also reassign a flight attendant away from their scheduled shift to cover for an absent colleague (also referred to as "drafting" or "tagging").  This can happen at the beginning of a flight attendant's shift or, in some instances, when a flight attendant completes a trip but is then reassigned to an additional trip.  Witnesses testified that such reassignments are understandably unpopular with flight attendants as they are being forced to work unexpected trips.  Additionally, in rare circumstances during periods of high sick rates, airlines can assign managers to flights to replace absent flight attendants to avoid cancellations.

Premium Pay:  Airlines can also offer premium pay to encourage flight attendants to (i) pick up open trips or (ii) work trips they have already been assigned.  This measure is most often implemented during times when the airlines anticipate an increase in sick calls.  For example, after American had to cancel so many flights over the Halloween weekend in 2021, it anticipated similarly elevated sick rates over the end-of-year holidays.  To avoid that, American offered

flight attendants "upwards of 300 percent" of their usual pay to cover trips during that period.

A4A's fact witnesses consistently testified, however, that offering premium pay is a short-term

solution, and that once airlines cease offering it, sick rates climb again.  Besides being expensive,

witnesses further testified that offering premium pay also leads to flight attendant burnout

because they are incentivized to pick up more shifts than they would typically be scheduled to

work.

    ii.    <u>Ground Crew</u>

Airlines also implement tools to mitigate the impact that ground crew absences have on

operations.  These tools include (i) outage relief; (ii) voluntary and mandatory overtime; and (iii)

reassignment.

<u>Outage Relief</u>: Sometimes referred to as the "resource pool," this tool involves staffing

extra employees on a shift in anticipation of a greater number of call outs.  As with staffing

larger pools of reserve flight attendants, staffing more ground crew employees to increase the

size of the "resource pool" is costly.

<u>Overtime</u>:  Airlines leverage voluntary and mandatory overtime to mitigate the impact of

ground crew employee absences.  The process of soliciting overtime is set forth in the Airlines'

CBAs.  As a first step, the Airlines must typically ask employees to sign up for voluntary

overtime.  If voluntary overtime is not sufficient to cover the number of open positions, the

Airlines can then resort to mandatory overtime.  Mandatory overtime involves the Airlines

requiring employees to continue working after their regular shift ends.  Unsurprisingly, it is

unpopular in addition to being costly.

<u>Reassignment</u>: When faced with high sick rates, the Airlines can also reassign ground

crew from one assignment—*e.g.*, working in the bag room—to another—*e.g.*, working on the

ramp.  For example, United's Director of Airport Operations, Christopher Painter, testified that

when ground crew is short-staffed, United's "number one" approach is to take employees who were scheduled to work as in-bound bag runners, *i.e.*, who are tasked with getting bags from an arriving aircraft to the baggage carousel, and to reassign them to a new task, *e.g.*, working on the ramp to assist departing planes.  That reassignment, however, negatively impacts the service the employee was reassigned away from, *e.g.*, moving bags from arriving airplanes to the baggage carousel, which results in decreased customer service and satisfaction.

iii.    <u>Investigating Potential Sick Leave Abuse</u>

Airlines can also devote resources to investigating potential sick leave or MESTL abuse. As numerous witnesses testified, however, doing so is resource intensive, difficult, and often ineffective.  The primary difficulty with investigating potential sick leave abuse is that when an employee calls and says they woke up feeling sick and cannot come to work, it is difficult for an airline to prove or disprove the employee's claim.  That is true even if the circumstances of the sick call suggest that it is possible, or even likely, that the employee is abusing sick leave.  Given this difficulty, even if airlines invested additional resources in investigating potential abuse, it is unlikely they would have greater success in preventing or proving abuse.  United's Christopher Painter testified that, given the number of absences the airline has, if the airline focused on investigating whether each absence was abuse, the employees who did show up would "be chasing that [investigation] all the time" rather than accomplishing their usual job responsibilities.  Given the challenges of investigating and proving sick time abuse, allocating greater resources to that task would almost certainly be a poor business decision given the competition in the airline industry, the need to control costs, and the near impossibility of proving an employee, in fact, felt healthy when they claim to have felt sick.

### G.    MESTL's Impact on Employee Sick Rates

Notwithstanding the Airlines' mitigation measures, evidence at trial showed that MESTL will lead, and has led, to an increase in the number of airline employees calling out sick.  This is because MESTL (i) increases the number of permissible uses of sick leave, (ii) prohibits airlines from enforcing their points-based attendance policies, and (iii) restricts the scenarios wherein airlines can require employees to provide a doctor's note to support their use of sick leave.

First, MESTL expands the reasons airline employees can use sick leave.  Many airline employees, for example, cannot, pursuant to their CBAs and associated policies, use sick leave to attend a routine doctor's appointment or to care for certain close family members suffering from injury or illness or to respond to instances of domestic violence, but they can use sick leave for any of these things under MESTL.  That MESTL provides additional permissible uses for sick leave logically suggests that sick leave absences will increase as employees take advantage of these opportunities.  This suggestion is further supported by witness testimony and airline data reflecting sick rates before and after MESTL.

American is the only A4A member airline that currently fully complies with MESTL by providing the earned sick leave to both its in-flight and ground crew employees.  American employees were first provided with MESTL leave in the first quarter of 2016.  American has maintained data on the overall sick rate for its Boston-based flight attendants from 2015, before MESTL was implemented, through 2021.  At trial, A4A presented, through the testimony of its Director of Airport Operations, Mark Blaska, an exhibit comparing the overall sick rate of American's Boston-based flight attendants to the overall sick rate of all its flight attendant bases.  In 2015, prior to MESTL, Boston's sick rate was comparable to the system average.  Beginning in the first quarter of 2016, however, there was a significant spike in the Boston sick rate, which

16

largely repeated in 2017, 2018, 2019 and 2020.[14]  This spike corresponds to when American

credits its employees with 40 hours of MESTL leave.[15]  The overall sick rate data clearly

demonstrates an increase post-MESTL in the rate of employees calling out sick.[16]

Second, MESTL prohibits employers from using an employee's use of MESTL leave as a

"negative factor" in a disciplinary decision.  MESTL thus prohibits airlines from assessing an

employee points for an absence as prescribed by their attendance policies.  That MESTL inhibits

airlines from implementing this accountability tool logically supports the conclusion that

implementing the law will cause employees to call out more often since they are immunized

from any discipline.  Moreover, there was considerable, credible testimony that more employees

call out sick when the Airlines' attendance policies are not enforced.  For example, soon after the

---

[14] Notably, there was a much smaller spike in 2021 when American suspended its attendance policy such that Boston-based flight attendants were subject to the same policy as the rest of American's flight attendants.

[15] Although the Attorney General has accurately noted that American is not required to credit its employees 40 hours of MESTL leave at the beginning of the year, and that doing so is a business decision, American's Managing Director supporting flight attendants, Cindi Simone, testified credibly that it would be very difficult for the airline to determine, in real time, when to credit an hour of sick time.  According to Simone, American does not look at the total number of hours flown per flight attendant until the end of the month, but if American did not credit employees leave until then, the Airline could run afoul of MESTL's requirement that an employee be credited an hour of sick leave for every 30 hours worked.  Mass. Gen. Laws ch. 149, § 148C(d)(1).  Simone further testified that it was both administratively easier for American to credit employees all 40 hours in a lump sum, and that doing so was also beneficial to employees who, for example, suffered a serious illness at the beginning of the year.

[16] This is further borne out by data reflecting American's sick rates over the Fourth of July holiday in 2015 through 2021.  In 2015, when MESTL was not available, the sick rate was below the system average.  Then, in 2016, 2017, 2018, and 2019, when MESTL was available, the Boston sick rates were higher (sometimes almost double) than the system average.  In 2020, however, during the pandemic when American was not enforcing its points system and demand for flying was low, Boston's sick rate dropped back below the system average.  Then, in 2021, when the point-system was back in effect system wide, Boston's sick rate again spiked substantially higher than the system average (9.1% vs. 5.6%).

onset of the COVID-19 pandemic, American paused its attendance policy for flight attendants from March 2020 until September 2021, and American's Managing Director of Crew Scheduling, Thomas Cochrane, testified that this caused a nearly two-fold increase in the flight attendant sick rate as compared to historical numbers.[17]  These elevated sick rates, in turn, caused numerous flight delays and cancellations, clearly illustrating the impact of non-enforcement of the attendance policies.

Third, MESTL also limits when an airline can require an employee to provide a doctor's note when they call out sick.  As several witnesses testified at trial, requiring employees to provide doctors' notes has been an effective tool in decreasing the number of employees calling out sick during critical coverage periods.  As just one example, evidence at trial showed that when Southwest requires flight attendants to have a medical verification of their sickness, sick rates drop precipitously.

### H.    Employee Absences Negatively Impact Airline Services

Evidence at trial further showed that in-flight and ground employee absences negatively impact airline services.  With respect to in-flight employees, flight attendants calling in sick at high rates, or at the last minute, routinely causes flights to be delayed or cancelled.[18]  For

---

[17] The increased absences, notably, were not attributable to COVID-related illnesses, because American created a separate pandemic leave option for employees, including flight attendants, who were negatively impacted by the pandemic.  Witnesses from American further testified that, when reviewing the sick rate data, they were able to easily differentiate between COVID-related illness and non-COVID illness and that the two-fold increase in the sick rate was independent of COVID-related absences.

[18] The Court notes, here, that it is unpersuaded by charts prepared by the Attorney General's witness, Sacha Zadmehran, to summarize American's Flight Service Daily Delay Performance ("FSDDP") reports, which were seemingly proffered to suggest that flight attendants' sick calls and delays do not impact the on-time operation of flights.  The FSDDP reports purport to summarize data for the 361-day period between March 21, 2019 and March 15, 2020 but only

example, American's Managing Director of Crew Scheduling, Thomas Cochran, testified about

hundreds of delays and cancellations caused by high flight attendant sick rates during the

summer of 2021, when American's attendance policy was paused, and over Halloween weekend

in 2021.  Similarly, United's Managing Director for Crew Planning, Scheduling, and

Administration for Inflight, Michael Sasse, testified about flight attendant sick calls causing

flight delays and cancellations over Halloween and Thanksgiving of 2020.  Southwest's Director

of In-Flight Crew Planning and Analytics, Lindy Johnston, and JetBlue's In-Flight General

Manager, Adelita Bentley, likewise testified regarding specific instances of flight attendant sick

calls causing flight delays and cancellations.

Witnesses also testified at length regarding delays caused by ground employees' sick

absences.  Among the many examples discussed at trial, United's Director of Airport Operations,

Christopher Painter, testified about a specific instance on December 17, 2020, where so many

ground employees called out sick that he had to cancel four flights because there were not

---

include data for approximately 56% of that time period, *i.e.*, 201 days.  Moreover, as Mr.
Zadmehran admitted on cross examination, numerous of the missing days included holiday
weekends, which, as discussed, often coincide with high rates of sick leave.

To address this apparent weakness in the summary charts, the Attorney General filed a motion
asking the Court to draw an adverse inference and find that the data from the missing days is "in
all ways, consistent" with the FSDDP reports that were produced.  [ECF No. 185 at 2].  For the
following reasons, the motion is DENIED.  Courts may draw an adverse inference when, for
example, "a party fails to produce evidence that exists or should exist and is within the party's
control" but doing so "usually makes sense only where the evidence permits a finding of bad
faith destruction."  Sharp v. Hylas Yachts, LLC, 872 F.3d 31, 42 (1st Cir. 2017) (cleaned up).
The crux of the Attorney General's argument is that the Court should draw certain inferences
about missing data because Plaintiff was not able to produce a complete set of FSDDP reports.
The sanction is not warranted here, however, because (i) there is no suggestion that A4A or
American destroyed or withheld data they possessed and would have been relevant to the
Attorney General's defense and (ii) the Attorney General never requested the data underlying the
FSDDP reports.

enough employees to complete the necessary services.[19]  Painter further testified about flight

delays on February 27, 2021, which were also attributed to ground employee sick calls.  His

testimony was substantiated by an email he received from one of the United supervisors that he

manages, Richard Freddura, stating that the delays were the result of ground employees calling

out sick and otherwise arriving late.  In these instances, United's mitigation measures, including

overtime and staffing employees to its resource pool, did not prevent these flight delays and

cancellations.

Southwest's Boston Station Manager, Alynn Albert, also testified about service impacts

caused by ground employee absences, including a flight delay on August 7, 2021 due to a

"station agent shortage."  She further testified, corroborated by emails related to that delay from

a Southwest customer service supervisor, Denny Contreras, that Southwest managers had used

the mitigation tools available to them to fill the staffing shortage, but were unsuccessful.

IV.      **CONCLUSIONS OF LAW**

A4A argues that MESTL will cause, and has caused, greater employee absences resulting

in service disruptions, such that it falls within the broad scope of the ADA's preemption clause,

49 U.S.C. § 41713(b) and that MESTL violates the Dormant Commerce Clause.  A4A further

asserts that if the Court finds preempted MESTL's provisions including those that (i) allow sick

leave for reasons beyond those allowed by the Airlines' CBAs, Mass. Gen. Laws ch. 149,

§ 148C(c); (ii) prohibit airlines from enforcing their points-based attendance policies, id.

§ 148C(h); and (iii) restrict the instances when airlines can require employees to provide a

doctor's note, id. § 148C(f), then the Court should find MESTL preempted in its entirety.  The

Attorney General responds that (i) MESTL's impact on A4A's members' services is too tenuous

---

[19] Notably, out of the approximately nineteen total employees who called out sick, nine
employees called out sick under MESTL.

to warrant preemption, (ii) MESTL does not violate the Dormant Commerce Clause, and

(iii) even if the Court finds that certain of MESTL's provisions are preempted, those provisions

are severable and MESTL should not be preempted in its entirety.

In its prior order denying the parties' cross-motions for summary judgment, the Court set

forth the legal standard for ADA preemption.  [ECF No. 103 at 19–21].  Drawing from First

Circuit precedent, the Court found that if MESTL has an impact on airline prices, routes, or

services and that such impact is significant, as opposed to tenuous, remote, or peripheral, it is

preempted by the ADA.  [ECF No. 103 at 21 (citing Mass. Delivery Ass'n v. Coakley, 769 F.3d

11, 17–21 (1st Cir. 2014) ("MDA I"); Schwann v. FedEx Ground Package Sys., Inc., 813 F.3d

429, 432, 436–37 (1st Cir. 2016); Mass. Delivery Ass'n v. Healey, 821 F.3d 187, 189, 192 (1st

Cir. 2016) ("MDA II"))].  The Court also concluded that it was immaterial whether MESTL's

impact was direct or indirect and, in addition, that empirical evidence is not required because the

Court may properly focus on the logical effect of MESTL.[20]  [ECF No. 103 at 21].

For the reasons set forth below, the Court finds that MESTL is preempted as applied to

the Airlines' in-flight and ground crew employees.  This conclusion is based on the substantial

evidence presented at trial that showed that MESTL logically will cause, and has caused,

---

[20] In her proposed conclusions of law pertaining to that motion, the Attorney General argued in
favor of an alternate legal standard that the Court considered and rejected at summary judgment.
See [ECF No. 103 at 21–23].  The Court's finding as to the proper legal standard to be applied is
the law of the case and will remain as such through this litigation.  Negron-Almeda v. Santiago,
579 F.3d 45, 50–51 (1st Cir. 2009) (the law of the case doctrine "contemplates that a legal
decision made at one stage of a criminal or civil proceeding should remain the law of that case
throughout the litigation"); Latin Am. Music Co. v. Media Power Grp., Inc., 705 F.3d 34, 40 (1st
Cir. 2013) ("[u]nless corrected by an appellate tribunal, a legal decision made at one stage of a
civil or criminal case constitutes the law of the case throughout the pendency of the litigation."
(quoting Flibotte v. Pa. Truck Lines, Inc., 131 F.3d 21, 25 (1st Cir. 1997)).

increased employee sick calls and, in turn, that these increased employee sick calls logically will cause, and have caused, a significant impact on the Airlines' services.

### A.      MESTL Will and Has Caused an Increase in Employee Sick Calls

As detailed in the Court's Findings of Fact, MESTL allows employees to call out sick for additional reasons beyond those permitted by the Airlines' CBAs and sick leave policies, including to attend routine medical appointments and to care for certain relatives.  It stands to reason, then, that allowing employees to use MESTL to call out sick for additional reasons will cause an increase in the number of employees calling out sick.  The data reflecting the sick rate of American's flight attendants before and after implementing MESTL confirms that MESTL increases the overall number of employees calling out sick.

The Court also found that sick leave abuse is common in the airline industry.  This finding is based on copious witness testimony as well as data from multiple airlines showing otherwise unexplained spikes in sick calls and overall absences during holidays and on weekend days.  Evidence further demonstrated that airlines have been able to reduce the number of absences by using points-based attendance policies and requiring employees to provide doctors' notes to support their use of sick leave.  The effectiveness of such policies was illustrated by, for example, American's experience when it paused its attendance policy during the pandemic, which led to record high sick calls and service disruptions.  This evidence supports the logical conclusion that MESTL, which interferes with the Airlines' ability to use their points-based attendance policies and, in some instances, to require doctors' notes, will cause an increase in absences similar to what American experienced when it put its policy on pause.  Finally, the evidence also showed that airline employees are using, and, in some cases, abusing, MESTL to be absent from work.

The Attorney General contends that MESTL alone is not at fault for the increase in employee absences, and that employee absences are at least partially attributable to the way the Airlines implement the policy.  In particular, she notes that MESTL does not permit employees to engage in sick leave abuse (*i.e.*, to use MESTL leave for an unauthorized reason) and that the Airlines could prevent such abuse by investigating and disciplining suspicious absences. Evidence at trial showed, however, that investigating and proving suspected sick leave abuse is difficult, sometimes verging on impossible, and resource intensive.  As one witness from American explained, "[i]t's very difficult for us to investigate abuse.  If a person tells us they're sick, they call out for a day or two, it's very difficult and would take resources that we don't have.'"

That MESTL will, and has, caused an increase in employee sick calls does not, however, resolve the issue of preemption.  The Court therefore turns to whether the increase in sick calls will have, or has had, a significant impact on the Airlines' services.

### B.  Increased Sick Calls Logically Will Have and Have Had a Significant Impact on the Airlines' Service

The First Circuit has held that the term "service" in the ADA "represents a 'bargained-for or anticipated provision of labor from one party to another,'" and that "'ticketing, boarding procedures, provision of food and drink, and baggage handling' are all included under the mantle of 'service.'"  Tobin v. Fed. Express Corp., 775 F.3d 448, 453 (1st Cir. 2014) (quoting Hodges v. Delta Airlines, Inc., 44 F.3d 334, 336 (5th Cir. 1995) (en banc)).  When considering whether increased sick calls significantly impact the Airlines' services, the Court is therefore not only considering the impact on the timely operation of flights but also whether there is a significant impact to any of the numerous services that airlines provide to their passengers.

The Court's conclusion that increased sick calls and, in turn, MESTL, significantly impacts the Airlines' services is straightforward.  Airlines depend on their employees, both in-flight and ground crew, to provide services to customers, whether it be ticketing, baggage handling, boarding, provision of food and beverages onboard, or on-time departure.  MESTL, in turn, by causing an increase in employees calling out sick, has a clear and direct impact, which is not tenuous, remote or peripheral, on the availability of the Airlines' labor force and therefore their ability to provide these services to customers.  For example, "[i]f flight attendants fail to report to work as scheduled, that directly precludes [the airlines] from being able to operate [their] core service[s] as scheduled."  Delta Air Lines, Inc. v. N.Y.C. Dep't of Consumer Affs., 564 F. Supp. 3d 109, 124 (E.D.N.Y. 2021).  That is equally true for ground crew employees, as their absence impacts the Airlines' ability to get planes in position for on-time boarding, ensure passengers' bags are sorted and loaded onto the correct airplanes, complete required airplane maintenance, and provide any number of additional services that are independently important and also directly impact the on-time operation of flights.  Moreover, that an airline can mitigate the negative repercussions of one employee's absence, in isolation, does not change the fact that the airline is still impacted by that absence.  For example, when one ground employee calls out sick, the airline may be able to replace that employee with an individual from their resource pool. The consequence, however, is that there is now one less employee in the resource pool available to respond to additional call outs or to assist with any number of challenges airlines face on a day-to-day basis, *e.g.*, snowstorms, icy conditions, broken machinery, etc.  Moreover, the Attorney General's argument that an airline could make different decisions with respect to how it provides its services in response to the increase in absences caused by MESTL, *e.g.*, by staffing

24

more reserve flight attendants or more ground crew employees in the "resource pool," simply illustrates the fact that MESTL will, and does, impact the core services the airlines provide.

Accordingly, the Court finds that Mass. Gen. Laws ch. 149, § 148C(c), (h), and (f) are preempted as applied to the Airlines' in-flight and ground employees.

### C.     MESTL Is Preempted in Its Entirety as to Airlines' In-Flight and Ground Crew Employees

Having found preempted the provisions of MESTL that (i) permit employees to use sick leave for reasons additional to those included in airlines' CBAs, (ii) prohibit the enforcement of the points-based attendance systems, and (iii) limit the instances airlines can require employees to provide a doctor's note, the Court considers whether the law is preempted in its entirety or whether those provisions are severable.  The issue of severability is controlled by Massachusetts law.  Schwann, 813 F.3d at 440.  Under Massachusetts law, "[t]he ultimate question on severability is the intent of the Legislature," id. (quoting Peterson v. Comm'r of Revenue, 825 N.E.2d 1029, 1038 (Mass. 2005)), including "whether the structure of the statute allows the valid provisions to stand independent of the invalid, or whether the provisions are so entwined that 'the Legislature could not have intended that the part otherwise valid should take effect without the invalid part,'" id. at 440-41 (quoting Murphy v. Comm'r of the Dep't of Indus. Accidents, 635 N.E.2d 1180, 1183 (Mass. 1994)).

Here, severing the provisions in § 148(c), (f), and (h) of MESTL would render the statute's definitions of "Earned paid sick time" and "Earned sick time" meaningless, as the statute defines both terms as "time off from work that is provided by an employer to an employee . . . that can be used for the purposes described in subsection (c)."  Mass. Gen. Laws ch. 149, § 148C(a).  The Court therefore finds that the preempted provisions, in particular subsection (c), are so entwined with the otherwise presumably valid provisions of § 148C that

the Legislature would not have intended MESTL to survive without them.  Accordingly, because the provisions are not severable, MESTL is preempted in its entirety as applied to the Airlines' in-flight and ground crew employees. [21]

## V.      CONCLUSION

For the reasons discussed herein, the Court concludes as a matter of law that MESTL as applied to the Airlines' in-flight and ground employees is preempted by the ADA.  Accordingly, the Court will enter an injunction prohibiting the Attorney General from enforcing MESTL with respect to such employees.


**SO ORDERED.**

June 2, 2023                                                    /s/ Allison D. Burroughs
                                                               ALLISON D. BURROUGHS
                                                               U.S. DISTRICT JUDGE

---

[21] Because the Court finds that MESTL as applied to the Airlines' in-flight and ground employees is preempted by the ADA, it does not reach the issue of whether MESTL violates the Dormant Commerce Clause.